**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| Estate of Marani Awanis Manook, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:08-cv-00096 |
| | ) | |
| Unity Resources Group and | ) | |
| RTI International | ) | Honorable Paul L. Friedman |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANT RTI'S MOTION (1) TO DISMISS PLAINTIFF'S FIRST AMENDED**
**COMPLAINT, (2) FOR A MORE DEFINITE STATEMENT WITH RESPECT TO**
**COUNTS IV-XVI, AND (3) TO TRANSFER ANY REMAINING CLAIMS**

Defendant RTI International ("RTI"), by counsel, hereby moves this Court (1) pursuant to Federal Rule of Civil Procedure 12, to dismiss Plaintiff's Complaint in its entirety, with prejudice; (2) for a more definite statement with respect to counts IV-XVI; and (3) to transfer any remaining claims.

As detailed in the accompanying Statement of Points and Authorities, RTI's Motion To Dismiss Plaintiff's First Amended Complaint should be granted because: (1) no one is authorized at this time, under the governing law of Iraq and the law of this judicial district, to assert claims on behalf of the Estate of Marani Awanis Manook, and thus all claims fail as a matter of law; (2) this Court lacks subject matter jurisdiction under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, over Counts I, II, and III because the ATS does not apply to alleged violations of the law of nations by corporations; and (3) Counts I, II, and III independently fail as

a matter of law because Plaintiff fails to allege facts that, even if accepted as true, would be sufficient to state a claim of "war crimes."

To the extent this Court does not dismiss Plaintiff's First Amended Complaint in its entirety, RTI moves for a more definite statement with respect to Counts IV-XVI. RTI's request for a more definite statement should be granted because Plaintiff's First Amended Complaint fails to identify the governing law and statutes under which Plaintiff seeks relief, thereby failing to set forth information necessary to allow Defendant to frame a response to Plaintiff's allegations. Alternatively, or in addition, briefing on the parties' proposed choice of substantive law with respect to Counts IV-XVI should be ordered for the same reasons.

Finally, to the extent this Court does not dismiss Plaintiff's First Amended Complaint in its entirety, RTI moves to transfer any remaining claims to the United States District Court for the Eastern District of North Carolina. RTI's motion to transfer should be granted because: (1) strong ties bind the instant dispute to North Carolina, while no meaningful ties connect the dispute to this judicial district; and (2) this case is in its initial stages, so there is no potential for delay if any remaining claims were transferred to North Carolina.

WHEREFORE, for these reasons and for the reasons set forth in RTI's accompanying Statement of Points and Authorities, RTI respectfully requests that its Motion to Dismiss Plaintiff's Complaint in its entirety, with prejudice, be granted.  In the alternative, to the extent this Court does not dismiss the Complaint in its entirety, RTI respectfully requests that this Court order a more definite statement with respect to counts IV-XVI and transfer any remaining claims to the United States District Court for the Eastern District of North Carolina.

Dated:  March 28, 2008                          Respectfully Submitted,

　　　/s/ Eric W. Bloom　　　　　　　　
Eric W. Bloom (Bar No. 417819)
Mark A. Clodfelter (Bar No. 387717)
Karen Sugden Manley (Bar No. 495029)
Nicole Y. Silver (Bar No. 472630)
Sarah E. Saucedo*
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C.  20006
Phone:  (202) 282-5743
Fax:  (202) 282-5100

Mark A. Ash*
SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, LLP
2500 Wachovia Capitol Center (27601)
P.O. Box 2611
Raleigh, NC 27601-2611
Phone:  (919) 821-1220
Fax:  (919) 821-6800

*Counsel for Defendant RTI International*

* Motion for *Pro Hac Vice* pending.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Estate of Marani Awanis Manook,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) ) | **Civil Case No. 1:08-cv-00096** |
| **Unity Resources Group and RTI International** | ) ) ) | **Honorable Paul L. Friedman** |
| **Defendants.** | ) ) ) ) | |

## DEFENDANT RTI'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION (1) TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT, (2) FOR A MORE DEFINITE STATEMENT WITH RESPECT TO COUNTS IV-XVI, AND (3) TO TRANSFER ANY REMAINING CLAIMS

Mark A. Ash*
SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, LLP
2500 Wachovia Capitol Center (27601)
P.O. Box 2611
Raleigh, NC 27601-2611
Phone: (919) 821-1220
Fax: (919) 821-6800

Eric W. Bloom (Bar No. 417819)
Mark A. Clodfelter (Bar No. 387717)
Karen Sugden Manley (Bar No. 495029)
Nicole Y. Silver (Bar No. 472630)
Sarah E. Saucedo*
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 282-5743
Fax: (202) 282-5100

*Counsel for Defendant RTI International*

March 28, 2008

*Motion for Pro Hac Vice pending

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................. 4

ARGUMENT ...................................................................................................... 5

I.    THE FIRST AMENDED COMPLAINT SHOULD BE DISMISSED IN
      ITS ENTIRETY BECAUSE CLAIMS ON BEHALF OF AN ESTATE
      MUST BE — BUT WERE NOT HERE — BROUGHT BY AN
      AUTHORIZED REPRESENTATIVE. .......................................................... 6

      A.   The "Estate" Is Not A Proper Plaintiff. ............................................ 7

      B.   A Foreign Personal Representative Must Comply With Statutory
           Requirements To Establish Her Authority To Act On Behalf Of
           The Estate. .......................................................................................... 8

II.   PLAINTIFF'S ALIEN TORT STATUTE CLAIMS MUST BE
      DISMISSED AS A MATTER OF LAW. ..................................................... 11

      A.   This Court Lacks Subject Matter Jurisdiction Over Counts I, II,
           And III Because The Alien Tort Statute Does Not Apply To
           Alleged Violations Of The Law Of Nations By Corporations. ........... 11

           1.   This Circuit Has Consistently Held That The Law Of
                Nations Does Not Impose The Same Liability On Non-
                State Actors As It Does On State Actors. ................................. 12

           2.   The Supreme Court Has Cautioned Restraint In
                Recognizing New Claims Under The ATS And Suggested
                That Only States, And Not Corporations Or Individuals,
                May Be Liable For Violations Of The Law Of Nations. ........... 15

           3.   This Court Has Heeded The Supreme Court's Admonition
                And Has Exercised Caution And Restraint In Refusing To
                Expand ATS Jurisdiction To Alleged Violations Of The
                Law Of Nations By Corporations. ............................................ 17

      B.   Counts I, II, And III Should Be Dismissed Because They Fail, As
           A Matter Of Law, To Allege Facts Sufficient To State A "War
           Crime." ............................................................................................... 23

i

III.    CONSISTENT WITH FEDERAL RULE OF CIVIL PROCEDURE 12(e),
        THIS COURT SHOULD ORDER PLAINTIFF TO PROVIDE A MORE
        DEFINITE STATEMENT WITH RESPECT TO COUNTS IV-XVI TO
        IDENTIFY THE STATUTES AND THE GOVERNING LAW UNDER
        WHICH PLAINTIFF BRINGS SUIT. ...............................................................31

IV.     IN THE ALTERNATIVE, PLAINTIFF'S COMPLAINT SHOULD BE
        TRANSFERRED TO NORTH CAROLINA. ...................................................33

CONCLUSION......................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.,*
    62 F.3d 1454 (D.C. Cir. 1995) ................................................................32

*Abu Ali v. Gonzales,*
    387 F. Supp. 2d 16 (D.D.C. 2005) ..............................................................6

*Aldana v. Del Monte Fresh Produce, N.A.,*
    416 F.3d 1242 (11th Cir. 2005) ...............................................................28

*Almog v. Arab Bank, PLC,*
    471 F. Supp. 2d 257 (E.D.N.Y. 2007) ........................................................23

*Bell Atlantic Corp. v. Twombly,*
    --- U.S. ---, 127 S.Ct. 1955 (2007) ...........................................................31

*BPA Int'l, Inc. v. Kingdom of Sweden,*
    281 F. Supp. 2d 73 (D.D.C. 2003) ..............................................................6

*Conley v. Gibson,*
    355 U.S. 41 (1957) ...............................................................................31

*\*Doe I v. Exxon Mobil Corp.,*
    393 F. Supp. 2d 20 (D.D.C. 2005) ....................................................... *passim*

*Doe v. Exxon Mobil Corp.,*
    473 F.3d 345 (D.C. Cir. 2007) ................................................................22

*\*Doe v. Islamic Salvation Front,*
    257 F. Supp. 2d 115 (D.D.C. 2003) .......................................................27-28

*\*Estate of Klieman v. Palestinian Auth.,*
    424 F. Supp. 2d 153 (D.D.C. 2006) .......................................................25-26

*\*Estate of Migliaccio v. Midland Nat'l Life Ins. Co.,*
    436 F. Supp. 2d 1095 (C.D. Cal. 2006) ........................................................7

*Fennell v. Monongahela Power Co.,*
    350 F.2d 867 (4th Cir. 1965) ...................................................................8

*Filartiga v. Pena-Irala,*
    630 F.2d 876 (2d Cir. 1980) ..............................................................12, 20

*Gemological Inst. of Am., Inc. v. Thi-Dai Phan,*
    145 F. Supp. 2d 68 (D.D.C. 2001) ........................................................ 34-36

*Guaranty Trust Co. v. York,* 326 U.S. 99 (1945) ........................................... 32

*\*Henson v. W.H.H. Trice & Co.,*
    466 F. Supp. 2d 187 (D.D.C. 2006) ........................................................... 8

*Hilska v. Jones,*
    217 F.R.D. 16 (D.D.C. 2003) .................................................................... 31

*\*Ibrahim v. Titan Corp.,*
    391 F. Supp. 2d 10 (D.D.C. 2005) .................................................... *passim*

*\*In re Sinaltrainal Litigation,*
    474 F. Supp. 2d 1273 (S.D. Fla. 2006) ................................................ 27-28

*Jaffe v. Pallotta TeamWorks,*
    374 F.3d 1223 (D.C. Cir. 2004) ................................................................ 33

*John W. Johnson, Inc. v. Atlantic States Constr. Co.,*
    276 F. Supp. 379 (D. Md. 1967) .............................................................. 34

*Joyner v. Reno,*
    466 F. Supp. 2d 31 (D.D.C. 2006) ........................................................... 34

*Kadic v. Karadzic,*
    70 F.3d 232 (2d Cir. 1995) ........................................................... 20, 23, 29

*Khulumani v. Barclay Nat'l Bank Ltd.,*
    504 F.3d 254 (2d Cir. 2007) .................................................................... 29

*Langford v. Merickel,*
    199 F. Supp. 424 (D. Minn. 1961) ........................................................... 10

*\*McQueen v. Woodstream Corp.,*
    244 F.R.D. 26 (D.D.C. 2007) ................................................................... 10

*Mehinovic v. Vuckovic,*
    198 F. Supp. 2d 1322 (N.D.Ga. 2002) ..................................................... 30

*Mujica v. Occidental Petroleum Corp.,*
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) .................................................... 30

*Nemariam v. Fed. Democratic Republic of Ethiopia,*
    400 F. Supp. 2d 76 (D.D.C. 2005),
    *aff'd on other grounds,* 491 F.3d 470 (D.C. Cir. 2007) .............................. 5

*Perry v. Criss Bros. Iron Works, Inc.*,
741 F. Supp. 985 (D.D.C. 1990) .................................................................32

*Pitney Bowes, Inc. v. U.S. Postal Serv.*,
27 F. Supp. 2d 15 (D.D.C. 1998) ..................................................................5

*Presbyterian Church of Sudan v. Talisman Energy Inc.*,
244 F. Supp. 2d 289 (S.D.N.Y. 2003) .........................................................20

*Reiffin v. Microsoft Corp.*,
104 F. Supp. 2d 51 (D.D.C. 2000) ...............................................................35

*Saleh v. Titan Corp.*,
436 F. Supp. 2d 55 (D.D.C. 2006) ........................................... 11, 15, 19-20

*Sanchez-Espinoza v. Reagan*,
770 F.2d 202 (D.C. Cir. 1985) ..............................................................*passim*

*Sarei v. Rio Tinto, PLC*,
487 F.3d 1193 (9th Cir. 2007) ......................................................................30

*Saunders v. Air Florida, Inc.*,
558 F. Supp. 1233 (D.D.C. 1983) ...................................................................7

