IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Estate of Marani Awanis Manook<br><br>                Plaintiff,<br><br>v.<br><br>Unity Resources Group and RTI International,<br><br>                Defendants. | Case No. 1:08-cv-00096 (PLF) |

**OPPOSITION TO DEFENDANT RTI'S MOTION TO DISMISS**

      Ms. Manook, an unarmed and innocent civilian, was gunned down in broad daylight for no legitimate reason by a Unity mercenary under contract to RTI and under subcontract to the United States. This lawsuit seeks to hold RTI and Unity accountable for their reprehensible misconduct. Now, RTI has filed a motion to dismiss, claiming that the action should be dismissed because (1) the Estate failed to allege capacity to sue and choice of law, and (2) war crimes cannot be committed by private parties. As explained below in Section I, the first argument fails because the Estate has the capacity to sue and it is premature to brief choice of law before discovery has been conducted. As explained below in Section II, although at first blush RTI has a strong argument based on two Court of Appeals' precedents, those decisions were issued more than twenty years ago. Subsequent to their issuance, there has been Congressional action, as well as development in both federal and international jurisprudence, that undercuts their precedential value.

RTI also argues that the suit should be transferred to their home district of North Carolina. As explained in Section III, RTI has failed to carry the heavy burden needed to transfer this action.

## REBUTTAL TO RTI'S STATEMENT OF "FACTS"

On March 28, 2008, Defendant RTI filed a Motion to Dismiss and Statement of Points and Authorities ("Statement"). Although wholly irrelevant to its motion, Defendant RTI includes a lengthy introduction and statement of facts (*Statement at 1-5*) in which it asserts that RTI, a think tank founded by Duke University and the University of North Carolina, is entitled to have its security forces gun down and kill innocents because otherwise RTI "either could not perform its mission, or otherwise its personnel would be at substantially greater risk." *Statement at 2*.

RTI thus admits it voluntarily went to Iraq and hired armed guards who killed several Iraqis. RTI does not appear to appreciate the sheer hubris of arguing that it should be allowed to kill innocent civilians like Ms. Manook in order to fulfill its mission of "supporting the establishment of a legal framework for a democratic, representative, and participatory form of decentralized government." *Statement at 1*. RTI may embrace the notion that innocent Iraqi women should be sacrificed merely because an American think tank wants to play politics in Iraq, but Ms. Manook's family is confident that an American jury will not have a similarly parochial approach to justice.

RTI claims it will be able to demonstrate at trial that Unity acted responsibly. If Unity had acted responsibly, Ms. Manook would not be dead. Unity itself has already admitted in the media that it made a terrible mistake. Based on the information available to Plaintiff to date, it appears that the evidence will show that the Unity shooter panicked, fired shots at Ms. Manook

for absolutely no reason, and is now filled with remorse at having taken an innocent life. But none of the disputes over the facts needs to be resolved by the Court at this early juncture.

## ARGUMENT

Instead, what needs to be resolved by the Court is whether the Estate has properly plead claims that survive scrutiny under Fed.R.Civ.P.12. **First**, contrary to RTI's allegations, the Estate has complied with all the necessary procedural and pleading requirements, as explained below in Section I. **Second**, although RTI asserts a compelling and sound argument that the war crime claims (Counts I-III) should be dismissed, that argument is based exclusively on the Court of Appeals' 1985 *Tel Orens* and 1986 *Sanchez* decisions.[1] As explained in Section II, in the more than twenty years that have passed since those decisions were issued, Congress has passed war crimes legislation that is inconsistent with the reasoning in those decisions. When RTI's motion is considered in light of Congressional action, as well as significant developments in American federal decisional and international law, it is clear that this Court is not controlled by these dated precedents, and instead should deny the motion with respect to Counts I-III. **Third** and finally, as the Estate explains in Section III, RTI fails to carry the heavy burden justifying its proposed transfer of this action to North Carolina, and this lawsuit should not be transferred away from the Estate's chosen forum.