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) .......................................................................................6

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) ...............................................................................*passim*

*Sparrow v. United Air Lines, Inc.*,
216 F.3d 1111 (D.C. Cir. 2000) .....................................................................6

*Stoner v. Nat'l Metropolitan Bank*,
77 F. Supp. 699 (D.D.C. 1948) ......................................................................8

*Tel-Oren v. Libyan Arab Republic*,
726 F.2d 774 (D.C. Cir. 1984) ..............................................................*passim*

*Trout Unlimited v. United States Dep't of Agric.*,
944 F. Supp. 13 (D.D.C. 1996) ...............................................................34-36

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006) .......................................................................6

*United States v. Alvarez-Machain*,
504 U.S. 655 (1992) .....................................................................................15

*Van Dusen v. Barrack,*
    376 U.S. 612 (1964) .................................................................................................34

*Walsh v. Ford Motor Co.,*
    588 F. Supp. 1513 (D.D.C. 1984),
    *vacated on other grounds,* 807 F.2d 1000 (D.C. Cir. 1986) ...................................11

*West Virginia Highlands Conservancy v. Johnson,*
    --- F. Supp. 2d ---, 2008 WL 746995 (D.D.C. Mar. 21, 2008) ................................6

*Wilson v. Johns-Manville Sales Corp.,*
    684 F.2d 111 (D.C. Cir. 1982) ...............................................................................32

**STATE CASES**

*Bullard v. Curry-Cloonan,*
    367 A.2d 127 (D.C. 1976) .........................................................................................8

*District of Columbia v. Coleman,*
    667 A.2d 811 (D.C. 1995) .......................................................................................33

*Estrada v. Potomac Elec. Power Co.,*
    488 A.2d 1359 (D.C. 1985) .....................................................................................33

*\*Greycoat Hanover F St. Ltd. P'ship v. Liberty Mut. Ins. Co.,*
    657 A.2d 764 (D.C. 1995) .......................................................................................32

*\*Herbert v. Dist. of Columbia,*
    808 A.2d 776 (D.C. 2002) .......................................................................................33

*\*In re Estate of Monge,*
    841 A.2d 769 (D.C. 2004) .....................................................................................8-9

*\*Lamphier v. Wash. Hosp. Ctr.,*
    524 A.2d 729 (D.C. 1987) .......................................................................................33

*Strother v. District of Columbia,*
    372 A.2d 1291 (D.C. 1977) .......................................................................................7

*Stutsman v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc.,*
    546 A.2d 367 (D.C. 1988) .......................................................................................32

**FEDERAL STATUTES**

Antiterrorism Act of 1991, 18 U.S.C. § 2331(4)(C) ....................................................25

*War Crimes Act of 1996, 18 U.S.C. § 2441 ...............................................................24

*Alien Tort Statute, 28 U.S.C. § 1350 ...............................................................5, 11-12

28 U.S.C. § 1391(a)(3) ..................................................................................34

28 U.S.C. § 1404 ...........................................................................................33

**STATE STATUTES**

*D.C. CODE § 12-101 (2001) ......................................................................7-8

D.C. CODE § 16-2701(a) (2001) ...................................................................32

*D.C. CODE § 16-2702 (2001) ....................................................................7-8

D.C. CODE § 20-101(h) (2001) .......................................................................9

*D.C. CODE § 20-341 (2001) ......................................................................8-10

D.C. CODE § 20-342 (2001) ........................................................................8-9

MINN. STAT. § 573.05 (2000) ........................................................................10

**RULES**

FED. R. CIV. P. 8(a) .......................................................................................31

FED. R. CIV. P. 12(b) ......................................................................................1

FED. R. CIV. P. 12(e) .....................................................................................31

*FED. R. CIV. P. 17 .......................................................................................7-8

**OTHER AUTHORITIES**

DAVID CHUTER, WAR CRIMES: CONFRONTING ATROCITY
   IN THE MODERN WORLD (2003) ..........................................................23, 25, 30

34 C.J.S. *Executors & Administrators* § 916 ...............................................9

Convention for the Amelioration of the Condition of the Wounded
   and Sick in Armed Forces in the Field, Aug. 12, 1949,
   6 U.S.T. 3114, 75 U.N.T.S. 31 (Feb. 2, 1956) ..........................................23

Convention for the Amelioration of the Condition of the Wounded, Sick, and
   Shipwrecked Members of the Armed Forces at Sea, Aug. 12, 1949,
   6 U.S.T. 3217, 75 U.N.T.S. 85 (Feb. 2, 1956) ..........................................23

*Convention Relative to the Protection of Civilian Persons in Time of War,
   Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (Feb. 2, 1956) .........23-25

Convention Relative to the Treatment of Prisoners of War,
    Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (Feb. 2, 1956) ...............................................23

H.R. REP. NO. 104-698 (1996) ....................................................................................24

SEAN D. MURPHY, PRINCIPLES OF INTERNATIONAL LAW 421 (2006) ...........................30

RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971) ................................................33

Pursuant to Federal Rule of Civil Procedure 12(b), Defendant RTI International ("RTI") respectfully submits this Statement of Points and Authorities in Support of its (i) Motion to Dismiss Plaintiff's First Amended Complaint (filed February 11, 2008), (ii) Motion for a More Definite Statement with Respect to Counts IV-XVI, and (iii) Motion to Transfer any remaining claims, if any, to the United States District Court for the Eastern District of North Carolina.

## INTRODUCTION

Defendant RTI, one of the world's leading non-profit research institutes, is "dedicated to improving the human condition by turning knowledge into practice." *See* http://www.rti.org/page.cfm?nav=6. RTI was founded in 1958 by the joint action of Duke University and The Consolidated University of North Carolina. RTI is currently engaged in projects in more than forty countries, in each case tasked with providing research and technical solutions to governments and businesses in the areas of health and pharmaceuticals, education and training, surveys and statistics, advanced technology, democratic governance, economic and social development, energy, and the environment. *Id.* RTI maintains its corporate headquarters in Research Triangle Park, North Carolina. Am. Compl. ¶ 8.

The core professional RTI team consists of thought-leading, internationally-known researchers in multiple disciplines. For the last six years, under a contract with the United States Agency for International Development ("USAID"), RTI has actively worked to improve the management and administration of local, municipal, and provincial governments in Iraq, providing technical assistance and training to local government-elected officials and supporting the establishment of a legal framework for a democratic, representative, and participatory form of decentralized government. *See* http://www.rti.org/page.cfm?nav=377&objectid=91AD4ED9-F623-4C93-8CCF98BA9F7C82F5.

RTI is not a security force. Its personnel in Iraq are not licensed or permitted to carry firearms, and they do not engage in any security operations of any kind. RTI is instead reliant on Unity Resources Group ("Unity"), whom it retained as an independent contractor, to provide protection to RTI personnel in Iraq. In the absence of that protection, RTI either could not perform its mission, or otherwise its personnel would be at a substantially greater risk.

Plaintiff's First Amended Complaint alleges that Unity personnel shot at a vehicle in Baghdad, Iraq, on October 9, 2007, allegedly "for no reason." Am. Compl. ¶ 1. Despite alleging that RTI has performed on the USAID contract since 2001, *id.* ¶ 25, that the relevant events have taken place "during a period of armed conflict," *id.* ¶ 38, and despite the barrage of news media reports (of which this Court may take judicial notice) regarding the daily carnage and escalating death toll in Iraq, the Amended Complaint has alleged during this six-year period only two other incidents — in which a person allegedly was killed and another injured — as support that Unity consists of "mercenaries" and that both Unity and RTI are engaged in "war crimes." *Id.* ¶¶ 16, 17, 19, 20. Indeed, *absent any basis in fact*, and absent any factual allegation to support its conclusory sweeping allegations, counsel for Plaintiff alleges in the First Amended Complaint that the Defendants "failed to investigate" the alleged prior two incidents, *id.* ¶ 20, that the Defendants failed to "properly screen personnel before their hiring," failed to "train and supervise personnel properly," failed to "reprimand for wrongful actions," *id.* ¶ 86, and, again, *absent any factual basis*, that the alleged acts were "deliberate, willful, intentional, wanton, malicious and oppressive." *Id.* ¶ 30.

Should this case not be dismissed by motion, RTI will demonstrate at trial the utter falsity of these allegations. RTI will instead establish that both Unity and RTI have acted responsibly and with restraint, and that Unity's alleged use of force on October 9, 2007, was made necessary

2

because Ms. Manook failed to: (1) obey a clearly-marked sign on the Unity vehicle to avoid approaching; (2) obey hand signals from Unity personnel to stop or slow down her vehicle; (3) react to the flashing of strobe lights by Unity; (4) stop or slow down after Unity fired a signal flare; and (5) otherwise stop her vehicle even after an initial discharge of firearms. The evidence will also show that Unity personnel, fearing a suicide attack in an area of Baghdad in which suicide attacks had been common, discharged their weapons reasonably believing that force was necessary to stop an imminent threat.

Plaintiff's counsel have transformed a tragedy in a distant land, with no connection to this judicial district, into a U.S.-style lawsuit aimed at recovering lots of money based on conclusory allegations in an attempt to meet minimum pleading requirements, notwithstanding the lack of a factual basis, in the hopes of getting to a jury. In fact, as shown below, the allegations, even taken as true, do not give rise to a cognizable claim under which this Court may grant relief. In this regard, RTI respectfully requests the following relief:

- Defendant RTI seeks dismissal of the First Amended Complaint in its entirety because no one is authorized at this time, under the governing Iraqi law and the law of this judicial district, to assert these claims on behalf of the Estate.

- Defendant RTI seeks dismissal of Counts I, II, and III for the further reason that this Court lacks subject matter jurisdiction of these claims, and because the facts, even if accepted as true, do not give rise to a claim of a war crime.

- Defendant RTI seeks an order requiring Plaintiff, pursuant to Federal Rule of Civil Procedure 12(e), to provide a more definite statement with respect to Counts IV-XVI, identifying both the statutes and the governing law under which Plaintiff seeks relief.

- Defendant RTI seeks the transfer of any remaining claims to the United States District Court for the Eastern District of North Carolina on the basis that there is precious little relationship between this judicial district and the dispute.

## STATEMENT OF FACTS

"Defendant RTI International is an American not-for-profit entity that has offices [in] … Research Triangle Park, North Carolina and … Washington, D.C." Am. Compl. ¶ 8. RTI "was formed pursuant to North Carolina law." *Id.* According to Plaintiff, Defendant Unity "provide[s] security services" for RTI. *Id.* ¶ 9. Although the contract between RTI and Unity (the "Contract") makes express that Unity acts as an independent contractor, Plaintiff alleges that Unity "works as an agent for RTI." Am. Compl. ¶ 9.

On the one hand, Plaintiff alleges that RTI "directly oversaw and supervised the work performed by Unity," *id.*, but, on the other hand, simultaneously alleges that RTI did not exercise "*any oversight or control* over the heavily-armed personnel" belonging to Unity. *Id.* ¶ 16 (emphasis added).

Plaintiff alleges that on or about October 9, 2007, the deceased, Marani Awanis Manook, "was driving her car down Karrada Street when Unity Resources Group personnel opened fire on her vehicle," killing Ms. Manook and a passenger in the vehicle. *Id.* ¶ 13. Plaintiff alleges that "[n]either Ms. Manook nor any of her passengers posed any threat to the Unity Resources Personnel." *Id.* ¶ 14. Plaintiff does not allege that *Defendant RTI* personnel fired any shots, or ordered that any shots be fired. Nor does Plaintiff allege that RTI was even present or anywhere near the scene. Plaintiff instead relies on allegations of "agency" and general notions of "supervision" as the alleged basis of RTI's liability, notwithstanding that, according to Plaintiff, RTI provided no "oversight or control" on the date and at the scene in question. *See id.* ¶¶ 9, 16.

4

According to Plaintiff, "Defendants' agents shot and wounded a civilian on Karrada Street" on June 24, 2007, *id.* ¶ 19, and "shot and killed a civilian at a security checkpoint" fourteen months earlier, in or about March 2006. *Id.* ¶ 20. While Plaintiff alleges that "[r]easonable discovery is likely to produce evidence of additional killings," *id.* ¶ 21, Plaintiff fails to allege any incidents of deadly force during the six years RTI has been under contract to the USAID other than the incidents identified above.