### I. The Estate Has Complied with the Necessary Procedural and Pleading Requirements.

RTI devotes four full pages of argument (*Statement at 6-10*) to the proposition that the complaint should be dismissed in its entirety because the Estate failed to comply with RTI's view of the required procedural requirements. This lengthy argument lacks any merit. First, as a

---

[1] *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791-96 (D.C. Cir. 1984), and *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985).

simple telephone inquiry to the Estates' counsel would have revealed, the Estate has the "Qassam Sharies" cited by RTI.  That document, and other documents in Arabic, are being translated and will be produced pursuant to Rule 26 as soon as discovery commences.  Second, given that the Estate does not have any property in the District of Columbia, by the terms of statute, it appears the Estate does not need to file with the Register.  The cases cited by RTI do not state any such requirement applicable to the Plaintiff.  If the Court holds otherwise, of course the Estate will gladly file the necessary papers.

RTI also argues that the Estate should be required to plead its choice of law.  There is no legal support for imposing this requirement on the Estate at this early juncture.  The Federal Rules of Civil Procedure require only that defendants be told the grounds for jurisdiction, the claims being made, and the type of relief being sought.  Fed.R.Civ.Pro. 8(a).  The Estate's complaint satisfies this Federal Rule.  Paragraph 10 asserts jurisdiction; paragraphs 12 through 20 plainly state the facts supporting the claim; and the prayer for damages states the type of relief being sought.

Although the Estate acknowledges that the parties ultimately may dispute which law controls, there is no need to manufacture such a dispute at this early juncture.  Indeed, it is premature to brief choice of law issues without the Estate having the benefit of discovery.  Discovery will uncover facts critical and likely dispositive to the choice of law analysis, such as the interested forums, the actual conflicts in law between those forums, and other facts such as the place where the defendants formed the contract, the place where RTI supervised Unity, and the place where RTI took actions to conceal the Unity shootings.

## II. Counts I-III State Viable War Crimes Claim and Should Not Be Dismissed Without Discovery.

### A. The Complaint Alleges Conduct That Rises to the Level of War Crimes.

A war crime is a term defined by federal law. As a matter of definition, the intentional killing of an unarmed civilian (Ms. Manook) in the course of an armed conflict or occupation (Iraq) constitutes a war crime. That is, the federal war crimes statute defines "war crime" as conduct that is "defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949," or conduct "which constitutes a violation of common Article 3 of the international conventions signed at Geneva, 12 August 1949." *War Crimes Statute*, *18 U.S.C. § 2441(c)(1))(3) (1996)*. Article 147 of the Fourth Geneva Convention, which protects civilians during armed conflict, defines "grave breaches" to include "willful killing…of a protected person [i.e. civilians]." *Geneva Convention IV, art. 147.*

RTI claims that Ms. Manook's murder was a merely a "municipal crime" unconnected to what they call the "alleged" armed conflict in Iraq. *Statement at 26-27*. RTI advances three arguments as to why the murder is not a war crime: war crimes only occur (1) in conflicts "not of an international nature" (Statement at 24-25); (2) in the course of armed conflict between militaries, (3) when the conduct is undertaken on behalf of a state. RTI's analysis fails in each instance.

#### 1. *War Crimes May Occur in Both International and Non-International Conflicts.*

First, although there are differing views as to whether the conflict in Iraq is an international armed conflict or a non-international conflict,[2] such characterizations are irrelevant

---

[2] The United States government "continues to regard the conflict in Iraq as an international armed conflict, with procedures currently in force consistent with provisions of the Fourth

as a matter of law.  That is, RTI's claim that war crimes can only occur in conflicts that are ***not*** of an international character is simply mistaken as a matter of law.[3]  Article 147 applies to international conflicts and occupations.  *See Geneva Convention IV, art. 2 ("the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties…The Convention shall also apply to all cases of partial or total occupation of the territory of a High Contracting Party*.")  RTI simply cannot credibly claim that there is no conflict in Iraq.  Indeed, RTI's own papers admit that the Court is entitled to take judicial notice of "the barrage of news media reports . . . regarding the daily carnage and escalating death toll in Iraq," *Statement at 2*.