From these allegations, Plaintiff seeks recovery in Counts I, II, and III under the Alien Tort Statute ("ATS"),[1] 28 U.S.C. § 1350, alleging that "[d]efendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and constitute war crimes." *See id.* ¶ 31. Plaintiff also alleges a variety of common law tort claims predicated on assault and battery (Counts IV-VI), wrongful death (Counts VII-IX), intentional infliction of emotional distress (Counts X-XII), negligence (Counts XIII-XV), and civil conspiracy (Count XVI). Plaintiff seeks compensatory damages for death, physical, mental, and economic injuries, as well as "punitive damages in an amount sufficient to strip Defendants of all of the revenue and profits earned from their pattern of constant misconduct and callous disregard for human life." *Id.* ¶ 92.

## ARGUMENT

RTI seeks dismissal of the complaint under Federal Rule of Civil Procedure 12 for lack of subject matter jurisdiction and for failure to state a claim. It is well settled that the party invoking the jurisdiction of a federal court bears the burden of establishing the court's jurisdiction. *Nemariam v. Fed. Democratic Republic of Ethiopia*, 400 F. Supp. 2d 76, 80 (D.D.C. 2005), *aff'd on other grounds*, 491 F.3d 470 (D.C. Cir. 2007) (quoting *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998)). Once the court's jurisdiction is

---

[1] The ATS is also sometimes referred to as the Alien Tort Claims Act or ATCA. However, for the sake of consistency, this Statement of Points and Authorities refers to the statute as the ATS, as the Supreme Court did in its landmark ATS case, *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

challenged, the plaintiff, rather than the movant, bears the burden of proof in establishing jurisdiction. *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 79 (D.D.C. 2003). Further, "a plaintiff['s] factual allegations . . . will bear closer scrutiny in resolving a [Rule] 12(b)(1) motion" to dismiss for lack of subject matter jurisdiction, *Abu Ali v. Gonzales*, 387 F. Supp. 2d 16, 17-18 (D.D.C. 2005) (quoted authority and internal quotation marks omitted), and the court may properly consider facts outside of the complaint. *BPA Int'l*, 281 F. Supp. 2d at 80 ("The submission of matters outside the pleadings does not convert a Rule 12(b)(1) motion [for lack of subject matter jurisdiction or a Rule 12(b)(2) motion for lack of personal jurisdiction] to one for summary judgment."); *see also Abu Ali*, 387 F. Supp. 2d at 18.

In ruling on a motion to dismiss for failure to state a claim for relief, a court generally accepts the allegations of a complaint as true. *West Virginia Highlands Conservancy v. Johnson*, --- F. Supp. 2d ---, 2008 WL 746995, *5 (D.D.C. Mar. 21, 2008) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)). Nonetheless, legal conclusions and conclusory allegations need not be accepted as true by the court. *Id.* (citing *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006)).

I.    **THE FIRST AMENDED COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY BECAUSE CLAIMS ON BEHALF OF AN ESTATE MUST BE — BUT WERE NOT HERE — BROUGHT BY AN AUTHORIZED REPRESENTATIVE.**

The instant action is brought by the "Estate of Marani Awanis Manook, Hay Al-Ghadeer 706/18/60, Baghdad, Iraq." Am. Compl. at 1; *see also id.* ¶ 2 (describing Plaintiff as "the Estate of Marani Awanis Manook" and stating that "Ms. Manook was a resident of Baghdad until [her] death"). Because the purported "Plaintiff," the "Estate," lacks capacity or standing to bring the alleged claims, this Court should dismiss the Amended Complaint in its entirety.

6

A.    The "Estate" Is Not A Proper Plaintiff.

The Amended Complaint is purportedly brought by the "Estate." Beyond the signature of counsel, however, the Amended Complaint wholly fails to identify any representative of the estate, much less allege that any person with authority to act on behalf of the estate has in fact authorized the bringing of the suit. Rather than identifying a representative, the case caption provides the former address of the decedent. Any claims on behalf of an estate, however, must be brought by a duly-appointed *representative* of the Estate.

As an initial matter, the Federal Rules require that "[a]n action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a). Thus, under Rule 17(a), the "[e]state cannot be a plaintiff in this lawsuit." *Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*, 436 F. Supp. 2d 1095, 1100 (C.D. Cal. 2006).

Further, in the District of Columbia, both the wrongful death statute and the survival statute require that claims be brought by a representative of the decedent. The District of Columbia's wrongful death statute provides that any wrongful death claim must "be brought *by and in the name of the personal representative* of the deceased person." D.C. CODE § 16-2702 (2001) (emphasis added); *see also Saunders v. Air Florida, Inc.*, 558 F. Supp. 1233, 1234 (D.D.C. 1983). The term "personal representative" "refers only to an officially appointed administrator or executor." *Strother v. District of Columbia*, 372 A.2d 1291, 1296 n.7 (D.C. 1977); *see also id.* at 1296 n.10; *Saunders*, 558 F. Supp. at 1235. Similarly, the District of Columbia's survival statute provides that "on the death of a person in whose favor . . . a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of . . . the legal representative of the deceased." D.C. CODE § 12-101 (2001). Thus, under either of these statutes, "claims must be brought by a representative of the decedent's

estate." *Henson v. W.H.H. Trice & Co.*, 466 F. Supp. 2d 187, 192 (D.D.C. 2006) (citing D.C. CODE §§ 16-2702, 12-101).

**B.    A Foreign Personal Representative Must Comply With Statutory Requirements To Establish Her Authority To Act On Behalf Of The Estate.**

Federal Rule of Civil Procedure 17 provides that the "[c]apacity to sue or be sued" of one "acting in a representative capacity" is determined "by the law of the state in which the district court is held." FED. R. CIV. P. 17(b). Thus, District of Columbia statutes governing the capacity to represent the estate of a foreign decedent apply in this action. *See, e.g., Fennell v. Monongahela Power Co.*, 350 F.2d 867 (4th Cir. 1965) (applying West Virginia statutes). Accordingly, not only must this action be brought by a representative, but also any purported representative must meet the statutory requirements dictated by the law of the District of Columbia.

In the District of Columbia, a "foreign personal representative is appointed to administer the estate of a decedent not domiciled in the District of Columbia, but which has property located here." *In re Estate of Monge*, 841 A.2d 769, 773 (D.C. 2004) (citing D.C. CODE § 20-341(a) (2001). Assuming the Estate of Ms. Manook has property located in D.C.,[2] once duly appointed, a "foreign personal representative may exercise all the powers of such office and may sue and be sued in the District of Columbia, subject to any statute or rule relating to nonresidents." D.C. CODE § 20-342 (2001). To demonstrate that she has authority to administer the estate, the D.C. Code requires that the foreign personal representative comply with certain statutory requirements.

---

[2] Plaintiff's lawsuit pending in D.C. may constitute "property" for the purposes of the D.C. Code. *See, e.g., Bullard v. Curry-Cloonan*, 367 A.2d 127, 132 (D.C. 1976) ("It has been repeatedly held that 'assets,' as applied to decedent's estate, means property, real or personal, tangible or intangible, legal or equitable, which can be made available (to the estate).") (citing *Stoner v. Nat'l Metropolitan Bank*, 77 F. Supp. 699, 700-01 (D.D.C. 1948)).

Unlike in many jurisdictions, in the District of Columbia a representative acting on behalf of a nondomiciliary does not "need to obtain letters[3] from the Superior Court of the District of Columbia." *Estate of Monge*, 841 A.2d at 774 (citing D.C. CODE § 20-341(a)); *see also* 34 C.J.S. *Executors & Administrators* § 916 ("Some statutes authorize a foreign representative to sue, or to be sued, . . . or on complying with certain conditions, to act as a local representative or to perform certain acts, and under such statutes ancillary letters need not be taken out."). However, a foreign personal representative administering an estate "*shall file with the Register a copy of the appointment as personal representative and a copy of the decedent's will, if any, authenticated pursuant to 28 U.S.C. sec. 1738.*" D.C. CODE § 20-341(b) (2001) (emphasis added).

"Upon filing a copy of the appointment as personal representative in another jurisdiction . . . [a] foreign personal representative may exercise all the powers of such office and may sue and be sued in the District of Columbia." *Estate of Monge*, 841 A.2d at 774  (citing D.C. CODE § 20-341(b), 20-342 (internal quotation marks omitted)).  If a representative fails to satisfy section 20-341, a court will not recognize his or her authority.  *See* 34 C.J.S. *Executors & Administrators* § 916 ("[A]ny conditions provided for by . . . statutes must be substantially complied with before a foreign representative will be recognized.").

Under Iraqi law, heirs of the decedent may apply to the responsible court, submit certain required documents (including the death certificate of the decedent and a civil status document identifying surviving family members) to obtain a "Qassam Sharie," translated as an "Heirs Divider."  Declaration of Dr. Adil Sinjakli, ¶ 10.  Only after obtaining a court-issued Qassam Sharie may a duly-appointed heir obtain a power of attorney sufficient to act as a personal

---

[3] *See Estate of Monge*, 841 A.2d 774 at n.14 (explaining that "'[l]etters' are 'the official instrument by which a personal representative is appointed by the Court to administer the estate of a decedent'") (citing D.C. CODE § 20-101(h) (2001))).

representative of the Estate in a legal action. *Id.* ¶ 11; *see also id.* ¶¶ 12-13. Here, there is no evidence or factual allegation that the instant action is authorized. Nor, more importantly, is there any evidence or allegation that a "foreign personal representative administering [the] estate" filed "with the Register a copy of the appointment as personal representative and a copy of the decedent's will, if any, authenticated pursuant to 28 U.S.C. sec. 1738," D.C. CODE § 20-341(b). *See* Affidavit of Karen Sugden Manley, ¶ 4.

Compliance with the relevant District of Columbia statutes not only is required, but is particularly important in a case such as this, which involves a foreign national, thereby implicating a legal system which may approach acting on behalf of an estate quite differently from what would be common in the United States.

Although few cases analyze D.C. CODE section 20-341, this provision is analogous to a Minnesota statute allowing a "foreign executor or administrator [to] commence and prosecute an action in th[e] state, in a representative capacity," but requiring such representative to "file an authenticated copy of his appointment as executor or administrator with the probate court of the county in which such action is to be commenced." MINN. STAT. § 573.05 (2000) (cited in *Langford v. Merickel*, 199 F. Supp. 424 (D. Minn. 1961)). In *Langford*, a federal court dismissed an action because the executrix failed to comply with the Minnesota statute. 199 F. Supp. at 427. As in *Langford*, no party has filed the required documents demonstrating authority to represent the Estate. Accordingly, this Court must dismiss the First Amended Complaint in its entirety for failure to meet the basic statutory requirements of the D.C. Code.

II.   **PLAINTIFF'S ALIEN TORT STATUTE CLAIMS MUST BE DISMISSED AS A MATTER OF LAW.**

    A.   **This Court Lacks Subject Matter Jurisdiction Over Counts I, II, And III Because The Alien Tort Statute Does Not Apply To Alleged Violations Of The Law Of Nations By Corporations.**

This Court lacks subject matter jurisdiction over Counts I, II, and III, because alleged violations of the law of nations by corporations are not cognizable under the Alien Tort Statute, 28 U.S.C. § 1350. This Court and this Circuit have consistently held that only *state actors* can be held liable for violations of the law of nations, except in very narrow circumstances not present here. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984); *Saleh v. Titan Corp.*, 436 F. Supp. 2d 55 (D.D.C. 2006); *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005); *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005). As this Court recently observed, the United States Supreme Court has *confirmed* this Circuit's narrow reading of the ATS, noting that the high Court similarly "suggested that *only states, and not corporations or individuals, may be liable for international law violations*." *Doe I*, 393 F. Supp. 2d at 26 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.20 (2004)) (emphasis added).

Plaintiff invokes the ATS to base federal subject matter jurisdiction over three claims against RTI and Unity — Count I (war crimes); Count II (civil conspiracy to commit war crimes), and Count III (aiding and abetting war crimes). *See* Am. Compl. ¶¶ 3, 5-6. "In assessing whether plaintiffs have stated a claim under the [ATS], courts must conduct a more searching merits-based inquiry than is required in a less sensitive arena." *Doe I*, 393 F. Supp. 2d at 24 (citing *Walsh v. Ford Motor Co.*, 588 F. Supp. 1513, 1519 (D.D.C. 1984), *vacated on other grounds*, 807 F.2d 1000 (D.C. Cir. 1986)). Because RTI, as a non-governmental corporation, cannot be held liable under the ATS for alleged violations of the law of nations nor secondarily

liable for the alleged law of nations violations of yet *another corporation*, i.e., Unity, this Court must dismiss Counts I, II, and III for lack of subject matter jurisdiction.