### 2. *Non-military Personnel May Commit War Crimes.*

RTI, relying exclusively on *Estate of Klieman v. Palestinian Authority*, 424 F.Supp.2d 153 (D.D.C. 2006), argues that only military personnel are able to commit war crimes.  But the court in *Klieman* was construing an exception to a specific statute – the anti-terrorism statute – that by its terms prevented victims from seeking recovery for "any act occurring in the course of….armed conflict ***between military forces*** of any origin." *Id. at 163 (emphasis added)*.  The district court found that the attack on civilians on the bus should not be considered outside the

---

Geneva Convention."   *U.N. Assistance Mission for Iraq (UNAMI) Human Rights Report, 1 July - 31 December 2007* (Mar. 2008) ¶ *66.*   The United Nations Assistance Mission for Iraq takes the position that the war is in Iraq is an armed conflict of a non-international character governed by "common article 3 to the four Geneva Conventions."  *Id.*

[3] Common Article 3, which does apply only to non-international armed conflicts and appears in all four Geneva Conventions, provides *inter alia* that "[p]ersons taking no active part in the hostilities…shall in all circumstances be treated humanely," and cannot be subjected to "[v]iolence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture."  Geneva Convention IV, art. 3.

zone of the statute because such attacks constituted war crimes, and thus could not be considered as occurring during the course of an armed conflict.[4]

RTI uses that liability-expanding conclusion to argue that it should be shielded from liability. But the fact that the *Klieman* court found attacks on civilians to be war crimes outside the zone of the anti-terrorism statute's protection for lawful military conduct suggests the opposite conclusion: the Estate may also be able to hold RTI and Unity liable under the anti-terrorism statute. Clearly, RTI cannot reasonably rely on the *Klieman* decision to argue that all conduct that violates the law of armed conflict cannot be categorically excluded from the definition of "war crimes." *Klieman's* holding simply has no application to this case. Instead, as is clear from the terms of the federal war crimes statute implementing the Geneva Conventions, non-military personnel can commit war crimes, and can be punished for doing so. *War Crimes Statute, 18 U.S.C. § 2441(c)(1))(3) (1996)*.

### 3. RTI Is Working for an Internationally-Recognized State, Namely the United States.

RTI claims that the Estate's allegations fail to allege a necessary predicate: namely, that the defendants were acting on behalf of a state. In so doing, RTI simply ignores the language of the Amended Complaint, which clearly alleges that Ms. Manook was unlawfully killed by heavily-armed mercenaries working as subcontractors to the United States government. *First Amended Complaint ¶¶ 1, 3*.

Indeed, because RTI and Unity were working under contract with the United States, the Manook family and the Iraqi government are precluded from treating Ms. Manook's death as an isolated "municipal crime" and prosecuting the murderers. The United States has decreed that

---

[4] The Court reasoned, "[a]s a matter of law, an act that violates established norms of warfare and armed conflict under international law is not an act occurring in the course of armed conflict." *Id. at 166.*

all contractors and subcontractors providing services to the U.S. occupation in Iraq, including both contractors performing reconstruction or development projects and private security companies, "shall be immune from Iraqi legal process." *Coalition Provisional Authority Order 17 at Sec. 1(11)-(14), Sec. 4(3)*.  The order defines "Iraqi legal process" as "any arrest, detention or legal proceedings in Iraqi courts or other Iraqi bodies, whether criminal, civil, or administrative." *Id. at Sec. 1(10)*.  As a result of their affiliation with the United States, RTI, Unity, and their employees are not subject to being hauled into Court in Iraq to account for murdering Ms. Manook.  Thus, this Court is the only venue for the victim's family to obtain justice.