> **1.    This Circuit Has Consistently Held That The Law Of Nations Does Not Impose The Same Liability On Non-State Actors As It Does On State Actors.**

In its entirety, the ATS reads, "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The first Congress passed the ATS as part of the Judiciary Act of 1789, and, until 1980, it was only rarely invoked. *See Sosa*, 542 U.S. at 712-13. In *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), the Second Circuit opened the door to a new generation of ATS claims. Therein, the court allowed a Paraguayan man and his daughter to sue Paraguayan government officials for the alleged torture of their son and brother because "official torture is now prohibited by the law of nations." *Id.* at 884; *see also id.* at 880 ("*[A]n act of torture committed by a state official* against one held in detention violates . . . the law of nations.") (emphasis added). Therefore, the court held, the alien plaintiffs had stated a claim cognizable under the ATS.

Following *Filartiga*, in 1984, this Circuit set forth its now-consistent approach that the ATS provides federal subject matter jurisdiction for violations of the law of nations — but, with few exceptions not applicable here, *only by state actors*. In *Tel-Oren v. Libyan Arab Republic*, 726 F.2d at 775, the plaintiffs, primarily Israeli citizens who were survivors and representatives of persons killed in an armed attack on a civilian bus in Israel, brought suit against the Libyan Arab Republic, the Palestine Liberation Organization, the Palestine Information Office, the National Association of Arab Americans, and the Palestine Congress of North America, alleging various tortious acts in violation of the law of nations, treaties of the United States, and U.S. criminal and common law. The plaintiffs invoked jurisdiction under various statutes, including

the ATS. *Id.* The D.C. Circuit affirmed this Court's dismissal for, *inter alia*, lack of subject matter jurisdiction, with each member of the panel writing separately to explain his different reasons for dismissing. *Id.*

Judge Edwards' concurrence is most often cited with respect to the construction of the ATS and the identification of claims that are cognizable under the ATS.[4] Judge Edwards found guidance in *Filartiga*, "adher[ing] to the legal principles [it] established." *Id.* at 776 (Edwards, J., concurring). But due to "factual distinctions" between the two cases, Edwards determined subject matter jurisdiction for the plaintiffs' claims was lacking because the law of nations *does not "impose[] the same responsibility or liability on non-state actors*, such as the PLO, as it does on states and persons acting under color of state law." *Id.* (emphasis added). While *Filartiga* held that *official* torture violated the law of nations, the torture alleged in *Tel-Oren* was at the hands of *non-state actors* and not under color of law. Accordingly, Judge Edwards, along with the other two members of the panel, affirmed the dismissal of the plaintiffs' ATS claims. *Id.* at 798.

While Edwards identified a "handful of crimes to which the law of nations attributes individual responsibility," including piracy and slavery, *id.* at 794-95, he was "*not prepared to extend the definition of the 'law of nations' [to cover torture at the hands of non-state actors] absent direction from the Supreme Court*." *Id.* at 792 (emphasis added). In the interceding twenty-four years, the Supreme Court has yet to signal that ATS jurisdiction lies in that direction for claims of torture, nor for the vast majority of other claimed violations of the law of nations. Indeed, as this Court recently noted, the Supreme Court has "suggested that *only states, and not*

---

[4] Judge Bork affirmed the dismissal of Plaintiffs' ATS claims because they "failed to state a cause of action sufficient to support jurisdiction . . . . Neither the law of nations nor any of the relevant treaties provides a cause of action that appellants may assert in courts of the United States." *Tel-Oren*, 726 F.2d at 799 (Bork, J., concurring). Judge Robb affirmed the dismissal of Plaintiffs' ATS claims on political question doctrine grounds, concluding the case to involve nonjusticiable political questions. *Id.* at 823 (Robb, J., concurring).

corporations or individuals, may be liable for international law violations." *Doe I*, 393 F. Supp.

2d at 26 (citing *Sosa*, 542 U.S. at 733 n.20) (emphasis added).

Since this Circuit's *Tel-Oren* decision in 1984, this Court and this Circuit have consistently held the line against invocation of the ATS against non-state actors. In *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), this Circuit expressly reaffirmed its reticence to recognize liability under the law of nations for private, non-state conduct. *Sanchez-Espinoza* involved a suit by Nicaraguan citizens against nine U.S. Executive officials, including then-President Ronald Reagan, then-CIA Director William Casey, and then-Secretary of State George Schultz, alleging law of nations violations under the ATS for the Executive officials' alleged "provi[sion] [of] financial, technical, and other support to anti-Nicaraguan terrorist groups operating military training camps in the United States, Honduras, Costa Rica, and Nicaragua . . . as a result [of which] the Contras . . . carried out 'scores of attacks upon innocent Nicaraguan civilians' which have 'resulted in summary execution, murder, abduction, torture, rape, wounding, and the destruction of private property and public facilities.'" *Id.* at 204-07 (quoting underlying complaint). This Court dismissed the ATS claims, as well as the plaintiffs' other federal claims, under the political question doctrine. *Id.* at 206. This Circuit affirmed the dismissal, "[w]ithout necessarily disapproving the District Court's conclusion that all aspects of the . . . case present[ed] a nonjusticiable political question," but "choos[ing] not to resort to that doctrine for most of the claims," including the ATS claims. *Id.*

Then-Judge Scalia, writing for the court, examined the ATS and concluded that "[t]his obscure section of the Judiciary Act of 1789 . . . may conceivably have been meant to cover only private, nongovernmental acts that are contrary to treaty or the law of nations — the most prominent examples being piracy and assaults upon ambassadors." *Id.* (citing *Tel-Oren*, 726

14

F.2d at 813-15 (Bork, J., concurring)). However, the court was "aware of no treaty that purports to make the activities at issue here unlawful when conducted by private individuals." *Id*. "As for the *law of nations* — so-called 'customary international law,' arising from 'the customs and usages of civilized nations,' . . . [it] *does not reach private, non-state conduct of this sort for the reasons stated by Judge Edwards in* Tel-Oren." *Id*. at 206-07 (internal citation omitted) (emphasis added). *Sanchez-Espinoza* continues to be controlling Circuit precedent to this day. *See, e.g., Saleh*, 436 F. Supp. 2d at 57-58; *Ibrahim*, 391 F. Supp. 2d at 14-15.

> **2.     The Supreme Court Has Cautioned Restraint In Recognizing New Claims Under The ATS And Suggested That Only States, And Not Corporations Or Individuals, May Be Liable For Violations Of The Law Of Nations.**

In the seminal Supreme Court case addressing the ATS, *Sosa v. Alvarez-Machain*, 542 U.S. 692, the high Court said nothing at all that would undermine this Circuit's holdings in *Tel-Oren* or *Sanchez-Espinoza*. To the contrary, the Supreme Court reaffirmed the narrow reach of the ATS. *Sosa* arose from the abduction and transportation of a Mexican national, Alvarez-Machain, to the United States at the direction of the U.S. Drug Enforcement Administration ("DEA"). *Id*. at 697 (citing *United States v. Alvarez-Machain*, 504 U.S. 655 (1992)). Alvarez-Machain had been indicted by a federal grand jury for the torture and murder of a DEA agent, *id*., though he was acquitted at trial. *Id*. at 698. Alvarez-Machain subsequently returned to Mexico and initiated a civil action against Sosa, the Mexican national hired by the DEA to seize and transport him to the United States, as well as the United States itself and four DEA agents. *Id*. Alvarez-Machain sought damages from the United States under the Federal Tort Claims Act and from Sosa under the ATS, alleging a violation of the law of nations for his arbitrary detention. *Id*. The district court granted Alvarez-Machain summary judgment and awarded him $25,000 in damages on the ATS claim. *Id*. at 699. The Ninth Circuit affirmed. *Id*. at 699. The

Supreme Court reversed, holding that "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy," under the ATS. *Id*. at 738.

In construing the ATS, the Court examined its history and concluded that the ATS is "only jurisdictional" and that only a "handful of international law *cum* common law claims understood in 1789," when it was drafted, *id*. at 712, as well as other claimed violations of the law of nations that can meet that same strict standard, confer subject matter jurisdiction in federal court. *Id*. at 725. The Court inferred from the Act's history that the drafters had in mind only a "narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs," namely, "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id*. at 715. Thus, the Court emphasized, "Congress intended the ATS to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations." *Id*. at 720.

The Court recognized lower federal court discretion, albeit "restrained," to "consider[] a new cause of action of this kind." *Id*. at 725. However, the Court specifically admonished that "any claim based on the present-day law of nations [must] rest on a norm of international character *accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized*." *Id*. (emphasis added). The Court underscored a number of reasons for lower courts to act with "*restraint*," *id*. (emphasis added), and "*great caution*," *id*. at 728 (emphasis added), in recognizing new claims under the law of nations, including: (i) "a general understanding that the law is not so much found or discovered as it is either made or created," *id*. at 725; (ii) "the general practice [of] . . . look[ing] for

16

legislative guidance before exercising innovative authority over substantive law," *id.* at 726; (iii) the Court's repeated admonition that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases," given "the possible collateral consequences of making international rules privately actionable," *id.* at 727; (iv) "the potential implications for the foreign relations of the United States of recognizing such causes," *id.*; and (v) the lack of "any congressional mandate to seek out and define new and debatable violations of the law of nations." *Id.* at 728. In sum, the Court determined "that the judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a *narrow class of international norms today*." *Id.* at 729 (emphasis added).

With this guidance, federal courts must not recognize any new cause of action as cognizable under the ATS "with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id.* at 732. The Court observed this limit was "generally consistent" with the reasoning in cases such as *Filatiga* and *Tel-Oren*. *Id.* In addition, "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 732-33 (footnote omitted). Other limiting principles could be exhaustion of remedies both in the alien's domestic legal system and in international claims tribunals and "a policy of case-specific deference to the political branches." *Id.* at 733 n.21.

> **3.**     **This Court Has Heeded The Supreme Court's Admonition And Has Exercised Caution And Restraint In Refusing To Expand ATS Jurisdiction To Alleged Violations Of The Law Of Nations By Corporations.**

In three recent cases, this Court has refused to expand liability under the ATS for alleged violations of the "law of nations" by *non-state actors*. In *Ibrahim v. Titan Corp.*, 391 F. Supp.

2d at 14, Iraqi nationals brought an action alleging torture by the U.S. military at Abu Graib prison, and sued private government contractors, Titan, which provided interpreters, and CACI, which provided interrogators, to the U.S. military in Iraq. *Id.* at 12.[5] Invoking *Sosa*, this Court explained that, in addition to the recognized law of nations violations of safe conducts, infringement of the rights of ambassadors, and piracy, "[n]ew claims may be recognized under common law principles, but they must 'rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.'" *Id.* at 13 (quoting *Sosa*, 542 U.S. at 725). This Court set forth the five factors discussed in *Sosa*, which "counsel[] *very great caution* on this front." *Id.* at 13-14 (citing *Sosa*, 542 U.S. at 725-28) (emphasis added). Then, examining the "numerous treaties and other sources of international law [referenced by the plaintiffs] that strongly condemn torture," the court noted that "[t]hose authorities generally address official (state) torture." *Id.* at 14.

Hence, the issue for this Court was "whether the law of nations applies to *private actors* like the [government contractors]." *Id.* (emphasis in original). This Court noted that the Supreme Court has yet to pass on that question, *"but in the D.C. Circuit the answer is no."* *Id.* (emphasis added). This Court looked first to *Tel-Oren*, in which this Circuit held that *"no consensus [exists] that private actors are bound by the law of nations."* *Id.* (discussing *Tel-Oren*, 726 F.2d at 786-87, 791-95) (emphasis added). This Court observed that the Circuit, just one year later in *Sanchez-Espinoza*, "stat[ed] quite clearly that the law of nations 'does not reach private, non-state conduct of this sort [i.e., "execution, murder, abduction, torture, rape, [and] wounding" by the Nicaraguan Contras"] for the reasons stated by Judge Edwards in *Tel-Oren*." *Id.* (quoting *Sanchez-Espinoza*, 770 F.2d at 205-07). While "[p]laintiffs' allegations describe

---

[5] The plaintiffs could not sue the U.S. Government itself because of sovereign immunity. *Id.*

conduct that is abhorrent to civilized people, and surely actionable under a number of common law theories," "[a]fter *Tel-Oren* or *Sanchez-Espinoza*, however, it is not actionable under the [ATS's] grant of jurisdiction, as a violation of the law of nations." *Id.* at 15. Accordingly, this Court dismissed the plaintiffs' ATS claims, thus again confirming this Court's adherence to the strong Circuit precedent that the law of nations does not reach private actors. *See id.* at 14.