> **B. Congressional Action Taken Subsequent to the Two 1980s Appellate Decisions Relied Upon by RTI Makes Clear that Private Parties Can Be Held Liable for War Crimes.**

In addition to alleging that the conduct at issue does not rise to the level of war crimes, RTI argues that that only state actors can be held liable for violations of the law of nations.  First and most importantly, as explained immediately above, RTI and Unity are acting on behalf of the state.  They would not be in the war zone of Iraq, carrying weapons, if they were not acting pursuant to contract with the United States.

But second, even assuming that RTI and Unity were not acting under contract to the United States, RTI's argument relies on two Court of Appeals' precedents that predate the United States adoption of the war crimes statutes.   As RTI explains, *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791-96 (D.C. Cir. 1984), and *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), stand for the proposition that murderous attacks do not violate the law of war and the law of nations unless they are undertaken on behalf of a state actor.

In *Tel-Oren*, three D.C. Circuit judges dismissed a lawsuit against an Arab terrorist organization by the survivors of civilians murdered in an attack on an Israeli bus. Yet even there, Judge Edwards, one of the three judges (each of whom wrote separate opinions and based their holding on separate legal theories), cautioned that he agreed with the Court of Appeals for Second Circuit's holding in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) that "the 'law of nations' is not stagnant and should be construed as it exists today among the nations of the world," and that "one course of that law is the customs and usages of civilized nations, as articulated by jurists and commentators." *Tel-Oren*, 726 F.3d at 777 (Edwards, J., concurring). He found, based on the existing state of international law, that "official torture" violated international law but torture by private actors did not. *Id.* at 795.

In *Sanchez-Espinoza,* the Court of Appeals held that private persons providing financial aid to a Nicaraguan faction that was murdering innocent Nicaraguan civilians did not violate customary international law or any treaty when committed by private actors. *Sanchez-Espinoza*, 770 F.2d at 205-207.

Here, of course, the Estate is not challenging the provision of aid, or the torture of Ms. Manook. Rather, the Estate is challenging the intentional and unwarranted murder of Ms. Manook, an unarmed and innocent civilian who was going about her affairs in a lawful manner on the streets of Baghdad. Thus, as the Supreme Court teaches in *Sosa v. Alvarez-Machain*, the viability of the Estate's Alien Tort Statute war crimes claims "must be gauged against the *current* state of international law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 (2004). Indeed, the Supreme Court even raised the prospect that *Tel-Oren* is no longer valid by indicating that

there was "insufficient consensus *in 1984* that torture by private actors violates international law," and recognizing the possibility that there *is* sufficient consensus today. *Id.* at n.20.[5]

Subsequent to the issuance of the *Tel-Orens* and *Sanchez* decisions, the United States Congress passed legislation that expressly makes purely private actors liable for war crimes if they intentionally kill unarmed civilians. That is, in 1996, Congress enacted the War Crimes Act, which provided that any "member of the Armed Forces of United States *or…national of the United States*" who commits a war crime "shall be fined under this title or imprisoned for life or any term of years, or both, and if death results to the victim, shall also be subject to the penalty of death." 18 U.S.C. § 2441(a), (b) (1996). The plain language of the Act makes clear that private parties as well as soldiers and government officials can be prosecuted for war crimes if they are U.S. nationals.

To similar effect are the Department of Defense Regulations, which expressly require contractors to notify their U.S. citizen employees that they are potentially subject to prosecution under the War Crimes Act for violations of the laws of war. *See* 48 C.F.R. § 252.225-7040(e)(2)(ii).