Less than a year later, in *Saleh v. Titan Corp.*, 436 F. Supp. 2d 55 (D.D.C. 2006), this Court yet again confronted a motion to dismiss in another Abu Graib case and "f[ound] no reason to treat any of the claims and defenses . . . differently from the way they were treated in *Ibrahim*," "the factual allegations of [which] . . . are virtually indistinguishable." *Id.* at 57. This Court noted that the plaintiffs, "assuming (correctly) that . . . *Ibrahim* . . . [would be treated] as if it were *stare decisis*, . . . have broken their ATS claims into component parts, added claims of aiding and abetting and conspiracy, added individual defendants, named three putative subclasses of plaintiffs . . . , and fashioned legal arguments that were not addressed in *Ibrahim*." *Id.*

In examining the plaintiffs' ATS claims, this Court first reiterated its holding in *Ibrahim* that, "after *Tel-Oren* . . . , *Sanchez-Espinoza* . . . , and *Sosa* . . . , it was clear . . . that the conduct of private parties described by plaintiffs' allegations was not actionable under the ATS's grant of jurisdiction as violative of the law of nations." *Id.* This Court then noted that the plaintiffs "apparently thinking they see daylight in footnote 3 of . . . *Ibrahim* . . . have run to it, arguing that the Supreme Court's *Sosa* opinion approved Judge Edwards's view in *Tel-Oren* . . . that torture by private parties would be actionable under the ATS if the private parties were acting under color of law, and alleging that these defendants were indeed acting under color of law." *Id.*

This Court's answer to that contention was succinct: "The argument is rejected." *Id.* It was rejected because "*Sanchez-Espinoza* is controlling Circuit precedent and is not cast in doubt by" *Presbyterian Church of Sudan v. Talisman Energy Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003), *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), or *Filartiga*, 630 F.2d 876, all involving acts under color of non-U.S. law. *Saleh*, 436 F. Supp. 2d at 57, 58 n.3. "*Sosa* did not overrule that precedent"; to the contrary, "*Sosa*'s pointed admonition that lower federal courts should be extremely cautious about discovering new offenses among the law of nations" merely serves to reinforce the conclusion that the ATS should not be lightly extended to private actors. *Id.* at 57-58. This Court summed up this Circuit's law as follows, "Sanchez-Espinoza *makes it clear that there is no middle ground between private action and government action, at least for purposes of the [ATS].*" *Id.* at 58 (emphasis added). Accordingly, this Court dismissed the plaintiffs' ATS claims. *Id.* at 60.

This Court's recent decision in *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, further reflects the Court's cautious and restrained reading of the ATS, particularly with respect to claims against non-state actors. In *Doe I*, Indonesian citizens brought suit against Exxon, alleging that Exxon had violated the ATS by aiding and abetting the Indonesian military in genocide, torture, crimes against humanity, arbitrary detention, extrajudicial killing, and sexual violence. *Id.* at 24. According to the complaint, Exxon had allegedly contracted with the Indonesian military to provide security for Exxon's natural gas pipeline "during an on-going conflict with the Indonesian government and Achenese rebels." *Id.* at 22. The plaintiffs alleged that Exxon "conditioned payment on providing security, made decisions about where to build bases, hired mercenaries to train the security troops, and provided logistical support," and, on this basis, claimed that Exxon was "liable for the alleged actions of the Indonesian soldiers, as an

aider and abettor, a joint action/joint venturer, or as a proximate cause of the alleged misconduct." *Id.* Exxon moved to dismiss, arguing both that adjudication of the claims would "impermissibly interfere[] with Indonesia's sovereignty and U.S. foreign policy," and that plaintiffs failed to state a claim under the ATS. *Id.* at 24.

In dismissing the plaintiffs' ATS claims, this Court was mindful of the collateral consequences to U.S. foreign policy concerns and foreign sovereignty that the case raised, particularly in the context of the global war on terrorism. *See id.* at 22-24. In light of these concerns, this Court concluded Exxon "cannot be held liable for violations of international law on a theory that they aided and abetted the Indonesian military in committing these acts." *Id.* at 24. This Court then reaffirmed Circuit precedent that no middle ground exists for purposes of the ATS between state and non-state action with respect to certain claimed violations of the law of nations, concluding that a finding of liability under a color of law theory "would be an end-run around the accepted principle that *most violations of international law can be committed only by states.*" *Id.* at 26 (citing *Sanchez-Espinoza*, 770 F.2d at 206-07) (emphasis added). This Court rejected the plaintiffs' assertion of liability under either a color of law *or* an aiding and abetting theory, finding both an "overreach" of the ATS. *Id.*

Like the plaintiffs in *Doe I*, Plaintiff here seeks damages from a corporate defendant who allegedly retained a third party to provide security for its employees. In *Doe I*, however, the corporate defendant allegedly conspired directly with a *state actor* (the Indonesian military), which allegedly was engaged in genocide, yet this Court still determined that the allegations did not give rise to a cognizable ATS claim. Here, RTI, a *non-state actor*, allegedly conspired with yet another *non-state actor* (Unity), and neither is alleged to have conspired with a state actor engaged in "genocide" or any other ATS-prohibited conduct. Because there was no ATS

jurisdiction in the circumstances presented in *Doe I* (wherein the plaintiff allegedly conspired directly with a state actor committing genocide), there can be no ATS jurisdiction in the circumstances presented here (where RTI allegedly conspired with another *non-state actor* and neither corporate defendant is accused of conspiring with a state actor to commit an ATS violation).[6]

\* \* \* \*

This Circuit has consistently held that the law of nations applies only to state actors, except in very narrow circumstances. *See Tel-Oren*, 726 F.2d at 776 (Edwards, J., concurring); *Sanchez-Espinoza*, 770 F.2d at 206-07. This Court's tight hold on the reins of ATS jurisdiction, particularly where the claimed violations of the law of nations involve non-state actors, is not only required under this Circuit's precedent, but essentially confirmed in light of the Supreme Court's guidance in *Sosa*. *See e.g.*, *Sosa*, 542 U.S. at 733 n.20. As the foregoing analysis elucidates, the concept of a corporation being directly or secondarily liable for a violation of the law of nations has little currency today, and had certainly much less, if any, in 1789, and thus does not fall within the "narrow set of violations of the law of nations" that should be recognized by this Court today. *See id.* at 715.

This Court should dismiss Counts I, II, and III for lack of subject matter jurisdiction.

---

[6] While the plaintiffs in *Doe I* have not immediately appealed this Court's dismissal of their ATS claims, Exxon filed an interlocutory appeal of this Court's denial of its motion to dismiss state tort claims on political question doctrine grounds. *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 347 (D.C. Cir. 2007). This Circuit dismissed the appeal, holding that the denial of the motion to dismiss was not immediately appealable, and that there was no basis to grant a writ of mandamus. *Id.* at 346. In dissent, Judge Kavanaugh gave the first post-*Sosa* indication of how this Circuit might view an ATS claim, in particular, an ATS claim that a defendant corporation "aided and abetted" a foreign government allegedly violating the law of nations. While Judge Kavanaugh focused on the foreign policy implications of allowing for such liability, *id.* at 364 (Kavanaugh, J., dissenting), he reiterated the concern of this Court in *Doe I*, 393 F. Supp. 2d at 26, about the collateral consequences of allowing ATS suits against corporations, either for complicity with foreign governments or for "direct corporate wrongdoing not involving foreign government officials." *Exxon Mobil*, 473 F.3d at 357 (Kavanaugh, J., dissenting). As Judge Kavanaugh explained, the Supreme Court in *Sosa* "took note of the growing litigation against multinational corporations (and recognized the concerns about such litigation)." *Id.* at 362 (Kavanaugh, J., dissenting).

**B.    Counts I, II, And III Should Be Dismissed Because They Fail, As A Matter Of Law, To Allege Facts Sufficient To State A "War Crime."**

Counts I, II, and III should be dismissed for the independent reason that Plaintiff's averments fail to allege facts — even if accepted as true for purposes of consideration of this Motion — that give rise to a cognizable "war crime" within the meaning of the ATS. To constitute a "war crime," the acts complained of must either involve military personnel or otherwise be undertaken in furtherance of a war objective. Plaintiff alleges neither circumstance here, nor could Plaintiff, consistent with Federal Rule of Civil Procedure 11, make the requisite allegations.

The four Geneva Conventions,[7] which the United States has ratified, are the principle written embodiment of the law of war. *See Kadic*, 70 F.3d at 242-43; *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). The norms set forth in the Geneva Conventions can be distilled into five broad categories of activity that constitute war crimes:

> [i] illegal actions committed by military personnel during the fighting itself, …
>
> [ii] the conduct of illegal actions by military personnel and against other military personnel once the fighting is over, …
>
> [iii] illegal acts committed against civilian or civilian objects during the fighting itself, …
>
> [iv] illegal acts committed against civilians when the fighting is over, … and …
>
> [v] the use of military or paramilitary forces for purposes that are entirely political and have no military objective.

DAVID CHUTER, WAR CRIMES: CONFRONTING ATROCITY IN THE MODERN WORLD 8-9 (2003).

---

[7] Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31 (Feb. 2, 1956); Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of the Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85 (Feb. 2, 1956); Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (Feb. 2, 1956); Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (Feb. 2, 1956).

As noted, some war crimes involve treatment of civilians. The Convention Relative to the Protection of Civilian Persons in Time of War — more commonly referred to as "Geneva Convention IV" — is the Geneva Convention that specifically applies to the treatment of civilians. Common Article 3 of Geneva Convention IV (which itself is replicated in practically identical terms in each of the Geneva Conventions) binds "each Party to the conflict" to certain minimum standards of conduct. Common Article 3, however, applies only to "armed conflict[s] not of an international character." Geneva Convention IV, art. 3(1).

As part of its obligations to implement the Geneva Conventions, the United States currently provides criminal penalties for "war crimes" committed by either "a member of the Armed Forces of the United States or a national of the United States" in the War Crimes Act of 1996. 18 U.S.C. § 2441; *see* H.R. REP. NO. 104-698, at 1-4 (1996). The War Crimes Act defines a "war crime" as, *inter alia*, "any conduct which constitutes a grave breach of common Article 3 (as defined in subsection (d)) when committed *in the context of and in association with an armed conflict not of an international character*," i.e., grave breaches of Geneva Convention IV, common Article 3. 18 U.S.C. § 2441(c)(3) (emphasis added). Subsection (d) enumerates "grave breach[es] of common Article 3" as including torture, cruel and inhuman treatment, performing biological experiments, murder, mutilation or maiming, intentionally causing serious bodily injury, rape, sexual assault or abuse, and taking hostages. 18 U.S.C. § 2441(d); *see also* Geneva Convention IV, art. 3(1). This Court thus has guidance from both Geneva Convention IV and the War Crimes Act as a point of departure from which to determine whether Plaintiff states a "war crimes" claim.

As the plain language of common Article 3 makes clear, there is a two-pronged threshold requirement to prove a "war crime." <u>First</u>, there must be "an armed conflict not of an

international character." Geneva Convention IV, art. 3; *see also* CHUTER, 59 (noting that a threshold to the application of international humanitarian law, i.e., the Geneva Conventions, is an "armed conflict"), 77-78 ("Self-evidently, violations of the laws or customs of war, as well as grave breaches of the Geneva Conventions, require an armed conflict of some kind if they are to be charged."). While it is "relatively easy" to determine whether an "armed conflict" exists between states, it is "somewhat more difficult in an internal armed conflict where it is necessary to avoid confusion with banditry, unorganized and short-lived insurrections, or terrorist activities, which are not subject to international humanitarian law." *Id.* at 78 (internal quotation marks and quoted authority omitted). Plaintiff alleges that "Defendants' acts took place *during* a period of armed conflict," Am. Compl. ¶¶ 32, 38, 43 (emphasis added), and, for purposes of this Motion only, we accept Plaintiff's allegations as true.