Subsequent to the passage of the War Crimes Statute, Congress again expressed the view that private parties who attack innocent civilians in the context of a war can be held liable for war crimes. That is, in 2006, Congress passed the Military Commissions Act ("MCA"). The MCA defines "Attacking Civilians" and "Murder of Protected Persons" as war crimes triable by

---

[5] RTI, quoting on *Doe v. Exxon Mobil*, 393 F.Supp.2d 20 (D.D.C. 2005), argues that footnote 20 suggests "that only states, and not corporations or individuals, may be liable for international law violations." That is a misreading of footnote 20, which simply recognizes that *some* international law norms apply only to state actors. As discussed in detail below, *Kadic v. Karadzić*, 70 F. 3d 232 (2nd Cir. 1995), one of the two cases cited in note 20, recognizes that private actors who commit war crimes are liable under the Alien Tort Statute. The *Sosa* majority gives no indication that it rejects *Kadic*'s holding regarding private liability.

military commission without regard to whether they were committed by private actors or government official.  "Attacking Civilians" is defined as "intentionally engag[ing] in an attack upon a civilian population as such, or individual civilians not taking active part in hostilities," and is punishable by death if the victim dies.  MCA § 950v(b)(2).  The prohibition of "Murder of Protected Persons" provides that a person who "intentionally kills one or more protected persons shall be punished by death or such other punishment as a military commission under this chapter may direct." MCA § 950v(b)(1).  A "protected person" is "any person entitled to protection under one or more of the Geneva Conventions," including "civilians not taking an active part in hostilities."  MCA § 950v(a)(2).  These provisions reflect the Congressional view that private actors who kill civilians during an armed conflict are guilty of war crimes.

The MCA also amended the War Crimes Act to criminalize only specified "grave breaches" of Common Article 3 instead of all violations.  The "grave breaches" listed still include the intentional killing of unarmed civilians.  *See* MCA § 6(b)(1)(D).[6]  In sum, Congressional action taken subsequent to the Court of Appeals issuance of the *Tel Oren* and *Sanchez* decisions suggests that federal law is no longer consistent with those holdings.

### C. Decisional Law in Other Circuits Makes Clear that Private Parties Can Be Held Liable for War Crimes.

Subsequent jurisprudence in the federal appellate courts is consistent with the Congressional passage of legislation permitting private actors to be held liable for war crimes.  For example, in 1995, the Court of Appeals for the Second Circuit held that war crimes by private actors were actionable under the Alien Tort Statute in *Kadic v. Karadzić*, 70 F. 3d 232 (2nd Cir. 1995).  There, the victims of atrocities in the former Yugoslavia brought suit against

---

[6] The MCA did not amend the provisions of the War Crimes Act regarding grave breaches of the Third and Fourth Geneva Conventions.

Bosnian-Serb militia leader Radovan Karadzić. The district court had dismissed the case because Karadzić's militia "does not constitute a recognized state," its members "do not act under the color of any recognized state law," and "acts committed by non-state actors do not violate the law of nations." *Id.* at 237 (quoting *Doe v. Karadzić,* 866 F.Supp. 734, 739-41 (S.D.N.Y.1994). The Court of Appeals overturned, and held that the defendants' alleged war crimes, including "acts of murder," of civilians,

> if proved, would violate the most fundamental norms of the law of war embodied in common article 3 [of the Geneva Conventions], which binds parties to internal conflicts regardless of *whether they are recognized nations or roving hordes of insurgents*. The liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II…. The District Court has jurisdiction pursuant to the Alien Tort Act over appellants' claims of war crimes and other violations of international humanitarian law.

*Id.* at 243 (emphasis added). *See also id.* at 240 ("Individuals may be held liable for offenses against international law, such as piracy, war crimes, and genocide.") (quoting the Restatement (Third) of the Foreign Relations Law of the United States (1986)).

The *Kadic* court noted that the United States government had filed a statement of interest in which it "emphatically restated in this litigation its position that private persons may be found liable under the Alien Tort Act for acts of genocide, war crimes, and other violations of international humanitarian law." *Id.* at 239-240. The Court of Appeals for Second Circuit subsequently affirmed *Kadic* in *Bigio v. Coca-Cola*, 239 F.3d 440, 448 (2d Cir. 2000).