Second, to state a "war crimes" claim, the conduct giving rise to the claim must take place "*in the context of and in association with* an armed conflict not of an international character." Geneva Convention IV, art. 3 (emphasis added). Plaintiff's allegations affirmatively demonstrate Plaintiff's utter failure to satisfy this *sine qua non* requirement. Plaintiff instead has alleged facts that demonstrably show that the complained-of conduct does not and cannot constitute a "war crime" within the meaning of the ATS.

This Court recently interpreted the term "*in the course of . . . armed conflict* between military forces of any origin," as used in the Antiterrorism Act of 1991 ("ATA"), 18 U.S.C. § 2331(4)(C) (emphasis added), to determine whether a bus bombing in Israel was subject to the "act of war" exception to ATA liability. *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 162-67 (D.D.C. 2006). The plaintiffs there argued that "an attack on a civilian bus which results in the murder of one or more innocent civilians cannot be deemed to have occurred '*in the*

*course of* war between nations or armed conflict within the meaning of § 2331" because "'in the course of' . . . [is] a gatekeeper phrase that is intended to exclude as a matter of law a subset of conduct which — because of its nature and substance — deviates from and/or is insufficiently related to the general set of conduct governed by the provision in question." *Id.* at 164 (emphasis in original); *see also id.* at 165 (citing a number of cases interpreting the "in the course of" statutory phrase as such). This Court "[wa]s persuaded . . . that . . . 'in the course of' necessarily imposes limitations on what 'acts' constitute 'acts of war' within the meaning of [the ATA]." *Id.* at 166. Thus, this Court concluded, "without deciding whether there existed 'armed conflict between military forces of any origin,'" "the alleged attack . . . committed on a recognized public transport bus, [where] it [wa]s undisputed that all of the passengers on the bus were non-combatant civilians . . . did not occur 'in the course of' an armed conflict." *Id.* at 167.

Common Article 3's use of the term "*in the context of and in association with* an armed conflict not of an international character," (emphasis added), suggests an even narrower meaning than the "in the course of" phrase used in the ATA. Plaintiff's counsel here makes neither direct nor indirect allegations, nor can any be inferred, that Ms. Manook was killed "*in the context of and in association with*" the alleged "armed conflict" in Iraq. The singular allegation that RTI and Unity's actions took place "*during* a period of armed conflict" is simply not enough. *See* Am. Compl. ¶¶ 32, 38, 43 (emphasis added). Nor are Plaintiff's allegations that RTI and Unity were "in Iraq at the behest of the United States Department of State . . . to . . . assist[] the United States' effort to rebuild local communities" sufficient to state a "war crimes" claim. *See id.* ¶ 23 (emphasis added); *see also id.* ¶ 3. Indeed, Plaintiff alleges that Ms. Manook was killed "in [a] hail of gunfire" "on Karrada Street in Baghdad, Iraq," while "Manook was driving her car down Karrada Street." *Id.* ¶¶ 12, 13. Plaintiff seeks to convert this conduct from, at most, an alleged

municipal crime or civil tort action into a war crime, but Plaintiff's "contention stretches the meaning of war crimes . . . under the law of nations too far." *See Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 120 (D.D.C. 2003). The logical consequence of Plaintiff's allegations is that "any violence or threat against a civilian or 'non-combatant' during an armed conflict should be considered a war crime," a contention this Court has previously rejected as "unsupported by authority." *See id.* at 120-21. Therefore, as in *Klieman*, this Court need not reach the question of whether there exists an "armed conflict" in Iraq within the meaning of common Article 3 because, even assuming *arguendo* it did, the facts alleged here did not take place "*in the context of and in association with*" an armed conflict and, thus, cannot, by definition, constitute a "war crime."

That the allegations in Plaintiff's First Amended Complaint fail to state a "war crimes" claim is further supported by a recent decision of the U.S. District Court for the Southern District of Florida. In *In re Sinaltrainal Litigation*, 474 F. Supp. 2d 1273, 1289-90 (S.D. Fla. 2006), a Colombian labor union and its members sued private corporations and a single person who were involved in the Coca-Cola bottling and distribution business in Colombia. *Id.* at 1276. The plaintiffs generally claimed that the defendants were "vicariously liable . . . for the violent actions of paramilitary members — whose actions should be imputed to the Republic of Columbia [sic] in an attempt to intimidate union members and squelch union activity." *Id.* The plaintiffs further alleged that "the [d]efendants' agents committed the 'tortious actions . . . *in connection with and in furtherance of Coke's business interests and activities.*'" *Id.* at 1287 (emphasis added).

While the *Sinaltrainal* plaintiffs "point[ed] to paragraphs of their complaints that establish[ed] general allegations about the state of civil war in Colombia, . . . they fail[ed] to

identify any allegations that the acts were committed in furtherance of war hostilities." *Id.* at 1287-88 (emphasis added). The district court ultimately concluded that "[a]lleging that the [d]efendants 'affirmatively acted to benefit from the civil war by making arrangements to have the paramilitaries target their union leaders' is a far cry from alleging that [d]efendants actually conspired with the paramilitaries to orchestrate hostilities." *Id.* at 1289. The district court "emphasize[d] that [the p]laintiffs [we]re not bringing claims against any paramilitary commander or paramilitary member. Rather, [p]laintiffs [sought] to hold corporations accountable for the actions of their 'agents and/or employees.'" *Id.* As this Court should in the instant case, the district court there "respectfully submit[ted] that [p]laintiffs seek a dramatic expansion of [ATS] jurisprudence, one which lacks support in either domestic or international law." *Id.*; *see also Islamic Salvation Front*, 257 F. Supp. 2d at 120-21. Accordingly, the court concluded it lacked subject matter jurisdiction over the plaintiffs' war crimes claims, as "some modicum of specificity regarding the details of *affirmative* action, whether it be in the form of conspiracy or joint action to orchestrate hostilities, is required to adequately plead a violation of the law of nations on the basis of war crimes." *Sinaltrainal*, 474 F. Supp. 2d at 1289-90 (emphasis in original); *cf. Aldana v. Del Monte Fresh Produce, N.A.*, 416 F.3d 1242, 1247-48 (11th Cir. 2005) (dismissing ATS claims for crimes against humanity where plaintiffs failed to plead that the events "occur[red] as a result of 'widespread or systematic attack' against civilian populations" and holding that "[p]laintiffs' reliance — found exclusively in the appellate brief [and not in the complaint] — on alleged systematic and widespread efforts against organized labor in Guatemala is too tenuous to establish a prima facie case, especially in the light of *Sosa*'s demand for vigilant doorkeeping").

In fact, research reveals no case in which a court has found a cognizable "war crimes" claim as a result of private individual or private corporate activity separate and distinct from any state actor, military, or even a non-state civil, political, or nationalist movement that itself was engaged in some alleged "war crime." And, as *Sinaltrainal* underscores, liability for a private entity (like RTI) for the conduct of another private entity (like Unity) disconnected from wrongful state acts strains both reason and the extreme outer bounds of ATS jurisprudence, particularly with respect to war crimes claims. RTI and Unity may have been in Iraq "pursuant to and under a contract with the United States Department of State," Am. Compl. ¶ 3; *see also id.* ¶ 23, but they were there "to . . . assist[] the United States' effort to rebuild local communities," *id.*, not as part of, nor "in the context of," nor "in association with" any role of the United States, or any other party for that matter, in the alleged "armed conflict" in Iraq.

For the sake of comparison, "war crimes" claims found cognizable under the ATS in every instance have involved allegations of misconduct of states or state actors, or of private individuals or entities acting in association or in concert with states or state actors, political movements, and militaries. *See, e.g., Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007) (vacating district court's dismissal of plaintiffs' ATS claims of forced labor, genocide, torture, sexual assault, unlawful detention, extrajudicial killings, war crimes, and racial discrimination against companies that did business in apartheid-era South Africa and were alleged to have acted directly and under of color of South African law and also to have aided and abetted the apartheid regime in the commission of these alleged international law violations); *Kadic*, 70 F.3d at 235, 242 (holding that Radovan Karadzic, President of the self-proclaimed Bosnian-Serb Republic of Srpska, could be held liable for, *inter alia*, war crimes in his private capacity, wherein "Karadzic personally planned and ordered a campaign of murder, rape, forced

impregnation, and other forms of torture *designed to destroy the religious and ethnic groups of Bosnian Muslims and Bosnian Croats*" (emphasis added)); *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1197-98, 1202 (9th Cir. 2007) (reversing the district court's dismissal of war crimes claims under the ATS against international mining company operating in Papua New Guinea (PNG), which was alleged to have "sought the assistance of the PNG government to quell [an] uprising and reopen [its] mine" in PNG, thus leading to a ten-year civil war in which PNG islanders, called for secession from PNG, and in which the mining company directed the PNG government to commit "atrocious human rights abuses and war crimes . . . , including a blockade, aerial bombardment of civilian targets, burning of villages, rape and pillage"); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1168-69, 1183 (C.D. Cal. 2005) (denying motion to dismiss ATS war crimes claim based on Colombian military's bombing of civilian homes in which seventeen civilians were killed and twenty-five were wounded for purposes of protecting American oil company's oil pipeline against insurgent attack); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322 (N.D.Ga. 2002) (basing jurisdiction in the ATS and finding defendant Serbian soldier/prison guard directly liable, and liable as an accomplice, for war crimes committed in the context of the conflict in the former Yugoslavia).[8]

Because Plaintiff has failed to allege facts sufficient to state a claim for "war crimes," this Court must dismiss Plaintiff's ATS claim for war crimes (Count I), as well as the derivative claims for civil conspiracy to commit war crimes (Count II), and for aiding and abetting war crimes (Count III).

---

[8] *See also* CHUTER, 15 ("[T]he typical pattern of war crimes" involves "*a high-level political objective* put into action in a brutal, incompetent, and unnecessarily (and sometimes self-defeatingly) violent fashion." (emphasis added)); SEAN D. MURPHY, PRINCIPLES OF INTERNATIONAL LAW 421 (2006) (To constitute "war crimes," "*the conduct must be connected to an* armed conflict *(international or internal) in order to distinguish it from an ordinary criminal offense.*" (emphasis added)).

III.   **CONSISTENT WITH FEDERAL RULE OF CIVIL PROCEDURE 12(e), THIS COURT SHOULD ORDER PLAINTIFF TO PROVIDE A MORE DEFINITE STATEMENT WITH RESPECT TO COUNTS IV-XVI TO IDENTIFY THE STATUTES AND THE GOVERNING LAW UNDER WHICH PLAINTIFF BRINGS SUIT.**

Plaintiff's First Amended Complaint fails to identify vital information necessary for Defendants to frame a response to Counts IV-XVI. Accordingly, to the extent this Court does not dismiss these causes of action, RTI requests a more definite statement.

The Federal Rules of Civil Procedure require a plaintiff to set forth "'a short and plain statement of the claim' [in her complaint] that will give the defendant fair notice of . . . the claim . . . and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting FED. R. CIV. P. 8(a)(2)), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S.Ct. 1955 (2007); *see* FED. R. CIV. P. 8(a). However, "where the pleading is 'so vague or ambiguous that a party cannot reasonably be required to frame a respons[e],'" Federal Rule of Civil Procedure 12(e) permits a court to order a plaintiff to file a more definite statement. *McQueen v. Woodstream Corp.*, 244 F.R.D. 26, 35 (D.D.C. 2007) (quoting FED. R. CIV. P. 12(e)); *see also Hilska v. Jones*, 217 F.R.D. 16, 22 (D.D.C. 2003) (quoting FED. R. CIV. P. 12(e)).

Here, the First Amended Complaint fails to satisfy the requirements of Rule 8(a) because it fails to identify the governing law or any statutes under which Plaintiff seeks relief, thereby failing to set forth information necessary to allow Defendants to frame a response to the allegations. For example, Plaintiff alleges that Defendants' acts and omissions caused the death of Ms. Manook, *see* Am. Compl. ¶¶ 12-15, 56-67, and brings claims for "wrongful death" in Counts IV, V, and VI, but in each instance fails to identify the statute under which it brings suit. Nor does Plaintiff identify the jurisdiction whose substantive laws it alleges should govern.