Even more recently and expressly, the Court of Appeals for Second Circuit affirmed that corporate actors may be held liable under the Alien Tort Statute for both direct violations of international law, and for aiding and abetting violations. In *Khulumani v. Barclay National Bank, Ltd.*, 504 F.3d 254 (2nd Cir. 2007), the court held in a per curiam opinion that corporations

could be held liable under the Alien Tort Statute for aiding and abetting South Africa's apartheid regime in committing human rights abuses.  The two members of the majority wrote separately to explain their reasoning.  Judge Katzmann's concurring opinion stated that "recognition of the individual responsibility of a defendant who aids and abets a violation of international law is one of those rules "that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern."  *Id.*

The Court held that the fact that the defendants were corporations did not change the outcome:  "We have repeatedly treated the issue of whether corporations may be held liable under the ATCA as indistinguishable from the question of whether private individuals may be."  As explained by the Court (J. Hall), concerns about exposing private corporations to liability under ATCA, "do not counsel in favor of the per se rejection of corporate liability, private party liability, and aiding and abetting liability under the ATCA."  Rather, "they require the narrow and careful extension of such liability to cases in which a defendant played a knowing and substantial role in the violation of a clearly recognized international law norm."  *Id.*

In reasoning directly applicable to the instant dispute, the Court (J. Hall) held that ATS liability for corporate aiding and abetting liability would be justified in "circumstances where the alleged aider and abettor is accused of having purchased security services with the knowledge that the security forces would, or were likely to, commit international law violations in fulfilling their mandate." *Id*.

Similarly, the Court of Appeals for the Ninth Circuit also adopted the proposition that private parties may be held liable for war crimes in *Doe v. Unocal*, 395 F.3d 932, 945-946, 954 (9th Cir. 2002).  Although that decision was later vacated for rehearing en banc, the Court of Appeals' subsequent denial of a motion to dismiss (which raised the same arguments raised by

RTI here) in *Sarei v. Rio Tinto*, *PLC*, 487 F.3d 1193, 1202 (9th Cir. 2007) reveals that the underlying holding remains valid law. In *Sarei*, the Court of Appeals denied a motion to dismiss an ATS claim against a mining company in part because the plaintiffs had "alleged several claims asserting jus cogens violations that form the least controversial core of modern day ATCA jurisdiction, including allegations of war crimes."

Many district courts have also recognized that private parties may be held liable for war crimes under the Alien Tort Statute. In *Doe v. Islamic Salvation Front*, 257 F. Supp.2d 115 (D.D.C. 2003), the district court stated that "war crimes" were included in the "handful of crimes" for which courts had found liability without regard to state action, but found that the plaintiffs' allegations did not constitute "war crimes."[7] *See also In Re Sinaltrainal Litigation*, 474 F.Supp.2d 1273, 1287 ("Plaintiffs argue that the paramilitary acts that constitute war crimes, including summary execution, torture, and unlawful detention, do not require a showing of state action….As a general principle of law, they are correct.")

### D. International Law Makes Clear that Private Parties Can Be Held Liable for War Crimes.

In addition to Congressional action and federal court jurisprudence, there is a strong consensus among international sources that private actors who attack civilians in the context of armed conflict are liable for war crimes. The first precedent for this is the Nuremberg tribunals' conviction of German industrialists for their participation Nazi atrocities. *See Flick Case*, Vol. IX, pp. 17-18 ("[a]cts adjudged criminal when done by an officer of the government are criminal

---

[7] The district court in *Doe v. Islamic Salvation Front* found that categorizing the plaintiffs' particular allegations as war crimes "stretches the meaning of war crimes and crimes against humanity under the law of nations too far," but the court made this finding only after allowing several years of discovery, during which plaintiffs failed to produce evidence that the defendant had "incited or facilitated the threats, injuries, or murders that are the focus of the plaintiffs' claims."

also when done by a private individual"); *Krupp Case*, Vol. X, p. 150 ("the laws and customs of war are binding no less upon private individuals than upon government officials and military personnel").