Knowing which statute applies is crucial to Defendant's response to the complaint because each jurisdiction's wrongful death statute sets forth different criteria. For example, to

the extent Plaintiff invokes this jurisdiction's wrongful death statute in Counts IV–VI, these Counts fail to state a claim because Plaintiff alleges that the death occurred in Baghdad, Iraq, Am. Compl. ¶ 12, while D.C.'s wrongful death statute requires that the place of death be in Washington, D.C. *See* D.C. CODE § 16-2701(a) (2001); *Perry v. Criss Bros. Iron Works, Inc.*, 741 F. Supp. 985, 986 (D.D.C. 1990). But Plaintiff has chosen to omit reference to the statute under which it seeks relief, so RTI is left to wonder whether Plaintiff seeks recourse under Iraqi law or other law, rather than the law of the District of Columbia. RTI therefore respectfully requests that this Court compel Plaintiff to make a more definitive statement under Rule 12(e) of the Federal Rules of Civil Procedure so that RTI is not forced to file a motion to dismiss covering the law of multiple jurisdictions.

Alternatively, or in addition to a more definite statement, RTI respectfully requests this Court to order briefing on the parties' proposed choice of substantive law with respect to Counts IV–XVI. Such briefing should apply the District of Columbia's choice of law rules because a district court applies the choice of law rules of the forum in which it sits. *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 114 n.11 (D.C. Cir. 1982) (quoting *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945)); *see also A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995) (cited authority omitted).

The District of Columbia uses the "substantial interests" or "governmental interests" approach to choice-of-law questions. *Greycoat Hanover F St. Ltd. P'ship v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 767-68 (D.C. 1995); *Stutsman v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc.*, 546 A.2d 367, 372 (D.C. 1988). When faced with a choice of law in an action sounding in tort, a court in the District of Columbia will "balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more 'substantial interest' in the

32

resolution of the issue." *Lamphier v. Wash. Hosp. Ctr.*, 524 A.2d 729, 731 (D.C. 1987); *see also Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004).    Further, District of Columbia courts consider the factors listed in Section 145 of the Restatement (Second) of Conflict of Laws (1971).    *Herbert v. Dist. of Columbia*, 808 A.2d 776, 779 (D.C. 2002); *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995); *Estrada v. Potomac Elec. Power Co.*, 488 A.2d 1359, 1361 n.2 (D.C. 1985).    These include:    (1) the place of injury; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil [sic], residence, place of incorporation and place of business of the parties"; and (4) the place where the relationship . . . between the parties is centered."    RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971).

A more definite statement, or the prompt briefing of the choice of law issues and this Court's resolution of the same, will provide RTI an opportunity to assess the adequacy of these Counts.[9]

## IV.    IN THE ALTERNATIVE, PLAINTIFF'S COMPLAINT SHOULD BE TRANSFERRED TO NORTH CAROLINA.

To the extent any of Plaintiff's claims in the First Amended Complaint survive this Motion, RTI respectfully requests that this Court, for the convenience of parties and witnesses and in the interest of justice, transfer this action to the United States District Court for the Eastern District of North Carolina.

"For the convenience of the parties and witnesses, in the interest of justice," a district court may "transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Under § 1404, the moving party bears the burden of establishing

---

[9] Upon the filing of a more definite statement, RTI may file a motion to dismiss, as appropriate, with respect to one or more of the common law tort claims (Counts IV–XVI). Otherwise, upon a determination of the appropriate choice of law, RTI may file a motion for judgment on the pleadings to the extent the causes of action, as alleged, are not cognizable under the governing law.

that transfer is proper. *Trout Unlimited v. United States Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996).

In evaluating a § 1404 motion to transfer, a court must first determine "whether the action could have been brought in the proposed transferee district." *Gemological Inst. of Am., Inc. v. Thi-Dai Phan*, 145 F. Supp. 2d 68, 71 (D.D.C. 2001). RTI is subject to personal jurisdiction in North Carolina; thus, this action could have been brought in North Carolina.[10] *See* 28 U.S.C. § 1391(a)(3); *see also Gemological Inst.*, 145 F. Supp. 2d at 72.

Because this threshold inquiry is easily met here, this Court must next weigh the traditional private and public interest factors. The private interest factors include:

> (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof.

*Trout Unlimited*, 944 F. Supp. at 16 (footnotes omitted). The public interest factors include:

> (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and

---

[10] Although Defendant RTI seeks, as an alternative to dismissal, to transfer this action to North Carolina, RTI reserves the right to challenge Plaintiff's capacity to sue on behalf of the estate. As acknowledged by courts in this district, the Supreme Court has made clear that capacity to sue is not a factor in determining whether an action "could have been brought" in a transferee district. *Joyner v. Reno*, 466 F. Supp. 2d 31, 36, 40 (D.D.C. 2006) (citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964)). In *Van Dusen v. Barrack*, the Supreme Court held that:

> [T]he "words 'where it might have been brought' must be construed with reference to the federal laws delimiting the districts in which such an action 'may be brought' and not with reference to laws of the transferee State concerning the capacity of fiduciaries to bring suit.

376 U.S. at 624; *id.* at 621 (holding that the words "where it might have been brought" in § 1404(a) do not "restrict the availability of convenient federal forums by referring to state-law rules, such as those concerning capacity to sue, which would have applied if the action had originally been instituted in the transferee federal court"); *see also John W. Johnson, Inc. v. Atlantic States Constr. Co.*, 276 F. Supp. 379, 385 (D. Md. 1967) (holding that corporate plaintiff's lack of capacity to sue in transferee court was not a bar to transfer). Thus, transfer is appropriate to a district where venue, service of process, and personal jurisdiction are appropriate. *Joyner*, 466 at 38.

> transferor courts; and (3) the local interest in deciding local
> controversies at home.

*Id.* (footnotes omitted); *see also Gemological Inst.*, 145 F. Supp. 2d at 71 (listing private and

public interest factors).

While a plaintiff's choice of forum is generally "accorded 'substantial deference,'" *id.*

(quoting *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 51, 52 (D.D.C. 2000)), "substantially less

deference is warranted when," as here, "the forum preferred by the plaintiff is not his home

forum." *Id.* The lack of deference is reinforced where the chosen forum — here, the District of

Columbia — has "no meaningful ties to the controversy and no particular interest in the parties

or the subject matter." *Trout Unlimited*, 944 F. Supp. at 17; *see also id.* at 18 (transferring case

where decision-making process occurred in transferee district, not in the District of Columbia).

North Carolina, the proposed transferee district has substantially greater ties to this case

than the District of Columbia. While RTI has both a District of Columbia and a North Carolina

office, North Carolina is RTI's place of incorporation, and the jurisdiction in which RTI

maintains its headquarters and its principal place of business. Declaration of Moddassir

Mohammad Ali ("Ali Decl.") ¶ 2. And while RTI has eight domestic offices and another eight

international offices, more than 2200 of RTI's 2600 employees work in its North Carolina

headquarters. *Id.* More fundamentally, the operative RTI-Unity Contract was negotiated

between Unity representatives in Dubai, the United Arab Emirates, and RTI representatives in its

North Carolina office. *Id.* ¶ 4. The Contract is also administered through RTI's International

Contracts and Procurement department, which is located in RTI's North Carolina office. *Id.* ¶ 5.

To the extent there is communication outside of Iraq under and pertaining to the Contract, the

communication is overwhelmingly between RTI's North Carolina office and Unity's Dubai

office. *Id.* ¶ 7. Also, payments to Unity for work in connection with the RTI-Unity Contract are

made through RTI's North Carolina office. *Id.* ¶ 6. Finally, the Contract designates a contractual representative for RTI in RTI's North Carolina office and specifies that North Carolina law governs. *Id.* ¶¶ 9-10. Thus, because of the strong ties to North Carolina and the lack of any meaningful ties to this district, this Court must be "especially cautious in allowing this case to remain in the District of Columbia." *Trout Unlimited*, 944 F. Supp. at 17.

The remaining private interest factors also weigh in favor of transfer. While most of the RTI witnesses with relevant knowledge of this action work or otherwise reside in Iraq, those domestic RTI witnesses who have any role at all with Unity overwhelmingly are located in North Carolina. Ali Decl. ¶ 8. Nor can Plaintiff point to any documentary evidence relevant to this action located in the District of Columbia. Thus, the private interest factors favor litigating this action in North Carolina. *See, e.g., Gemological Inst.*, 145 F. Supp. 2d at 73 (transferring action to district in which "key witnesses, documents and stored inventory" were located).

Given the limited ties to this judicial district, there is no reason to burden the courts of this district with litigation in which this district has no interest. Rather, North Carolina has a greater interest in having this controversy decided before its courts. Finally, because this case is in its early stages, there is no potential for delay if the case were transferred to North Carolina. *See Trout Unlimited*, 944 F Supp. at 19. Accordingly, RTI requests that any claims not dismissed be transferred to the United States District Court for the Eastern District of North Carolina.

## CONCLUSION

For the foregoing reasons, RTI respectfully requests that this Court dismiss Plaintiff's First Amended Complaint in its entirety. To the extent this Court dismisses fewer than all of the Counts, RTI respectfully requests that this Court order Plaintiff to provide a more definite statement with respect to Counts IV-XVI, order briefing on choice of law, and transfer the remainder of the case to the United States District Court for the Eastern District of North Carolina.

Respectfully Submitted,

   /s/ Eric W. Bloom
Eric W. Bloom (Bar No. 417819)
Mark A. Clodfelter (Bar No. 387717)
Karen Sugden Manley (Bar No. 495029)
Nicole Y. Silver (Bar No. 472630)
Sarah E. Saucedo*
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 282-5743
Fax: (202) 282-5100

Mark A. Ash*
SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, LLP
2500 Wachovia Capitol Center (27601)
P.O. Box 2611
Raleigh, NC 27601-2611
Phone: (919) 821-1220
Fax: (919) 821-6800

*Counsel for Defendant RTI International*

* Motion for *Pro Hac Vice* pending.

## CERTIFICATE OF SERVICE

The undersigned verifies that on March 28, 2008, she caused a true and correct copy of (i) Defendant RTI's Motion (1) To Dismiss Plaintiff's First Amended Complaint, (2) For A More Definite Statement With Respect To Counts IV-XVI, And (3) To Transfer Any Remaining Claims and (ii) Defendant RTI's Statement Of Points And Authorities In Support Of Its Motion (1) To Dismiss Plaintiff's First Amended Complaint, (2) For A More Definite Statement With Respect To Counts IV-XVI, And (3) To Transfer Any Remaining Claims to be served, via the indicated method, upon the following:

**VIA the Electronic Case Filing system & U.S. Mail**
Susan L. Burke
William T. O'Neil
Elizabeth M. Burke
Katherine R. Hawkins
BURKE O'NEIL LLC
4112 Station Street
Philadelphia, PA 19127
tel: (215) 971-5058
fax: (215) 482-0874

*Counsel for Plaintiff*

**VIA U.S. Mail**
Shereef Hadi Akeel
AKEEL & VALENTINE, P.L.C.
Suite 910
888 West Big Beaver Road
Troy, MI 48084-4736
tel: (248) 269-9595
fax: (248) 269-9119

*Counsel for Plaintiff*

**VIA U.S. Mail**
Michael Ratner
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
tel: (212) 614-6439
fax: (212) 614-6499

*Counsel for Plaintiff*

**VIA the Electronic Case Filing system & U.S. Mail**
William S. D'Amico
David T. Blonder
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., NW
Washington, D.C. 20036
tel: (202) 974-5616
fax: (202) 974-5602

*Counsel for Defendant UnityResources Group*

Karen Sugden Manley

# Sinjakli & Associates
## *Legal Consultants*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Estate of Marani Awanis Manook, )<br><br>Plaintiff, )<br><br>v. )<br><br>Unity Resources Group and )<br>RTI International )<br><br>Defendants. ) | Civil Case No. 1:08-cv-00096<br><br>Honorable Paul L. Friedman |

### FOREIGN LAW DECLARATION OF DR. ADIL SINJAKLI

I, Dr. Adil Sinjakli, hereby declare under 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the following is true and correct:

**Introduction**

**1.** My name is Dr. Adil Sinjakli, born in Baghdad. I am an Iraqi national, licensed and practicing lawyer (presently practicing in Dubai as well). I received my law degree from Law College University of Baghdad in 1961. I hold a Post Graduate Diploma in Law from Kings College University of London (1966), Post Graduate Diploma in Law (1968) and Doctorate of Laws from Aim Shams University, Cairo (1975).