The precedents arising from Nuremberg have now been adopted and followed (and therefore strengthened) by recent international criminal tribunals in Rwanda and the former Yugoslavia have confirmed private actors' liability for war crimes.  *See Prosecutor v. Akayesu*, ITCR-96-4-A, ICTR Appeals Chamber, Judgment, 1 June 2001, ¶¶ 443-444 ("[I]nternational humanitarian law would be lessened and called into question if it were to be admitted that certain persons be exonerated from individual criminal responsibility for [war crimes] under the pretext that they did not belong to a specific category. … Th[e] nexus between violations and the armed conflict implies that, in most cases, the perpetrator of the crime will probably have a special relationship with one party to the conflict.  However, such a special relationship is not a condition precedent…");  *Prosecutor v. Tadic,* IT-94-1-T, ICTY Trial Chamber, Judgment, 7 May 1997, ¶ 572 ("It is not … necessary to show that … the proscribed acts [were] … part of a policy or of a practice officially endorsed or tolerated by one of the parties to the conflict, or that the act be in actual furtherance of a policy associated with the conduct of war or in the actual interest of a party to the conflict; *the obligations of individuals under international humanitarian law are independent and apply without prejudice to any questions of the responsibility of States under international law.*  The only question, to be determined in the circumstances of each individual case, is whether the offences were closely related to the armed conflict as a whole.") (emphasis added); GUENAEL METTRAUX, INTERNATIONAL CRIMES AND THE *AD HOC* TRIBUNALS 42-43 (2005) ("it is not a requirement that the perpetrator should some how be related to or linked to one of the parties to the conflict").

The International Criminal Court's Rome Statute, similar to the United States' War Crimes Act, defines "war crimes" to include "Grave breaches of the Geneva Conventions of 12 August 1949," including the "Wilful killing" of any protected person; and violations of Common Article 3, including "Violence to life and person, in particular murder of all kinds" against persons not taking part in hostilities." Rome Statute, Art. 8(2)(a)(i), Art.(8)(2)(c)(i), *available at* http://untreaty.un.org/cod/icc/statute/romefra.htm. The Rome Statute's definition of "war crimes" also includes "Intentionally directing attacks against the civilian population as such or against individual civilians not taking direct part in hostilities," in both international and non-international armed conflicts." *Id.*, Art. 8(2)(b)(i), Art. 8(2)(d). There is no requirement that the perpetrators be members of a state's military, or otherwise acting on behalf of a governmental party to a conflict. *See* KNUT DORMANN, ET AL. (INTERNATIONAL COMMITTEE OF THE RED CROSS), ELEMENTS OF WAR CRIMES UNDER THE ROME STATUTE OF THE INTERNATIONAL CRIMINAL COURT 34-37 (2003) ("the mere fact of being a civilian does not guarantee any protection whatsoever from charges based upon international criminal law"). In negotiating these provisions, states rejected any proposal to 'list' the potential perpetrators of war crimes. *Id.* Since the Rome Statute took effect, the I.C.C. has issued arrest warrants charging several private actors for their killing of unarmed civilians, including four members of the anti-government

Lord's Resistance Army in Uganda: Joseph Kony,[8] Vincent Otti (deceased),[9] Raska Lukwiya (deceased),[10] and Dominic Ongwen.[11]

In short, subsequent to the Court of Appeals' issuance of the *Tel Orens* and *Sanchez* decisions, there is a growing body of law that controls the issue of whether private parties may be held liable for war crimes. Congressional action, federal appellate court jurisprudence, and international law, all lead to the conclusion that the Court of Appeals' twenty-year old decisions are no longer controlling. This Court should deny RTI's motion to dismiss the war crimes claims in Counts I-III.

### III.  The Lawsuit Should Not Be Transferred to North Carolina.

RTI seeks to have this action transferred to the Eastern District of North Carolina but does not articulate any compelling reasons why this Court should use its discretionary power to transfer the action pursuant to 28 U.S.C. Section 1404(a). *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (recognizing court power and stating standard for reviewing request for transfer).