**2.** I have practiced in Baghdad with Iraq Petroleum Company (the international Consortium registered as British Company) from 1961 until nationalization of the Petroleum sector in Iraq in 1972. Subsequently I was Legal Director for International Agreements and Contracts with the Ministry of Oil, Legal Advisor to Iraq National Oil



Level 5, Building 3
Burj Dubai Square
Sheikh Zayed Road
PO Box 37172
Dubai, UAE

**www.sinjakli.com**
email: a.sinjakli@sinjakli.com

Tel. +971 4 429 3050
Fax: +971 4 429 3051

# Sinjakli & Associates
## *Legal Consultants*

Company, and Legal Advisor to the External Development Fund as well as a former lecturer at College of Law Baghdad.

**3.** In 1981, I established my Law Firm in Baghdad providing Legal Consultancy and Advocacy services. In this capacity, I acted as Legal Advisor to a number of leading foreign companies such as Cegelec/Cogelex of France (major power stations builders, TPL of Italy( building oil refineries and other facilities to oil projects /now merged with French Company), and many others foreign, Arab and Iraqi Companies that had business presence in Iraq, and I further acted as a pleading lawyer before Baghdad Courts.

**4.** From 1998 to 2004, I served in Dubai as Senior Legal Consultant with Al Tamimi & Co. Law Firm. Subsequently, in 2004, I opened a Dubai Office for my Dubai practice and for serving Iraq clients. Among other instructions; I carried out in Baghdad in 2005 legal Due Diligence for HSBC acquiring major shares of an existing Iraqi bank and was properly finalized and implemented. Also provided many legal consultations to Citibank Dubai during 2004-2007 on Iraq Law constituent documentation and bank licensing aspects needed from Iraqi banks in compliance with Citibank requirement to open accounts with Citibank. Also provided many legal consultations on Iraq Law issues to a number of foreign law firms and companies.

5. I have extensive experience in writing on various legal topics and have authored a number of legal books and articles on a number of legal topics, including, among others, [Engineering Consultancy Contracts(book published by Legal Research Centre of Iraq Ministry of Justice in 1983), International Trade Law (Lectures given at Law College Baghdad-1990-1992), Arbitration in Iraq (Article published in the Journal of Dubai International Arbitration Centre-DIAC- October 2004), Banking Operations under new Iraq Laws (Articles published in Middle East Economic Digest "MEED" in its special report on banking in September 2005), Comparison of Main Arbitration provisions between Iraq and UAW Laws (published in DIAC Journal October

Level 5, Building 3
Burj Dubai Square
Sheikh Zayed Road
PO Box 37172
Dubai, UAE

**www.sinjakli.com**
email: a.sinjakli@sinjakli.com

Tel. +971 4 429 3050
Fax: +971 4429 3051

2

# Sinjakli & Associates
## *Legal Consultants*

2005), and many others, as well as being speaker in conferences and seminars and have attended many regional and international conferences.

I am fluent in both English and Arabic.

**6.** I have conducted litigation and acted as Advocate in respect of many large and important cases before Baghdad Courts at all levels, I have also been appointed by Iraqi Courts as an Arbitrator in a number of important arbitration cases. I also practice Arbitration in Dubai.

**7.** I have been asked by counsel for RTI International, Winston & Strawn LLP in Washington D.C., to offer my opinion regarding Iraqi Law as it applies to the rights of the deceased, the Estate of the deceased, and of the heirs of the deceased.

**8.** This opinion is given from my own knowledge and belief and from my own understanding of and research into related Iraq Laws.

### Chronology events to the extent related to mandate

**9.**   The main chronology of relevant events, as alleged by the plaintiff in the Complaint, is spelled out hereunder to the extent related to this mandate.

**a.** On October 9, 2007 the first defendant which is a security company in Iraq (Unity) working under a contract for the second defendant (RTI), was engaged in an incident in Baghdad resulting in the death of two women, Marani Awanis Manook and Genevia Jalal Antranick.

**b.** The named plaintiff in this case is the "Estate of Marani Awanis Manook."  Ms. Manook allegedly was a resident of Baghdad and said to be a mother of three daughters.



| | | |
|---|---|---|
| Level 5, Building 3 | **www.sinjakli.com** | Tel. +971 4 429 3050 |
| Burj Dubai Square | email: a.sinjakli@sinjakli.com | Fax: +971 4429 3051 |
| Sheikh Zayed Road | | |
| PO Box 37172 | | |
| Dubai, UAE | | |

# Sinjakli & Associates
## *Legal Consultants*

**c.** Both defendants have existence in Iraq.

**d.** Defendant RTI has a contract with the U.S. State Department and as a result has a presence in Iraq, RTI hired Unity to provide security services to RTI personnel in Iraq.

**e.** Unity allegedly caused the death of Marani Awanis Manook, thereby causing the Plaintiff, "the Estate of Marani Awanis Manook," to seek compensation from both defendants.

**Statement of Foreign Law**

**10. I have been asked to identify who, if anyone, is currently authorized to bring a lawsuit on behalf of the "estate" of Marani Awanis under Iraq Law?**

It is an established practice before Iraq Courts that upon the death of an Iraqi citizen, the decedent's heirs (or any of them) are authorized to apply to the competent court of personal status to obtain what is termed a "Heirs Divider" (in Arabic known as a "*qassam sharrie*"). This is based on unified court practice. The applicant for a *qassam sharrie* is generally required to produce to the court certain documents, including a death certificate and the applicant's civil status document (a document from the Civil Register of the family which also indicate the relationship and age (adults or minors) and to bring in two witnesses. The applicant is further required to provide the court with further details of the heirs (with any supporting documents as needed).These are standing requirement by the court to issue "Heirs Divider"(Qassam Sharie) and are normally spelled out as a "check list" available in each court. "Qassam Sharie" is needed to establish each heir by name and share in the deceased estate and to be eventually used for all further requirement whether under Personal Status Law or minor's guardianship law, or for the distribution of any stocks/shares, or for any other rights to the heirs.



| | | |
|---|---|---|
| Level 5, Building 3 | **www.sinjakli.com** | Tel. +971 4 429 3050 |
| Burj Dubai Square | email: a.sinjakli@sinjakli.com | Fax: +971 4429 3051 |
| Sheikh Zayed Road | | |
| PO Box 37172 | | |
| Dubai, UAE | | |

# Sinjakli & Associates
## *Legal Consultants*

**11.** Based on the *qassam sharrie*, or "Heirs Divider," the heirs will be able to execute a valid Power of Attorney through a notary public in Baghdad (or in other governorates). If the POA is intended for use outside Iraq, then the heirs are required to have the document "legalized" by Iraq Ministry of Foreign Affairs and by the Embassy of the country concerned. Legalization of the POA in this context is the authentication of signatures. It starts in notarization before the Notary public, followed by the authentication by Department of Notaries under the Ministry of Justice, then by Iraq Ministry of Foreign Affairs and ends with the Embassy concerned in Iraq.( In addition to any further local requirement as directed from time to time)

**12.** If the heirs are not in Iraq, then the heirs may execute a POA at their place of domicile but again it is based on a legalized *qassam sharrie*, or "Heirs Divider," issued by a Baghdad Court, and in this case the "Qassam" should also be authenticated (legalized).

**13.** Under Iraqi law, any heir acting on behalf of the estate of an Iraqi citizen should first obtain a *qassam sharrie*, from the competent Iraqi Court, and based on the "Qassam" the needed POA should be prepared and then to be legalized in the manner prescribed above.

Attorney Dr. Adil Sinjakli

March 26, 2008

Level 5, Building 3
Burj Dubai Square
Sheikh Zayed Road
PO Box 37172
Dubai, UAE

**www.sinjakli.com**
email: a.sinjakli@sinjakli.com

Tel. +971 4 429 3050
Fax: +971 4429 3051

5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Estate of Marani Awanis Manook,      ) | |
|      ) | |
| Plaintiff,      ) | |
|      ) | |
| v.      ) | Civil Case No. 1:08-cv-00096 |
|      ) | |
| Unity Resources Group and      ) | |
| RTI International      ) | Honorable Paul L. Friedman |
|      ) | |
| Defendants.      ) | |
|      ) | |

## AFFIDAVIT OF KAREN SUGDEN MANLEY

I, Karen Sugden Manley, hereby make this affidavit in support of Defendant RTI International's Motion (1) To Dismiss Plaintiff's First Amended Complaint, (2) For A More Definite Statement With Respect To Counts IV-XVI, And (3) To Transfer Any Remaining Claims, and state as follows:

1.      I am a member of the bar of this Court.

2.      I am an attorney at Winston & Strawn LLP in Washington, D.C. and counsel to Defendant RTI International.

3.      On March 27, 2008, I called the Probate Division/Office of the Register of Wills of the Superior Court of the District of Columbia to confirm that the Estate of Marani Awanis Manook, the Plaintiff in this action, had not retained an authorized representative in the District of Columbia to act on its behalf in this jurisdiction.

4.      I spoke with a clerk in the court who, over the course of the call, conducted and completed a computer search for any possible entries relating to Marani Awanis Manook. She

advised that she performed the search using both "Manook" and "Awanis" as the last names. The clerk informed me that she found no records relating to the "Estate of Marani Awanis Manook."

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 28, 2008

*Karen Sugden Manley*

Karen Sugden Manley
WINSTON & STRAWN LLP
1700 K Street NW
Washington, D.C.  20006
(202) 282-5826

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Estate of Marani Awanis Manook, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:08-cv-00096 |
| | ) | |
| Unity Resources Group and | ) | |
| RTI International | ) | Honorable Paul L. Friedman |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DECLARATION OF MODDASSIR MOHAMMAD ALI

I, Moddassir Mohammad Ali, hereby declare under 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that, based upon personal knowledge and information provided to me during my employment at RTI, the following is true and correct:

1. I am currently an employee of Research Triangle Institute ("RTI"). I have been the Director of International Contracts and Procurement of RTI since April 2007.

2. RTI has its principal place of business and its headquarters in North Carolina. North Carolina is also RTI's state of incorporation. While RTI has 8 domestic offices and 8 additional international offices, more than 2200 of RTI's 2600 employees work at its North Carolina headquarters.

3. On June 27, 2005, RTI contracted with Unity Resources Group ("Unity") for the provision of security services (the "RTI/Unity Contract").

4. The RTI/Unity Contract was negotiated between personnel in RTI's North Carolina office and personnel in Unity's Dubai office. RTI's Washington D.C. office did not participate in the negotiation of the RTI/Unity Contract.

5. The RTI procurement office, which administers the RTI/Unity Contract, is located in RTI's North Carolina office.

6. Payments to Unity for work in connection with the RTI/Unity Contract are made through RTI's North Carolina office, not through RTI's Washington, D.C. office.

7. Formal contractually binding communication between RTI and Unity regarding the RTI/Unity Contract is conducted between RTI's North Carolina office and Unity's Dubai office.

8. While a number of RTI employees in North Carolina are responsible for administering the RTI/Unity Contract and for approval for payment on the RTI/Unity Contract, there is but a single RTI employee in Washington, D.C. who shares any responsibility in connection with the RTI/Unity Contract.

9. Article 12 of the RTI/Unity Contract provides that the contractual representatives for RTI and Unity are located in North Carolina and Dubai, United Arab Emirates, respectively.

10. Article 34 of the RTI/Unity Contract provides that North Carolina law governs.

Executed on this 26th day of March, 2008

_____
Moddassir Mohammad Ali

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**Estate of Marani Awanis Manook,**     )
                                        )
**Plaintiff,**                          )
                                        )
**v.**                                  )        **Civil Case No. 1:08-cv-00096**
                                        )
**Unity Resources Group and**           )
**RTI International**                    )        **Honorable Paul L. Friedman**
                                        )
**Defendants.**                         )
_____)


This matter coming to be heard on Defendant RTI's Motion to Dismiss,

IT IS HEREBY ORDERED that Plaintiff's First Amended Complaint be DISMISSED in its entirety, with prejudice.


Dated: _____, 2008        _____
                                  **Honorable Paul L. Friedman**