While Section 1404(a) permits transfers for the convenience of the parties and witnesses, the deference must be given to plaintiff's choice of forum. "[I]n assessing the convenience to the parties [in the context] of the two potentially proper venues, the court recognizes that the

---

[8]  Counts 4, 8, 12 14, 17, 18 25, 30 and 32 of Kony's indictment, available at http://www.icc-cpi.int/library/cases/ICC-02-04-01-05-53_English.pdf, charge him with "war crimes" for his participation in unlawful killings of civilians.

[9] Counts  of Otti's indictment, available at, http://www.icc-cpi.int/library/cases/ICC-02-04-01-05-54_English.pdf, charge him with "war crimes" for his participation in unlawful killings of civilians. Otti was killed in November 2007.

[10] Counts of Lukwiya's indictment, available at, http://www.icc-cpi.int/library/cases/ICC-02-04-01-05-55_English.pdf, charge him with "war crimes" for his participation in unlawful killings of civilians. Lukwiya was killed by government forces in August 2006.

[11] Counts of Ongwen's indictment, available at, http://www.icc-cpi.int/library/cases/ICC-02-04-01-05-57_English.pdf, charge him with "war crimes" for his participation in unlawful killings of civilians.

plaintiff's choice of forum is usually accorded *substantial deference* in the venue analysis." *Reiffin v. Microsoft Corp.*, 104 F.Supp.2d 48, 52 (D.D.C.2000) (citations omitted) (emphasis added).

Furthermore, the moving party bears the burden of demonstrating that transfer pursuant to Section 1404 is warranted. *DeLoach v. Philip Morris Co., Inc.*, 132 F.Supp2d 22, 24 (D.D.C. 2000), *Sheraton Operating Corp. v. Just Corporate Travel*, 984 F.Supp 22, 25 (D.D.C. 1997). The district court has broad discretion in the determination of such motions and should undertake a case-by-case consideration of such issues as convenience and fairness. *Stewart Org. Inc., v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed 22(1988) (citation omitted.)

Defendant RTI maintains and staffs an office in the District of Columbia. The other defendant, Unity Resources Group, also maintains and staffs an office in the District of Columbia. Both defendants have substantial ties to this forum and perform significant business here. Travel from North Carolina to the District of Columbia is not particularly onerous, especially when RTI maintains an office here for its employees and admits that some of the employees located in this District are involved in the events at issue. RTI makes no showing of increased fairness in the judicial process by moving the case to North Carolina. Venue is properly seated in the District of Columbia, and RTI has not met its burden to overcome the deference accorded to plaintiff's choice of forum**.**

## CONCLUSION

For the reasons stated above, RTI's Motion to Dismiss or Transfer should be denied.

| | |
|---|---|
| Date:  April 18, 2008 | __/s/ Susan L. Burke_____<br>Susan L. Burke (D.C. Bar # 414939)<br>William T. O'Neil (D.C. Bar # 426107)<br>Elizabeth M. Burke<br>Katherine R. Hawkins<br>BURKE O'NEIL LLC<br>4112 Station Street<br>Philadelphia, PA 19127<br>Telephone:   (215) 971-5058<br>Facsimile:   (215) 482-0874<br><br>Katherine Gallagher<br>CENTER FOR CONSTITUTIONAL RIGHTS<br>666 Broadway, 7th Floor<br>New York, NY 10012<br>Telephone:   (212) 614-6439<br>Facsimile:   (212) 614-6499<br><br>Shereef Hadi Akeel<br>AKEEL & VALENTINE, P.C.<br>401 South Old Woodward Avenue<br>Suite 430<br>Birmingham, MI 48009<br>Telephone:   (248) 594-9595<br>Facsimile:   (248) 594-4477<br><br>*Counsel for Plaintiff* |