IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ESTATE OF MARANI AWANIS MANOOK,<br><br>                              Plaintiff,<br><br>            -against-<br><br>UNITY RESOURCES GROUP and RTI<br>INTERNATIONAL,<br><br>                              Defendants. | Civil Case No. 1:08-cv-00096 (PLF)<br><br>Hon. Paul L. Friedman |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION
OF DEFENDANT UNITY RESOURCES GROUP PTE. LTD.
TO DISMISS THE FIRST AMENDED COMPLAINT**

CHADBOURNE & PARKE LLP
Attorneys for Defendant
    Unity Resources Group Pte. Ltd.
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(212) 408-5100

William S. D'Amico
Robert A. Schwinger
Daniel J. Greenwald III

        Of Counsel

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 3

    I     PLAINTIFF HAS FAILED PROPERLY TO EFFECTUATE
         SERVICE UPON UNITY ........................................................................... 3

    II    THIS COURT LACKS PERSONAL JURISDICTION OVER
         UNITY ...................................................................................................... 8

         A.    Unity's Use of Office Space in the District is Not
               Dispositive of the Jurisdiction Issue ................................................. 8

         B.    The Activities of Unity's Independent Contractor Do Not
               Meet This District's Jurisdictional Standards ................................ 10

         C.    Plaintiff Has Not Shown Other Meaningful Contacts With
               This District .................................................................................. 13

         D.    Plaintiff is Not Entitled to Jurisdictional Discovery ..................... 15

CONCLUSION ....................................................................................................... 18

# TABLE OF AUTHORITIES

**Page**

## CASES

3M Distrib. Corp. v. Rugby Corp., 209 A.2d 790 (D.C. 1965)...........................................7

*AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F. Supp. 64 (D.D.C. 2004) ....9, 14

Atlantigas Corp. v. Nisource, Inc., 290 F. Supp. 2d 34 (D.D.C. 2003)......................15, 16

*Brockmeyer v. May, 383 F.3d 798 (9th Cir. 2004)...........................................................5

Burman v. Phoenix Worldwide Indus., Inc., 437 F. Supp. 2d 142 (D.D.C. 2006)...........12

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080 (D.C. Cir.
   1998).......................................................................................................................16, 17

Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express
   World Corp., 230 F.3d 934 (7th Cir. 2000)....................................................16, 17, 18

*City of Moundridge, KS v. Exxon Mobil Corp., 471 F. Supp. 2d 20 (D.D.C.
   2007).............................................................................................................................8, 9

Costa v. Keppel Singmarine Dockyard Pte, Ltd., No. CV 01-11015, 2003 WL
   24242419 (C.D. Cal. Apr. 24, 2003) .......................................................................9, 11

Costal Video Commc'ns, Corp. v. Staywell Corp., 59 F. Supp. 2d 562 (E.D. Va.
   1999)................................................................................................................................9

*Del Monte Corp. v. Everett S.S. Corp., S/A, 402 F. Supp. 237
   (N.D. Cal. 1975) .....................................................................................................9, 10, 12

Export-Import Bank of U.S. v. Asia Pulp & Paper Co., No. 03 Civ. 8554, 2005
   WL 1123755 (S.D.N.Y. May 11, 2005) .......................................................................5

Fasolyak v. The Cradle Society, Inc., Civ. A. No. 06-01126, 2007 WL 2071644
   (D.D.C. July 19, 2007) ................................................................................................16

G & H Partners, Ltd. v. Boer Goats Int'l Ltd., 896 F. Supp. 660 (W.D. Tex. 1995)..........5

GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343 (D.C. Cir. 2000) .......... 18

Ghanem v. Kay, 624 F. Supp. 23 (D.D.C. 1984) ............................................... 12

*Gorman v. Ameritrade Holding Corp., 293 F.3d 506 (D.C. Cir. 2002) .................... 12, 15

*Hargrove Displays, Inc. v. Rohe Scientific Corp., 316 A.2d 330 (D.C. 1974) ................ 7

Helmer v. Doletskaya, 393 F.3d 201 (D.C. Cir. 2004) ........................................ 13

*Hughes v. A.H. Robins Co., 490 A.2d 1140 (D.C. 1985) .......................................... 13, 14

Int'l Terminal Operating Co. v. Skibs A/S Hidlefjord, 63 F.R.D. 85 (S.D.N.Y. 1973) ................................................................................................................. 17

Jazini v. Nissan Motor Co., 148 F.3d 181 (2d Cir. 1998) .................................... 18

Lampe v. Xouth Inc., 952 F.2d 697 (3d Cir. 1991) ............................................. 5

*Landell v. Northern Pac. Ry. Co., 98 F. Supp. 479 (D.D.C. 1951) ................................... 12

*Lehigh Portland Cement Co. v. Ornstein, 334 F. Supp. 1032 (D.D.C. 1971) ................... 7

MacInnes v. Fontainebleau Hotel Corp., 257 F.2d 832 (2d Cir. 1958) ....................... 12, 13

Mantello v. Hall, 947 F. Supp. 92 (S.D.N.Y. 1996) ........................................... 11

Med. Solutions, Inc. v. C Change Surgical LLC, 468 F. Supp. 2d 130 (D.D.C. 2006) ................................................................................................................. 16

*Osborn & Barr Commc'ns, Inc. v. EMC Corp., No. 4:08-CV-87, 2008 WL 341664 (E.D. Mo. Feb. 5, 2008) ......................................................................... 16

*Palmer v. Kawaguchi Iron Works, Ltd., 644 F. Supp. 327 (N.D. Ill. 1986) .............. 9, 12

In re Rationis Enters., Inc. of Panama, 261 F.3d 264 (2d Cir. 2001) ........................ 9

Rose v. Silver, 394 A.2d 1368 (D.C. 1978) ...................................................... 11

Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U.S. 516 (1923) .................................. 14

*<u>Roz Trading Ltd</u> v. <u>Zeromax Group, Inc.</u>, 517 F. Supp. 2d 377 (D.D.C. 2007) ...............8

<u>Shoppers Food Warehouse</u> v. <u>Moreno</u>, 746 A.2d 320 (D.C. 2000) ..................................13

<u>Willis</u> v. <u>Willis</u>, 655 F.2d 1333 (D.C. Cir. 1981) .............................................................13

## STATUTES

D.C. Code § 13-423(b) ...................................................................................................13

D.C. Code § 29-312(b) .....................................................................................................6

D.C. Code § 29-101.12 .....................................................................................................6

D.C. Code § 29-101.12(b) .............................................................................................6, 7

D.C. Code § 29-101.99 .....................................................................................................6

D.C. Code § 29-101.99(a) .................................................................................................7

*D.C. Code § 29-101.99(b) ...............................................................................................7

D.C. Code § 29-101.99(e)(1) ........................................................................................6, 7

## RULES

Fed. R. Civ. P 4(f)(2)(C)(ii).....................................................................................3, 4, 6

## URLs

http://ipoaonline.org/php/index.php?option=com_content&task=view&id=130&It
    emid=130 ..................................................................................................................15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ESTATE OF MARANI AWANIS MANOOK,<br><br>                          Plaintiff,<br><br>        -against-<br><br>UNITY RESOURCES GROUP and RTI<br>INTERNATIONAL,<br><br>                        Defendants. | Civil Case No. 1:08-cv-00096 (PLF)<br><br>Hon. Paul L. Friedman |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION
OF DEFENDANT UNITY RESOURCES GROUP PTE. LTD.
TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendant Unity Resources Group Pte. Ltd. ("Unity") respectfully submits this Reply Memorandum of Law in Further Support of its Motion to Dismiss the First Amended Complaint (the "Complaint" or "Compl.").

## PRELIMINARY STATEMENT

Plaintiff's Opposition to Unity's Motion to Dismiss ("Opp. Mem."), despite its heated rhetoric and demonstrable overstatements,[1] still fails to show either that Unity has

---

[1]  As an example, Plaintiff asserts, without citing any authority, that "Unity publicly admitted to the mass media that Unity had made a dreadful mistake in shooting Ms. Manook and intends to compensate the family."  (Opp. Mem. at 2 n. 2.)  While Unity

(Cont'd on following page)

been effectively served with process or that any adequate basis exists for the exercise of personal jurisdiction over Unity.  In fact, Plaintiff's opposition only serves to confirm that dismissal is warranted and that Unity's motion therefore should be granted.

With respect to service of process, Plaintiff, while attempting to argue to the contrary, effectively acknowledges that its first effort to serve Unity was flawed. Moreover, Plaintiff's attempt to cure its initial defective effort by serving the Mayor of the District of Columbia fails under District of Columbia law because Plaintiff has not shown that Unity, a foreign corporation, "transacts business" in the District.

With regard to Plaintiff's attempt to use "doing business" as a basis of personal jurisdiction, Plaintiff apparently assumes that its belated identification of a Unity "office" in this District is in itself sufficient to resolve any issue of whether Unity was "doing business" such that the Court has personal jurisdiction over it.  The law is squarely to the contrary — particularly when, as the declarations accompanying this reply memorandum make clear, the "office" in question was in fact nothing but a "rent-a-desk" for intermittent use by a non-employee of Unity who primarily assisted Unity in soliciting business.  Such an office provides no basis for exercising personal jurisdiction here, and

---

(Cont'd from preceding page)

has extended its condolences to the families affected by this unfortunate incident (see Supplemental Declaration of Thomas E. Butler, dated April 24, 2008, ¶ 2, Exh. A), this expression of sympathy is far from an "admi[ssion] . . . that Unity had made a dreadful mistake."

Plaintiff identifies no other contacts with the District that would allow such exercise. Accordingly, Unity's motion should be granted. Further, because the evidence before this Court establishing that Unity is not subject to either general or specific jurisdiction in the District of Columbia is uncontroverted, Plaintiff's last-ditch effort to keep this case alive under the guise of requesting jurisdictional discovery lacks a sufficient basis and thus should be denied as well.

## ARGUMENT

### I

### PLAINTIFF HAS FAILED PROPERLY TO EFFECTUATE SERVICE UPON UNITY

The Complaint should be dismissed because the Plaintiff has not properly effectuated service upon Unity. Service was certainly not effectuated through Plaintiff's botched sending of a DHL package to the wrong address in February, and Plaintiff has not cured this failure through its recent alleged service upon the Mayor of the District of Columbia.

As Unity explained more fully in its opening Memorandum of Law ("Unity Mem."), Plaintiff did not properly serve Unity pursuant to Rule 4(f)(2)(C)(ii) of the Federal Rules of Civil Procedure by sending copies of the Summons and Complaint by DHL delivery to Unity's former address in Dubai. While Plaintiff argues that "[t]he mere

fact that the clerk made use of the plaintiff's counsel to act as a delivery person does not invalidate otherwise valid service,"[2] (Opp. Mem. at 3), this assertion is wrong for two reasons.

First, the plain language of the rule says otherwise. Fed. R. Civ. P. 4(f)(2)(C)(ii) is explicit that there must be "mail that the clerk addresses <u>and sends</u>" (emphasis added). The obvious point behind having the rule written in this manner is to avoid having to rely upon the attestations of partisan intermediaries when evaluating the sensitive issue of serving process upon nonresident foreign corporations by mail; <u>i.e.</u>, exactly what Plaintiff now seeks to have this Court do. Plaintiff cites no authority for its apparent theory that the sending-by-Clerk requirement can be dispensed with as long as the Clerk addressed the envelope and the sender eventually deposited the envelope with a delivery service of some sort.

Second, Plaintiff's own submissions make clear that the Clerk never requested that Plaintiff's counsel "act as a delivery person" notwithstanding the express requirement of Rule 4(f)(2)(C)(ii).[3] Rather, Plaintiff's own counsel acknowledges, "[o]n

---

[2]    As discussed in Unity's opening Memorandum of Law, at 4-11, the failure of the Clerk to dispatch the Summons and Complaint was not the only defect in service; consequently, service was not "otherwise valid."

[3]    Indeed, it also apparently contravenes the usual practice of the Clerk's Office as well, inasmuch as a representative of the Clerk's Office informed Unity's counsel that the Clerk's Office typically handles such deliveries itself, using the Court's envelopes,

(Cont'd on following page)

or about February 21, 2008, rather than attempt to schedule DHL to pick up the package

from the clerk for the third time, I personally went to the Clerk's office and volunteered

to bring the package." (Declaration of William T. O'Neil, executed April 10, 2008

("O'Neil Decl."), ¶ 8.) Counsel's apparent impatience with the DHL pick-up service

from the Clerk's office does not vitiate the clear directive of Rule 4 that the Clerk both

address and send service of process to the foreign corporation. Brockmeyer v. May, 383

F.3d 798, 805 (9th Cir. 2004) (clerk of the court must address and dispatch service of

process); Lampe v. Xouth, Inc. 952 F.2d 697, 702 (3d Cir. 1991) (same); Export-Import

Bank of U.S. v. Asia Pulp & Paper Co., No. 03 Civ. 8554, 2005 WL 1123755, at *2

(S.D.N.Y. May 11, 2005) (Appendix of Cases, Exh. B) (same); G & H Partners, Ltd. v.

Boer Goats Int'l Ltd., 896 F. Supp. 660, 663 (W.D. Tex. 1995) (same).

Apparently recognizing the defects in its first effort to serve Unity by directly

sending a package to the wrong address[4] using a private courier service,[5] Plaintiff now

---

(Cont'd from preceding page)

which bear a return address making clear that the package was sent from the Court.
(Unity Mem. at 8.)

[4]    Plaintiff's counsel apparently misreads the Unity declaration regarding the current
address of Unity entities in Dubai in asserting that a different Unity entity was at the
address to which Plaintiffs sent the DHL. (Opp. Mem. at 3.) There was no Unity
entity at all that did business at that address. (Declaration of Patrick Gaul, dated
April 24, 2008 ("Gaul Decl."), ¶ 6.)

claims to have effected valid service upon Unity by delivering a copy of the Summons and Complaint to the Mayor of the District of Columbia. This latest attempt at service is also well short of the mark.

Plaintiff maintains that its latest attempt at service was proper "[u]nder D.C. Code 29-101.12(b), formerly 29-312(b)" (Opp. Mem. at 3-4), but this is plainly incorrect. Section 29-101.12 on its face applies only to corporations incorporated in the District of Columbia. Section 29-101.12(b) makes no reference to foreign corporations generally, or to unregistered foreign corporations subject to D.C. Code § 29-101.99(e)(1), at all. Unity, which is incorporated in Singapore, simply is not subject to the provisions of § 29-101.12.

The only statutory provision that is even potentially relevant, D.C. Code § 29-101.99, applies only to foreign corporations that "transact business" in the District of Columbia, and requires them to procure a certificate of authority and register an agent for service of process. As more specifically discussed in Section II infra, Unity, which is in the business of providing security services outside of the District of Columbia, is not

---

(Cont'd from preceding page)

[5]    Although DHL may require a signed receipt, a private courier service -- let alone a compound process involving the alleged use of Plaintiffs' counsel "as a delivery person" -- is not a "form of mail" as contemplated by Rule 4(f)(2)(C)(ii). (Unity Mem. at 9-10.) Plaintiff offers no response whatsoever to the numerous cases cited by Unity that have so held.

"doing business" in the District of Columbia. Unity therefore is not subject to the certification requirements of § 29-101.99(a) or the registration requirements of § 29-101.99(e)(1). See D.C. Code § 29-101.99(b) ("[a] foreign corporation shall not be required to procure a certificate of authority merely . . . by reason of the appointment of an agent for the solicitation of business not to be transacted in the District."); Hargrove Displays, Inc. v. Rohe Scientific Corp., 316 A.2d 330, 330 (D.C. 1974) (defendant "was not transacting business in the District of Columbia within the meaning of the statute and it was therefore inapplicable"); 3M Distrib. Corp. v. Rugby Corp., 209 A.2d 790, 791 (D.C. 1965) (foreign corporation's leasing activities "did not constitute the transaction of business by appellee in the District of Columbia within the meaning of the Code"); Lehigh Portland Cement Co. v. Ornstein, 334 F. Supp. 1032, 1034 (D.D.C. 1971) ("Many federal courts have found that such statutes have no application to the acts of a foreign corporation in making sales or contracts for the sale of products in interstate commerce, or the consummation of such transactions by the delivery or shipping of the goods from outside the states.").

Because Unity was never required to register an agent for service of process in the District of Columbia, there is no basis for treating the Mayor's office as its default agent. Accordingly, service upon the Mayor, whether under D.C. Code § 29-101.12(b) or any other section of the D.C. Code, did not constitute proper service upon Unity.

## II

## THIS COURT LACKS PERSONAL
## JURISDICTION OVER UNITY

**A.    Unity's Use of Office Space in the District
is Not Dispositive of the Jurisdiction Issue**

Plaintiff incorrectly asserts that because Unity maintains an office in the District of Columbia,[6] "Unity clearly has been doing business in this District and is therefore subject to this Court's exercise of general jurisdiction." (Opp. Mem. at 4.) Plaintiff's hyperbole does not accurately state the law in this area, let alone resolve the question of personal jurisdiction. In fact, "courts in this Circuit have concluded that allegations of corporate offices in the District of Columbia do not conclusively establish that corporations are 'doing business' in the District." Roz Trading Ltd v. Zeromax Group, Inc., 517 F. Supp. 2d 377, 386 (D.D.C. 2007). Without sufficient "factual allegations as to what, if any, business [the defendant] conducted [in the District of Columbia office] at the relevant point in time," general personal jurisdiction will not be available. Id.; see also City of Moundridge, KS v. Exxon Mobil Corp., 471 F. Supp. 2d 20, 33-34 (D.D.C. 2007) (holding that where the defendant had a corporate office in the District of Columbia and a Vice President permanently assigned to that office, general jurisdiction

---

[6]    Unity's office could have been uncovered at any time, merely by performing a basic Internet search.

would still be lacking absent "specific facts regarding the nature of [defendant's] business activity in its District of Columbia's office"). Moreover, "the mere presence of a single representative of a corporation who is limited to one type of activity does not ordinarily confer jurisdiction over the corporation as to matters unrelated to those activities." AGS Int'l Servs. S.A. v. Newmont USA Ltd., 346 F. Supp. 2d 64, 75 (D.D.C. 2004) (quoting Palmer v. Kawaguchi Iron Works, Ltd., 644 F. Supp. 327, 331 (N.D. Ill. 1986)).

Courts outside of the District of Columbia have also found that the presence of an office in the forum is not dispositive of the jurisdiction issue. In re Rationis Enters., Inc. of Panama, 261 F.3d 264, 270 (2d Cir. 2001) ("the presence of such an office is not dispositive"); Costa v. Keppel Singmarine Dockyard Pte, Ltd., No. CV 01-11015, 2003 WL 24242419, at *11 (C.D. Cal. Apr. 24, 2003) (Appendix of Cases, Exh. A) (quoting In re Rationis Enters., Inc. of Panama); Costal Video Commc'ns, Corp., v. Staywell Corp., 59 F. Supp. 2d 562, 571 (E.D. Va. 1999) ("[i]n traditional terms, the placing of a store or salesmen in a state is not sufficient to confer general jurisdiction over a defendant without some evidence that the store or salesmen actually generated sufficient sales in the forum state for the contact to be considered continuous and systematic"); Palmer, 644 F. Supp. at 331 (holding that general jurisdiction was lacking over a foreign defendant when the only contact with the forum was the presence of one service representative); Del Monte Corp. v. Everett S.S. Corp., S/A, 402 F. Supp. 237, 241-42 (N.D. Cal. 1975) (holding that presence of a corporate officer and local office in the District "indicates that defendants enjoy the business advantage of having an executive officer residing and working in the

state.  However, this proof falls short of the showing courts usually require to establish personal jurisdiction over a non-resident corporation").

A consideration of the actual facts concerning the office, and Unity's meager activities in this District, clearly demonstrates that they do not subject Unity to general jurisdiction.

**B.    The Activities of Unity's Independent Contractor Do Not Meet This District's Jurisdictional Standards**

The activities of Mr. Rolfes, the only person affiliated with Unity who has regularly used the Unity office in this District, do not subject Unity to jurisdiction.  Mr. Rolfes is <u>not</u> a Unity employee.  (<u>See</u> Gaul Decl. ¶ 2.)  Rather, he is an independent contractor who works out of the District of Columbia space -- which, at the time the Complaint was filed, was a small room leased from a company called Preferred Offices which also supplied office services -- only intermittently, and performs work for Unity on a part-time basis.  (<u>See</u> Declaration of David Rolfes, dated April 24, 2008 ("Rolfes Decl."), ¶ 7.)[7]  Mr. Rolfes resides in Maryland, not in the District of Columbia.  (<u>Id</u>. ¶ 4.)  His principal responsibilities for Unity involve the solicitation of potential clients both outside and within the District.  (<u>Id</u>. ¶ 5.)  He has broad discretion as to how to perform

_____

[7]    When Unity's contract with Preferred Offices ended in March of this year, the arrangement was changed.  Unity now contracts for the right to use non-private space in the District for a certain number of hours each month. (Rolfes Decl. ¶ 9.)

his solicitation and business development tasks.  (Id. ¶ 5.)  He is paid a fee pursuant to a contract, not a salary.  (Id. ¶ 3.)  His tax status is that of a self-employed individual.  (Id. ¶ 2.)  See Rose v. Silver, 394 A.2d 1368, 1371 (D.C. 1978) (discussing how activities of an independent contractor have been held "not imputable to the out-of-state defendant for the purpose of obtaining personal jurisdiction").

Even if Mr. Rolfes were a full-time employee, the nature of his Unity-related activities in the District of Columbia would not rise to the level of "doing business," such that the assertion of general jurisdiction over Unity would be appropriate.  As a threshold matter, Unity's business is providing security services, and Unity has never provided such services in the District of Columbia (Rolfes Decl. ¶ 5).  See Mantello v. Hall, 947 F. Supp. 92, 98 (S.D.N.Y. 1996) (holding that certain New York business activities did not ground personal jurisdiction in New York where "[Defendant's] business is the presentation of plays.  Plaintiff has not alleged that defendant presented . . . any . . . play in New York"); Costa, 2003 WL 24242419, at *11 (activity within forum insufficient to support jurisdiction, "particularly given evidence that the contracts were consummated outside the state and all work performed pursuant to the contracts was done in Singapore").

Moreover, the solicitation of business, the primary activity in which Mr. Rolfes is engaged, is insufficient to provide a basis for personal jurisdiction over a defendant.

Landell v. Northern Pac. Ry. Co., 98 F. Supp. 479, 482 (D.D.C. 1951); see also Ghanem v. Kay, 624 F. Supp. 23, 24-25 (D.D.C. 1984).[8] Mr. Rolfes also spends a small portion of the limited time he spends on Unity matters performing client relations and client support tasks (Rolfes Decl. ¶ 5), activities that likewise provide no basis for jurisdiction over Unity. See Palmer, 644 F. Supp. at 331 (personal jurisdiction absent where a defendant maintained a resident "service representative" in the forum whose duties involved the provision of technical advice to customers and even the making of service calls).

In short, the aforementioned activities are not "continuous and systematic" or "substantial" in nature, and thus do not provide a basis for the assertion of general jurisdiction. Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 510 (D.C. Cir. 2002). Indeed, courts have declined to assert jurisdiction over corporate defendants in circumstances where such defendants were engaged in far more extensive activities within the forum. See Del Monte Corp., 402 F. Supp. at 241-42 (finding jurisdiction lacking where, unlike here, defendant's office in the forum was staffed by a high-ranking corporate officer managing the company's general business activities); MacInnes v. Fontainebleau Hotel Corp., 257 F.2d 832, 834 (2d Cir. 1958) (finding jurisdiction lacking

---

[8]    Indeed, Mr. Rolfes' efforts have resulted in the generation of less than $200,000 in business, a tiny percentage of Unity's revenues. (Gaul Decl. ¶ 4.) See Burman v. Phoenix Worldwide Indus., Inc., 437 F. Supp. 2d 142, 155 (D.D.C. 2006) (holding activities accounting for .15% of a corporation's annual income not sufficient to ground jurisdiction).

where an office in the forum was staffed "with three employees" who answered customer inquiries, distributed promotional material, and received reservations).

**C.    Plaintiff Has Not Shown Other Meaningful Contacts With This District**

Plaintiff also contends, based upon allegations in the First Amended Complaint, that "[e]ven without consideration of Unity's office in this District . . . Plaintiff has alleged sufficient facts showing that Unity does conduct business in this district and is therefore subject to the jurisdiction of this Court." (Opp. Mem. at 5.)  In support of this contention, Plaintiff cites the "transacting business" prong of the D.C. long-arm statute. But § 13-423(b) of the District of Columbia long-arm statute clearly provides that "only a claim for relief arising from acts enumerated in this section may be asserted." Willis v. Willis, 655 F.2d 1333, 1336 (D.C. Cir. 1981) (emphasis added).  There is no basis for exercising long-arm jurisdiction over Unity because Plaintiff has made no allegation that Unity's contacts with the District of Columbia have the "substantial connection" to Plaintiff's claims required to support jurisdiction under the D.C. long-arm statute (Unity Mem. at 21-22).   Shoppers Food Warehouse v. Moreno, 746 A.2d 320, 335 (D.C. 2000); see also Helmer v. Doletskaya, 393 F.3d 201, 207 (D.C. Cir. 2004).

Nor has Plaintiff shown any other basis for the exercise of general personal jurisdiction.  As Unity noted in its opening brief, Plaintiff has the "fairly extensive" burden of establishing jurisdiction when the injury complained of is unrelated to the forum. Hughes v. A.H. Robins Co., 490 A.2d 1140, 1149-51 (D.C. 1985) (holding that

defendant's continuous solicitation of sales in the District, $3.2 million in revenue from sales in the District, advertising in the District, and sending of marketing letters to doctors in the District were not sufficient to support "doing business" jurisdiction).

Plaintiff contends that it "likely would be able to establish" that "Unity executives maintain offices in this District and travel regularly and routinely to this District to solicit and conduct business" and that "Unity executives travel here to disseminate marketing materials and solicit new contracts." (Opp. Mem. at 5-6.) However, Unity's undisputed and indisputable declarations show that no "Unity executives" maintain offices in the District of Columbia, and that visits to the District of Columbia by Unity executives in order to solicit business have been intermittent, occasional, and infrequent. (Gaul Decl. ¶ 3; Rolfes Decl. ¶ 6.) Indeed, the handful of business and client development trips to this District by Unity executives are insufficient as a matter of law to confer general personal jurisdiction. AGS Int'l Servs. S.A., 346 F. Supp. 2d at 76-77 (holding fourteen trips by defendant employees into the District when ten of them were to meet with the International Finance Corporation were "not of such significant 'frequency and volume' that [the defendant] could reasonably anticipate being haled into court in the District for actions which occurred in Peru pursuant to a contract governed by Peruvian law"); see also Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U.S. 516, 518 (1923) (holding that "[v]isits on such business, even if occurring at regular intervals, would not warrant the inference that the corporation was present within the jurisdiction of the state").

Plaintiff also alleges that Unity is a member of the International Peace Operations Association ("IPOA"), which requires Unity "by its membership to participate in IPOA proceedings here in the District."[9] (Opp. Mem. at 6.) Even if this were true, the IPOA enforcement mechanism is not legally binding, and a hypothetical IPOA proceeding that may require Unity executives to travel into the District of Columbia sometime in the future is not the kind of "substantial" and "continuous and systematic" contact required to exercise general jurisdiction over Unity. See Gorman, 293 F.3d at 510 (D.C. Cir. 2002); cf. Atlantigas Corp. v. Nisource, Inc., 290 F. Supp. 2d 34, 52 (D.D.C. 2003) ("[t]he question is not whether District of Columbia residents 'can' transact business in the District with the non-resident defendant through the defendant's website, but if they actually 'do' engage in sustained business activities in a continuous and systematic way").

**D.      Plaintiff is Not Entitled to Jurisdictional Discovery**

Finally, Plaintiff is not entitled to jurisdictional discovery. Contrary to Plaintiff's assertions, jurisdictional discovery is not "routinely" granted before an action is dismissed on jurisdictional grounds, and should not be granted here. To warrant

---

[9]   Contrary to Plaintiff's characterization of IPOA as a "trade association for mercenaries," it is actually a trade association whose members are "active in the Peace and Stability Operations Industry." (http://ipoaonline.org/php/index.php? option=com_content&task=view&id=130&Itemid=130).

jurisdictional discovery, the plaintiff must make a "detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce." Med. Solutions, Inc. v. C Change Surgical LLC, 468 F. Supp. 2d 130, 135 (D.D.C. 2006) (citations omitted). The court in Atlantigas Corp. stated that "where there is no showing of how jurisdictional discovery would help plaintiff discover anything new, it [is] inappropriate to subject [defendants] to the burden and expense of discovery." 290 F. Supp. 2d at 53 (internal quotation marks omitted) (alteration in original); see also Fasolyak v. The Cradle Society, Inc., Civ. A. No. 06-01126, 2007 WL 2071644, at *10 (D.D.C. July 19, 2007) (Appendix of Cases, Exh. C) ("it is not error to deny jurisdictional discovery when the record indicates there is nothing to be gained from the effort"); Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1090 (D.C. Cir. 1998) ("it is reasonable for a court . . . to expect the plaintiff to show a colorable basis for jurisdiction before subjecting the defendant to intrusive and burdensome discovery") (citation omitted) (alteration in original).

Additionally, "[n]umerous cases hold that district courts have the discretion to deny jurisdictional discovery when a plaintiff has failed to make a prima facie case of jurisdiction." Osborn & Barr Commc'ns, Inc. v. EMC Corp., No. 4:08-CV-87, 2008 WL 341664, at *1 (E.D. Mo. Feb. 5, 2008) (Appendix of Cases, Exh. D) (citing Caribbean Broad. Sys., Ltd., 158 F.3d at 1089-90); see also Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 946 (7th Cir. 2000)

("[a]t a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted").

Plaintiff has not alleged any specific facts to warrant jurisdictional discovery. The sweeping allegations of jurisdictional contacts made by Plaintiff in its Complaint have been demonstrated to be false or greatly overstated (Unity Mem. at 14-19). Plaintiff's request for discovery now is supported only by the assertion that "undersigned counsel likely would be able to establish on the record in depositions that Unity executives maintain offices in this District and travel regularly and routinely to this District to solicit and conduct business."[10]  (Opp. Mem. at 5-6.)  These allegations are directly contrary to declarations by Unity personnel, and even if true would not provide a sufficient basis for an exercise of jurisdiction over Unity.  Thus, they do not support Plaintiff's request here.  See Caribbean Broad. Sys., Ltd., 148 F.3d at 1090 (citing Int'l Terminal Operating Co. v. Skibs A/S Hidlefjord, 63 F.R.D. 85 (S.D.N.Y. 1973) (holding that "jurisdictional discovery [is] not appropriate when plaintiff merely hopes to find statements in defendant's affidavit not accurate but has not made counter-allegations in its own affidavit")).

_____

[10]  Plaintiff also makes a vague reference to having "interviewed" unidentified people supposedly knowledgeable about Unity's activities in the District.  (Opp. Mem. at 6 n. 3.)  The promise that unnamed individuals will provide non-specific information pertinent to the jurisdictional question is not a basis for allowing jurisdictional discovery.

Finally, Unity, a corporation based in Dubai and organized in Singapore, should not be subjected to the costs and burdens of discovery in order to determine if the court can exercise jurisdiction over it.   "Foreign nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists." Central States, Southeast and Southwest Areas Pension Fund, 230 F.3d at 946-947 (holding "imposing such burdensome, wide-ranging discovery against defendants from a foreign nation is not appropriate at a stage where the district court is trying to determine whether it has any power over the defendants) (citing Jazini v. Nissan Motor Co., 148 F.3d 181, 185-86 (2d Cir. 1998).[11]

## CONCLUSION

For the foregoing reasons, Unity respectfully requests that its motion to dismiss be granted in all respects.

Dated:  April 24, 2008

---

[11]   Any jurisdictional discovery that the Court may order should be "precisely focused" and tightly limited in scope. GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1352 (D.C. Cir. 2000).

Respectfully submitted,

CHADBOURNE & PARKE LLP


By_____/s/ David T. Blonder_____
      William S. D'Amico  (Bar No. 2694)
      David T. Blonder (Bar No. 501602)
    Attorneys for Defendant
      Unity Resources Group Pte. Ltd.
    1200 New Hampshire Avenue, N.W.
    Washington, D.C. 20036
    Tel. (202) 974-5600
    Fax (202) 974-5602

Of Counsel:

Robert A. Schwinger  (Bar No. NY0092)
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY 10112
Tel. (212) 408-5100
Fax (212) 541-5369

Daniel J. Greenwald III
CHADBOURNE & PARKE LLP
City Tower I
Sheik Zayed Road
P.O. Box 23927
Dubai
United Arab Emirates
Tel. +971 (4) 331-6123
Fax +971 (4) 331-0844

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF MARANI AWANIS MANOOK,<br><br>                  Plaintiff,<br><br>       -against-<br><br>UNITY RESOURCES GROUP and RTI<br>INTERNATIONAL,<br><br>               Defendants. | Civil Case No. 1:08-cv-00096 (PLF)<br><br>Hon. Paul L. Friedman |

## SUPPLEMENTAL DECLARATION OF THOMAS E. BUTLER

THOMAS E. BUTLER hereby declares, under penalty of perjury, as follows:

1.    I am a member of the law firm of Chadbourne & Parke LLP, attorneys for Defendant Unity Resources Group Pte., Ltd. ("Unity") in the above-referenced action, based in the firm's New York office.  I make this supplemental declaration on the basis of personal knowledge, in support of Unity's motion, pursuant to Rule 12(b)(2) and 12(b)(5) of the Federal Rules of Civil Procedure, to dismiss the first amended complaint in this action (the "Complaint") for improper service of process and lack of personal jurisdiction.

2.    Copies of press releases issued by Unity on October 9, 2007, October 10, 2007, October 13, 2007, and January 23, 2008, are attached hereto as Exhibit A.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on April 24, 2008.

_____
Thomas E. Butler

# EXHIBIT A



## Unity Resources Group

**Media Release**


**09/10/07**

We are aware that there has been a shooting incident today, Tues 9 Oct 07 at 1.40 PM in the Karrada area of Baghdad involving one of the security teams belonging to Unity Resources Group. At this time we are awaiting details of the exact circumstances.

The first information that we have is that our security team was approached at speed by a vehicle which failed to stop despite an escalation of warnings which included hand signals and a signal flare. Finally shots were fired at the vehicle and it stopped.

Unity is now working with the Iraqi authorities to determine the outcome of this incident.

We deeply regret this incident and will continue to pass on further information when the facts have been verified and the necessary people and authorities notified.

Company point of contact:

Michael Priddin
Chief Operating Officer
Unity Resources Group

mpriddin@unityresourcesgroup.com
Tel +971 4 299 1720
Mob +971 50 458 7885



**Unity Resources Group**

**Media Release**


**10/10/07**

At 1.40 PM on Tuesday, October 9 2007, a stationary Unity Resources Group security team of four vehicles in Karrada, Baghdad was approached at speed by a white car. The area of Karrada had been subject to vehicle suicide bomber attacks in recent weeks.

The security team used graduated and escalated responses which included non-lethal means such as signage, strobe lights, hand signals, and a signal flare fired in front of the vehicle in an effort to get it to stop. The vehicle did not heed these warnings and failed to halt. Fearing a suicide attack, only then did the team use their weapons in a final attempt to stop the vehicle.

Unity has since confirmed that two people have lost their lives in this tragic incident. We deeply regret the loss of these lives.

Unity has been meeting with Iraqi authorities throughout the day and are cooperating with their investigations. Further information will be provided as these investigations are progressed.

Company point of contact:

Michael Priddin
Chief Operating Officer
Unity Resources Group

mpriddin@unityresourcesgroup.com
Tel +971 4 299 1720
Mob +971 50 458 7885



**Unity Resources Group**

## Media Statement
**13 October 2007**

Following the tragic incident in Karrada, Baghdad, on October 9, the Iraqi authorities provided Unity Resources Group with the designated next of kin contact details for the family of Marani Awanees and Ginivia Jalal.

"Since that time we have been working in conjunction with the Iraqi authorities and senior members of the community to establish contact with the next of kin," said Unity Resources Group Chief Operating Officer, Michael Priddin.

"To date we have spoken to the Awanees family and at their request have been asked to postpone any further discussions until the mourning period has passed, in accordance with local customs."

"We have experienced difficulty in contacting the next of kin or relatives of Ginivia in Baghdad.  We are continuing to pursue a number of avenues of contact with her family in Iraq."

"Meeting with the two families is a priority for Unity. The process of investigation continues in conjunction with the Iraqi authorities."


Unity Resources Group
+971 4 299 1720
info@unityresourcesgroup.com



**Unity Resources Group**

**Media Release**


**23 Jan 08**

Following the tragic incident in Karrada, Iraq on 9th October 2007 that resulted in the deaths of Marani Awanees and Genevia Jalal, Unity has attempted on numerous occasions to talk to the two families in Iraq and personally extend our condolences and support for the families of Marani and Genevia. Contact with the families in Iraq to date has been difficult and only possible through intermediaries as the families have not wanted personal contact with Unity; we have respected those wishes whilst following customary practices. Unity is still attempting to meet with the families in Iraq.

It has been reported to us that police and Government investigations of this incident have been completed. Unity cooperated fully with both investigations. The completed investigations have reportedly concluded that the incident was a tragic accident and a direct consequence of the driver failing to heed numerous and obvious signals to stop the cars approach towards the Unity convoy. Unity personnel fearing a suicide attack had acted lawfully and within the bounds of Iraqi rules when the vehicle drove at speed towards their parked vehicles. The Iraqi Judiciary on Iraqi police advice has closed the incident and deemed it complete.

Unity is aware of press reports that family members outside Iraq have engaged the services of legal counsel in the United States and filed a legal complaint. Unity has to date not received any documentation about this and is not in a position to respond further to any enquiries and questions about this matter.


Unity Resources Group
media@unityresourcesgroup.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF MARANI AWANIS MANOOK,<br><br>　　　　　　　　　　　　　Plaintiff,<br><br>　　　　-against-<br><br>UNITY RESOURCES GROUP and RTI<br>INTERNATIONAL,<br><br>　　　　　　　　　　　　　Defendants. | Civil Case No. 1:08-cv-00096 (PLF)<br><br><br><br>Hon. Paul L. Friedman |

## DECLARATION OF PATRICK GAUL

**PATRICK GAUL** hereby declares, under penalty of perjury under the laws of the United States of America, as follows:

1.  I am the Financial Controller for Defendant Unity Resources Group Pte. Ltd. ("Unity"), and am based at Unity's offices in Dubai, United Arab Emirates. I make this Declaration on the basis of my personal knowledge, in further support of Unity's motion to dismiss the first amended complaint in this action for insufficient service of process and lack of personal jurisdiction.

2.  I have seen the Plaintiff's papers submitted in opposition to Unity's motion to dismiss, dated April 10, 2008, which allege that "Unity maintains an office at 1701 Pennsylvania Avenue, Washington D.C., staffed by at least one Unity employee named David Rolfes." This is incorrect. Mr. Rolfes is not a Unity employee. He is an independent contractor. He has never filled out a U.S. Form W-4 with respect to Unity

or received a U.S. Form W-2 from Unity for U.S. income tax purposes. In fact, Unity does not even have a U.S. Tax I.D. Number.

3. Contrary to the assertions in Plaintiff's opposition papers, no Unity executive "travel[s] regularly and routinely to [the] District to solicit and conduct business." In fact, prior to the filing of the complaint in January, 2008, Unity executives have made a total of only ten short trips through the District of Columbia (including trips where D.C. was used merely as a transit hub) in connection with business development and client relations activities.

4. During 2007, Mr. Rolfes was involved in the generation of no more than approximately $200,000 in business, compared to Unity's overall revenue of approximately $57,000,000.00.

5. Unity maintains no bank accounts in the District of Columbia or elsewhere in the United States.

6. As of February 24, 2008, neither Unity nor any affiliate of Unity maintained offices at the First Gulf Bank Building in Dubai, United Arab Emirates.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed on April 2̲4̲, 2008.

2

Patrick Gaul

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF MARANI AWANIS MANOOK, <br><br>                           Plaintiff, <br><br>          -against- <br><br> UNITY RESOURCES GROUP and RTI INTERNATIONAL, <br><br>                     Defendants. | Civil Case No. 1:08-cv-00096 (PLF) <br><br><br> Hon. Paul L. Friedman |

## DECLARATION OF DAVID ROLFES

DAVID ROLFES hereby declares, under penalty of perjury under the laws of the United States of America, as follows:

1. I am an independent contractor who has performed certain services under a contract with Defendant Unity Resources Group Pte. Ltd. ("Unity"). I make this Declaration on the basis of my personal knowledge, in support of Unity's motion to dismiss the first amended complaint in this action for insufficient service of process and lack of personal jurisdiction.

2. I have seen the plaintiff's papers submitted in opposition to Unity's motion to dismiss, dated April 10, 2008, which allege that "Unity maintains an office at 1701 Pennsylvania Avenue, Washington D.C., staffed by at least one Unity employee named David Rolfes." This is incorrect. I am not an employee of Unity. Since July 20, 2007, I

have performed certain services for Unity as an independent contractor. In fact, I have never filled out a U.S. Form W-4 with respect to Unity or received a U.S. Form W-2 from Unity for U.S. income tax purposes. I file my tax returns as a self-employed person.

3. I am paid a fixed monthly fee by Unity, and am eligible, pursuant to my contract, for bonuses based upon the business that I help to generate.

4. I reside in the State of Maryland.

5. The bulk of the time that I spend performing services for Unity is devoted to soliciting new business within the District of Columbia and elsewhere. In addition, I spend a small portion of my time on client relations and client support activities. I have broad discretion with regard to how to perform my solicitation and business development efforts. In 2007, I was involved in the generation of no more than approximately $200,000 in business. Unity has never received any payments or performed any security services in the District.

6. Unity first secured the use of office space in the District of Columbia in February of 2007, pursuant to a contract with a company known as Preferred Offices, which rents, on a term basis, the use of office space along with certain pooled support services. At the time the original complaint was filed in this action, Unity contracted with Preferred Offices for the use of a single small room at 1701 Pennsylvania Avenue in

the District of Columbia (the "Preferred Space"), and related support services. I am the only person associated with Unity who has regularly used the Preferred Space.

7. As of the date of the filing of the original complaint in this action, I used the Preferred Space both for personal and business purposes. I spent an average of 2.5 days per week in the Preferred Space working on Unity-related issues during the months immediately preceding the filing of the original complaint. During that period, I was rarely present in the Preferred Space for more than a few days per week, and during some weeks I did not use the space at all.

8. Prior to March of 2008, I kept approximately three boxes worth of files relating to Unity in the office. The only Unity equipment kept in the Preferred Space was a single laser printer and a scanner. These documents and items are now maintained in Maryland.

9. In March of 2008, Unity stopped maintaining any private office space with Preferred Offices because the original contract with Preferred Offices expired, and entered into an arrangement whereby it is entitled to a fixed number of hours a month of use of non-private office space. I have not used the office space at all since it was converted to non-private space. Unity still maintains the D.C. office space address and a telephone number that forwards calls to my cell phone.

I declare under penalty of perjury under the laws of the United States of America
that the forgoing is true and correct.

Executed on April **23**, 2008.

David Rolfes

4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ESTATE OF MARANI AWANIS MANOOK, | |
| Plaintiff, | Civil Case No. 1:08-cv-00096 (PLF) |
| -against- | Hon. Paul L. Friedman |
| UNITY RESOURCES GROUP and RTI INTERNATIONAL, | |
| Defendants. | |

## APPENDIX OF UNREPORTED CASES CITED IN THE REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION OF DEFENDANT UNITY RESOURCES GROUP PTE. LTD. TO DISMISS THE FIRST AMENDED COMPLAINT

Defendant Unity Resources Group Pte. Ltd. ("Unity") respectfully submits the attached copies of the following unreported cases cited in its memorandum of law in support of its motion to dismiss the First Amended Complaint.

| Case | Exhibit |
|---|---|
| Costa v. Keppel Singmarine Dockyard Pte, Ltd., No. CV 01-11015, 2003 WL 24242419, at *11 (C.D. Cal. Apr. 24, 2003) ........................... A | |
| Export-Import Bank of U.S. v. Asia Pulp & Paper Co., No. 03 Civ. 8554, 2005 WL 1123755, at *2 (S.D.N.Y. May 11, 2005) ............................... B | |
| Fasolyak v. The Cradle Society, Inc., Civ. A. No. 06-01126, 2007 WL 2071644 (D.D.C. July 19, 2007) ............................................................ C | |

Osborn & Barr Commc'ns, Inc. v. EMC Corp., No. 4:08-CV-87,
2008 WL 341664, at *1 (E.D. Mo. Feb. 5, 2008)....................................... D

Dated:    April 24, 2008

CHADBOURNE & PARKE LLP

By_____/s/ David T. Blonder_____
    William S. D'Amico (Bar No. 2694)
    David T. Blonder (Bar No. 501602)
Attorneys for Defendant Unity
    Resources Group Pte. Ltd.
1200 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel. (202) 974-5600
Fax  (202) 974-5602

Of Counsel:

Robert A. Schwinger (Bar No. NY0092)
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY  10112
Tel.  (212) 408-5100
Fax  (212) 541-5369

Daniel J. Greenwald III
CHADBOURNE & PARKE LLC
City Tower I
Sheikh Zayed Road
P.O. Box 23927
Dubai
United Arab Emirates
Tel:  +971 (4) 331-6123
Fax  +971 (4) 331-0844

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
(Cite as: 2003 WL 24242419 (C.D.Cal.))

C

Only the Westlaw citation is currently available.

United States District Court,
C.D. California.
Paul Alexander COSTA, Personal Representative
of the Estate of Anthony Peter
Costa, Deceased, Plaintiff,
v.
KEPPEL SINGMARINE DOCKYARD PTE,
LTD., a corporation, Vilter Manufacturing
Corporation, a corporation, and Does 1-50, inclusive, Defendants.
VILTER MANUFACTURING CORPORATION, a
corporation, Cross-Claimant,
v.
KEPPEL SINGMARINE DOCKYARD PET LTD.,
a corporation Cross-Defendant.
No. CV 01-11015MMM.

April 24, 2003.

John S. Lopez, William L. Banning, Kurt Micklow,
Banning, Micklow, Bull & Lopez, San Diego, CA,
for Plaintiff.

Andria L. Catalano, Daniel B. MacLeod, MacLeod
& Catalano, San Diego, CA; Kenneth F. Mattfeld,
Jr., Geoffrey W. Gill, Gerald M. Fisher, Arter &
Hadden, Ernst & Young PLZ, Los Angeles, CA, for
Defendants.

Kenneth F. Mattfeld, Jr., Geoffrey W. Gill, Gerald
M. Fisher, Arter & Hadden, Ernst & Young PLZ,
Los Angeles, CA, for Cross-Claimant.

Andria L. Catalano, Daniel B. MacLeod, MacLeod
& Catalano, San Diego, CA, for Cross-Defendant.

ORDER DENYING DEFENDANT KEPPEL
SINGMARINE DOCKYARD'S MOTION TO DISMISS

MORROW, J.

**\*1** This case concerns an accident that occurred on
June 20, 2000, aboard the F/V Daniela while it was
sailing in the Western Pacific Ocean. Anthony
Peter Costa, the Daniela's Chief Engineer, was
doused with hot pressurized ammonia when ammonia discharge valves explosively separated. Costa
was air-lifted to a hospital; in the ensuing months,
he received extensive medical treatment in Malaysia, Singapore, San Diego and Denver. Costa died
some thirteen months later, on July 5, 2001. The
plaintiff in this action is Pete Costa's brother, Paul
Alexander Costa, who is the personal representative
of his estate. Costa alleges that defendant Vilter
Manufacturing Corporation improperly manufactured and designed the ammonia valves that exploded, and that defendant Keppel Singmarine
Dockyard ("KSD") improperly installed the valves
while servicing the Daniela at its Singapore
shipyard. Costa pleads claims for negligence and
strict liability under General Maritime Law, as well
as a claim for wrongful death under the Death on
the High Seas Act, 46 U.S.C. §§ 761 et seq.

Vilter filed a cross-complaint for contribution and
indemnity against KSD, alleging that KSD improperly removed and reinstalled the ammonia discharge valves that Vilter manufactured. Vilter also
filed a third-party complaint against the Daniela, its
owner, Z No. 2 Fishing Company, and its manager,
Sardinha & Cileu.

On January 31, 2002, KSD filed a motion to dismiss for lack of personal jurisdiction pursuant to
Rule 12(b)(2) of the Federal Rules of Civil Procedure. On February 25, 2002, this court granted
Costa's request for jurisdictional discovery and continued the hearing on KSD's motion. After conducting discovery, Costa and Vilter filed opposition to
the motion, arguing that the court may exercise
both general and specific jurisdiction over KSD, or
alternatively, that KSD has sufficient national contacts that it is subject to jurisdiction under Rule
4(k)(2).

I. FACTUAL BACKGROUND
A. The Underlying Complaint

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

Plaintiff Paul Alexander Costa, as personal representative of the Estate of Anthony Peter Costa, filed this action in Los Angeles County Superior Court on June 19, 2001. He filed a First Amended Complaint, which is the operative pleading, on November 20, 2001, and served Vilter the following day. Vilter removed the action to this court on December 20, 2001.

Costa is a citizen of the United States and a California resident. [FN1] At the time of his death, Pete Costa was also a United States citizen and a resident of California. [FN2] Defendant Keppel Singmarine Dockyard Pte Ltd ("KSD") is a foreign corporation incorporated under the laws of the Republic of Singapore. [FN3] Defendant and cross-claimant Vilter Manufacturing Corporation is a Wisconsin corporation that maintains an office in California and is licensed to do business in the state.

>    FN1. See First Amended Complaint, ¶ 2.

>    FN2. *Id.,* ¶ 3.

>    FN3. *Id.,* ¶ 4.

Pete Costa was a United States licensed Chief Engineer who served on the U.S. flagged tuna seiner F/V Daniela. On June 20, 2000, he was fatally injured when the face plate and spindle assembly of an ammonia discharge valve explosively separated from the refrigeration system's housing valve. A large quantity of hot pressurized ammonia chloride gas spewed onto Costa, severely burning his upper torso, lungs, eyes, and groin. [FN4] Decedent lost his eyesight and was ventilator-dependent for twelve and one half months. During this period, he underwent intensive and painful medical treatments. He passed away on July 5, 2001.

>    FN4. *Id.,* ¶ 8.

**\*2** The First Amended Complaint alleges that KSD solicits and transacts business in California and that it has the requisite minimum contacts to be subjected to jurisdiction in the state. [FN5] It further alleges that KSD solicited and entered into a ship repair contract in California with the California-based owner of the Daniela. Pursuant to this contract, KSD allegedly undertook to repair and perform other work on the Daniela's ammonia freezer system. The work was performed at KSD's shipyard in Singapore between January and June 2000. [FN6] Plaintiff contends that in the course of their repair work, KSD personnel improperly removed the ammonia discharge valves, and used the wrong-sized bolts to reattach the valve cover of the No. 2 ammonia valve to the valve housing. He also asserts that KSD personnel removed the No. 2 "check" or "safety" valve from the ammonia system, and reinstalled it without all of its component parts, finally, he contends that KSD failed to test and/or improperly tested the ammonia system. These acts and omissions, he alleges, caused the accident that injured his brother. [FN7] Plaintiff also alleges that Vilter improperly manufactured and/or designed the ammonia valves that failed aboard the Daniela. [FN8]

>    FN5. *Id.,* ¶ 4.

>    FN6. *Id.,* ¶ 9.

>    FN7. *Id.,* ¶¶ 10, 11.

>    FN8. *Id.,* ¶ 12.

B. KSD's Contacts With California

1. General Contacts With The State

KSD does not own or lease any property in California, and has no offices or facilities in the state. [FN9] None of its employees, agents, officers, or directors are domiciled in California, [FN10] and none of its subsidiaries operates here. [FN11] KSD has not applied for any licenses in the state, does not pay taxes here, and has no California banking relationships. [FN12] While KSD has been sued in California and has not challenged personal jurisdiction here, it has not initiated litigation here. [FN13]

>    FN9. Declaration of Fok Swee Yin ("Fok

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

Decl."), ¶¶ 28, 29.

FN10. *Id.*, ¶ 30.

FN11. *Id.*, ¶ 39.

FN12. *Id.*, ¶¶ 34-36.

FN13. *Id.*, ¶ 40; Declaration of William Banning ("Banning Decl."), ¶ 3.

1. The August 1999 Visit To San Diego

a. Undisputed Facts

KSD is an established shipyard in the Western Pacific Ocean that is well-known within the tuna fishing industry. [FN14] In August 1999, Fok Swee Yin, KSD's Assistant General Manager for Ship Repair, Allen Ng, also a KSD employee, and Lee Tai Kwee [FN15] traveled to California. [FN16] Lee was General Manager of Precision Craft (88) Pte Ltd., a company that specializes in the manufacture of aluminum hull boats. Precision Craft is not owned or operated by KSD; it is also not a subsidiary of KSD. Lee accompanied Fok and Ng to explore opportunities to buy used tuna boats that Precision Craft contemplated having KSD modify for sale to the Thailand Department of Fisheries. [FN17] Lee became KSD's Deputy General Manager on January 2, 2001.

FN14. *Id.*, ¶ 7.

FN15. The parties refer variously to Lee Tai Kwee, K.T. Lee, Mr. Lee, and Mr. Kwee. For consistency, the court will refer to Mr. Lee. Similarly, the parties refer to Fok Swee Yin variously as Fok or Yin. Again for consistency, the court will refer to Mr. Fok.

FN16. *Id.*, ¶¶ 4, 5.

FN17. Declaration of Lee Tai Kwee ("Lee Decl."), ¶¶ 4, 5.

While in San Diego on August 9, 1999, Fok Ng, and Lee met with Paul Krampe of the United Tuna Cooperative, [FN18] Italo "Itchy" Cileu of Sardinha & Cileu Management (S & C), and Joe Finete of C & F Ltd. [FN19] S & C manages the Daniela for her owner, Z No. 2 Fishing Co., Inc., a Northern Marianas corporation. [FN20] On August 10, 1999, Fok, Lee, and Ng had lunch with various persons in the tuna fishing industry. [FN21]

FN18. Fok Decl., ¶ 15.

FN19. *Id.*, ¶ 16.

FN20. Declaration of Lee Chee Weng ("Weng Decl."), ¶ 17. Costa has moved to strike Weng's declaration in its entirety on the basis that it contradicts his deposition testimony. It also objects to paragraphs 5, 6, 9, and 10 on the basis that they lack foundation and are designed to mislead the court. As respects Costa's argument that specific paragraphs of the declaration lack foundation, Weng is Superintendent of KSD's Commercial Division and is responsible for negotiating ship repair contracts. Because his declaration concerns KSD's solicitation of and entry into contracts for vessel repair and construction, it addresses facts within his personal knowledge. As respects inconsistencies, Costa contends that Weng's statement that he has not directed anyone at KSD to travel to the United States contradicts his deposition testimony that he does not have responsibility for directing KSD employees to travel to this country. (Compare Weng. Decl., ¶ 5 with Weng 4/12/02 Depo. at 45:5-46:7.) Costa also asserts that Weng's statement that he reviewed shipyard and business records of repair contracts and quotations is contradicted by his deposition testimony that he referred only to the estimate book of repairs and bids attached to his deposition as Exhibit 8. It is not clear that this is an inconsistency, as the "estimate book" appears to be the primary record used by

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

KSD to record its bids and contracts. Finally Costa asserts that Weng's statement that KSD was solicited in Singapore to submit a bid on the Sea Encounter should not be admitted given his refusal to answer questions on this subject during his deposition. (Compare Weng Decl., ¶ 10 with Weng 4/12/02 Depo. at 74:7-24.) As there is no indication that Costa sought to compel answers to questions regarding the Sea Encounter, the court will not exclude Weng's declaration statements concerning the subject. Regarding purported inconsistencies generally, the court resolves disputed facts in Costa's favor on this motion. Thus, to the extent Costa relies on Weng's deposition testimony, the court accepts that testimony as true. Additionally, the court accepts the independent evidence proffered by Costa regarding KSD's solicitation of work on the Sea Encounter. For all these reasons, the court denies Costa's motion to strike the declaration of Lee Chee Weng.

FN21. Fok Decl., ¶ 17.

b. Disputed Facts

1. KSD's Version

**\*3** The parties dispute the purpose of the visit Fok, Lee and Ng made to San Diego, as well as the nature of the activities in which they engaged while there. Fok contends that the purpose of the visit was to conclude negotiations with Les Chikami of Western Pacific Fisheries concerning a contract to extend the hull of F/V Western Pacific. Chikami had invited KSD to submit a bid for the work and sent it a proposed specification. [FN22] At the time of the visit, KSD had already inspected the vessel in Samoa, and Ng had furnished a quotation for the work to be done from Singapore. KSD did not receive a response to the quotation, and learned that a competitor was also bidding on the job. Accordingly, Fok and Ng were sent to California to see if they could secure the contract. [FN23] Fok con-

tends that he did not come to the state to solicit work from S & C, C & F or any other tuna vessel management company or owner, [FN24] and that the visit was a departure from KSD's usual business practice. [FN25]

FN22. Declaration of Les Chikami ("Chikami Decl."), ¶ 3.

FN23. Lee Decl., ¶ 6; Fok Decl., ¶ 5; Declaration of Allen Ng Eng Cheng ("Ng Decl."), ¶ 6.

FN24. Fok Decl., ¶¶ 18, 19.

FN25. *Id.*, ¶ 13.

Negotiations with Chikami were conducted at his home in Hermosa Beach, California. They consumed many hours over a two day period. [FN26] When agreement was finally reached, Chikami states that Fok said he would have the contract typed at Keppel Singmarine's office in Anaheim, California. [FN27] The agreement was signed two days later at Chikami's home in Hermosa Beach. [FN28]

FN26. Chikami Decl., ¶ 6; Deposition of Fok Swee Yin ("Fok Depo.") at 71:2-6.

FN27. Chikami Decl., ¶ 6.

FN28. *Id.*, ¶ 8.

Chikami states that, after the negotiation of the contract had been concluded, Fok asked for the names of other vessel owners and managers from whom he could solicit similar business. Chikami referred Fok to Joe DeSilva and Julie Zolezzi in San Diego, and Fok said that he and Ng would visit these individuals while the contract for the Western Pacific was being prepared. [FN29] Chikami asserts that when Fok returned with the contract two days later, he explained that Precision Craft wanted to buy used fishing vessels to refurbish and sell in Thailand, and asked that Chikami give him the names of owners or managers who might have vessels for sale.

Not Reported in F.Supp.2d                                                        Page 5
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

[FN30] Based on his conversations with Fok, Chikami states it was apparent that the primary focus of Fok and Ng's trip was to solicit business from other owners interested in having their vessels jumboized. [FN31]

FN29. *Id.,* ¶ 7. See also Ng Decl., ¶ 10.

FN30. *Id.,* ¶ 9.

FN31. *Id.,*

KSD proffers evidence, however, that it was Chikami who urged that Lee travel to San Diego to explore opportunities to purchase used fishing vessels, even before Fok, Ng and Lee arrived in the United States. Lee states that Chikami sent a facsimile to KSD in Singapore on July 20, 1999, suggesting that he meet with representatives of the Tuna Fishing Association. Chikami recommended that Lee contact Paul Krampe of the United Tuna Cooperative and Dave Burney of the U.S. Tuna Foundation. [FN32]

FN32. Lee Decl., ¶ 8.

On August 9, 1999, Fok, Ng and Lee met with Krampe, Cileu and Finete. Lee and Fok state that Cileu and Finete had offices in the same building as Krampe, and that they were known to Fok as a result of prior repair contracts. They contend they "briefly updated [Cileu and Finete] about [KSD's] ship repair capabilities" and "exchanged business cards." [FN33] Ng states that the men "generally discussed the tuna market," and that Cileu mentioned that his vessels would be due for repair soon. He did not describe the repairs in any detail. [FN34]

FN33. Lee Decl., ¶ 10; Fok Decl., ¶ 16.

FN34. Ng Decl., ¶ 12.

*4 On August 10, 1999, Fok, Ng and Lee had lunch with various people involved in the tuna fishing industry. Fok contends the lunch was arranged by Chikami, who was in San Diego to attend a meeting

of the Tuna Cooperative. Fok and Lee assert that the primary topic of conversation at the luncheon was the tuna market, although they also discussed opportunities to purchase used tuna vessels for conversion. [FN35]

FN35. Lee Decl., ¶ 11; Fok Decl., ¶ 17.

In addition to these meetings, Fok, Ng and Lee visited Joe DeSilva's residence to discuss DeSilva's vessel, the F/V Sea Encounter. KSD had previously bid on work on this vessel. During the meeting, DeSilva said that he had changed the specifications for the work, relating primarily to the lengthening of the hull, and that Cileu would give KSD new drawings so that it could prepare a new bid. [FN36] Fok, Lee and Ng also had dinner with John Freitas, who had solicited a bid from KSD in December 1998 for work on the F/V Carol Linda. [FN37]

FN36. Ng Decl., ¶ 13.

FN37. *Id.,* ¶ 14.

2. Costa's Evidence [FN38]

FN38. KSD asserts that the declarations of Italo Cileu, John Freitas Paul Krampe and Cathy Dellenback should be stricken or given substantially reduced weight because each declarant's deposition was noticed, delayed and ultimately cancelled after Costa and Vilter secured the witness' declaration. When KSD sought to renotice the depositions, Costa and Vilter purportedly objected and thwarted KSD's efforts to cross-examine the declarants. (See Declaration of Andria Catalano ("Catalano Decl."), ¶¶ 9- 12; May 2, 2002 Declaration of Paul Krampe, ¶ 6.) Lawyers frequently prefer to obtain declarations from third-party witnesses in lieu of deposing them. Moreover, the evidence that Costa and Vilter interfered with KSD's ability to obtain depositions from the witnesses is weak at best. The court therefore declines to strike

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                            Page 6
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

the declarations or accord them less weight. Should subsequent examination of the witnesses reveal that the statements contained in their declarations are false or materially misleading, KSD may bring this to the court's attention through an appropriate motion for reconsideration.

Costa's evidence regarding the December 1999 visit to San Diego is quite different. Cileu contends that Fok telephoned him Fok in mid-summer 1999, stated that KSD was looking for shipyard work, and was prepared to offer good deals and competitive pricing. Fok asked whether Cileu was planning to dry-dock any of the vessels under S & C's management and whether any of the owners Cileu knew were planning to lengthen or "jumboize" their vessels. Fok said he would be visiting the San Diego area soon, and asked if Cileu would introduce him to owners and managers interested in dry-dock or extension services. [FN39] When Cileu met with Fok and Ng in August, they gave him business cards and a sales brochure for a company called "Keppel Singmarine." [FN40] Cileu discussed the fact that S & C planned to dry-dock the Daniela soon, and Fok said he wanted to bid on the work, that KSD was qualified to do the job and that it would give Cileu a very competitive price. [FN41] Fok also allegedly pressed Cileu to introduce him to other tuna vessel owners and managers who might be interested in dry-dock or jumboizing services. [FN42] Cileu provided the names of several potential customers, including the owners of tuna seiners Jennine, Lone Wolf, M.J. Souza, Carol Linda and Sea Encounter. The Sea Encounter is owned by Joe DeSilva, and Cileu knew that DeSilva was interested in jumboizing the vessel. He states he told Fok this, and Fok purportedly said he wanted to meet with DeSilva to solicit the business. Cileu called DeSilva, and drove Fok and Ng to his house for a meeting. [FN43] DeSilva showed Fok and Ng his plans for the extension, and Fok said that KSD was capable of doing the work and wanted to bid on the project. He suggested that KSD personnel meet with the naval architect work-

ing on the extension, Robert Rados, and DeSilva gave him Rados' address. [FN44] This version of the DeSilva meeting is in direct contrast to that offered by Ng, who, as noted earlier, asserts that KSD had already submitted a bid on the Sea Encounter project as of August 1999, and the parties discussed modifications to the project and the submission of a revised bid as a result.

> FN39. Declaration of Italo J. Cileu ("Cileu Decl."), ¶ 4. Because Fok was acting within the scope of his employment for KSD when he made the purported statements, and because the evidence reflects that Fok traveled to San Diego on KSD's behalf, the statements he allegedly made regarding the solicitation of business are not hearsay when offered against KSD. Fed.R.Evid. 801(d)(2)(D).

> FN40. *Id.,* ¶ 5.

> FN41. *Id.,* ¶ 6.

> FN42. Ng disputes this, contending that Fok asked only for the names of owners who might be interested in selling their vessels to Lee. (See Ng Decl., ¶ 12.)

> FN43. *Id.,* ¶ 7.

> FN44. *Id.,* ¶ 8.

**\*5** Costa proffers evidence that Fok, Ng and Lee also met with John Freitas, president of the company that owns the Carol Linda, during the August 1999 visit to San Diego. Like Cileu, Freitas states that Fok called him to advise that he was traveling to San Diego to develop ship repair and jumboizing contracts. [FN45] He contends Fok stated that KSD's business was slow and that he intended to offer potential customers discounts and competitive contracts. Freitas states that, during his subsequent meeting with the KSD representatives, they discussed not only the status of the United States tuna fleet, as Fok and Lee assert, but also KSD's ability to provide shipyard services for Freitas' vessel.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 7
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

[FN46] Fok said that KSD had upgraded and expanded its facilities and that it would discount the price of shipyard services that Freitas purchased. Specifically, Fok said that KSD had given Chikami a discount on the work it was performing on F/V Western Pacific, and that he would offer Freitas a similar discount. He also gave Freitas a sales brochure. [FN47] Fok asked Freitas whom he should contact in the San Diego tuna industry to solicit additional business. Fok purportedly said he had come to the California to market KSD's capabilities and services to the U.S. tuna fleet, and wanted to meet with as many owners as possible. [FN48] Lee introduced himself as a representative from Keppel's California office in the Los Angeles/Orange County area. [FN49]

> FN45. Declaration of John J. Freitas ("Freitas Decl."), ¶ 5.

> FN46. *Id.,* ¶ 6.

> FN47. *Id.,* ¶¶ 6, 7.

> FN48. *Id.,* ¶ 8.

> FN49. *Id.,* ¶ 6.

Fok, Ng and Lee also met with Paul Krampe of the United Tuna Cooperative, [FN50] to whom they gave a sale brochure, [FN51] and Joe Finete, owner of F/V Diana, to discuss KSD's ship repair capabilities. [FN52] Finete subsequently engaged KSD to perform work on the Diana. [FN53]

> FN50. Declaration of Paul Krampe ("Krampe Decl."), ¶ 1. Krampe does not specifically place the meeting in August 1999. Rather, he recalls that KSD representatives visited his office sometime before June 2000. (*Id.*)

> FN51. *Id.,* ¶ 4. Defendants object to so much of Krampe's declaration as refers to the brochure on the basis that it lacks foundation and is not authenticated. Krampe has personal knowledge of the fact

that KSD representatives approached him at UTC's offices and gave him a brochure. He asserts that the brochure attached as an exhibit to his declaration is similar or identical to one he received. This testimony is sufficient to authenticate the exhibit. See Fed.R.Evid. 901(b)(1).

> FN52. Fok Depo. at 36:4-7.

> FN53. *Id.* at 47:3-5. Ng states that he had met Finete and Freitas in 1998 when they visited KSD's shipyard. (Ng Decl., ¶ 12.)

### 2. Solicitation Of Work On The Daniela

On September 16, 1999, S & C sent letters to five shipyards, inviting them to bid on work to be done on the Daniela and the Sea Encounter. [FN54] Cileu contends that the upcoming overhaul of the Daniela was discussed during his meeting with Fok, Ng and Lee in August 1999, and that Fok said KSD would like to bid on the project at that time. Cileu maintains, moreover, that he decided to award the repair contract to KSD as a result of KSD's solicitations, including Fok and Ng's visit to San Diego. [FN55] Indeed, he states "with certainty" that Fok's August 1999 solicitation of the business was "a substantial factor" in S & C's decision to send the Daniela to KSD for repairs. [FN56] In response, Fok asserts that he did not "specifically discuss" the repairs needed to the Daniela's ammonia cooling or other systems while in San Diego. [FN57]

> FN54. Cileu Decl., ¶ 11; Weng Decl., ¶ 16.

> FN55. Cileu Decl., ¶ 11. Defendants object to this portion of Cileu's declaration on the ground that it lacks foundation and that it constitutes improper opinion testimony and hearsay. As previously noted, statements regarding future shipyard contracts made by Fok and Ng during their visit to San Diego are not hearsay. Moreover, Cileu is a principal in S & C, which selected the shipyard to overhaul the Daniela. (See

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Cileu Decl., ¶¶ 2, 11.) He thus has the requisite personal knowledge to offer an opinion as to the reason his firm awarded the repair contract to KSD. Finally, the opinion is rationally based on Cileu's perception, and helpful to the determination of a fact in issue. It is thus admissible under Rule 701. See Fed.R.Evid. 701.

FN56. *Id.,* ¶ 12.

FN57. Fok Decl., ¶ 20. See also Lee Decl., ¶ 14 ("I did not have any conversations with Messrs. William Sardinha or Italo Cileu while in San Diego, California concerning repairs to the ammonia cooling system or any other systems aboard F/V Daniela").

On September 21, 1999, KSD personnel inspected the Daniela while it was docked in the Philippines. S & C's William Sardinha furnished a detailed specification of the work to be performed, and invited KSD to submit a bid on the job. [FN58] KSD faxed a quotation to S & C at its San Diego office on October 12, 1999. On November 16, 1999, S & C e-mailed additional information to KSD and invited a revised bid. A second quotation was submitted on November 27, 1999. The parties also agreed that KSD would reinspect the vessel in the Philippines. [FN59] This inspection took place on December 15, 1999. Sardinha was present, and at the end of the meeting, took KSD's draft quotation and incorporated it into an electronic version of the company's earlier bids that he had on his laptop computer. [FN60]

FN58. Weng Decl., ¶ 18.

FN59. *Id.,* ¶¶ 19-21.

FN60. *Id.,* ¶ 22.

**\*6** Negotiations continued via e-mail and fax between Sardinha in San Diego and KSD in Singapore. On December 29, 1999, KSD faxed Sardinha a final price quotation from Singapore. Sardinha

faxed back a handwritten confirmation that the companies had reached agreement. He sent the a final version of the quotation, including work specifications, to Singapore by e-mail on December 30, 1999. [FN61]

FN61. *Id.,* ¶ 23.

All work on the Daniela was done in Singapore. [FN62] Sardinha signed a detailed work order that stated the agreement would be governed by and construed in accordance with the law of Singapore. It further stated that the parties submitted to the non-exclusive jurisdiction of the Singapore courts. [FN63]

FN62. See *id.,* ¶ 24.

FN63. *Id.,* ¶¶ 24, 25, Ex B.

3. KSD's Efforts To Secure Repair And Jumboizing Contracts On Vessels Other Than The Daniela

KSD's contract and bid records reflect that between 1995 and 2000, it performed repair or jumboizing work on five U.S. flag vessels--the Toaimoana, Fuiono, Western Pacific, Diana and Daniela--and bid on contracts for at least four others--the Koorale, Carol Linda, Sea Encounter, and Andrea C.J. [FN64]

FN64. See Exhibits to April 10, 2002-April 16, 2002 depositions, Ex. 8 at K00001-00142; Cileu Decl., ¶ 7. Cileu asserts that Fok solicited work on the Carol Linda, Proud Heritage, Legacy, Tradition, and Rafaello. This is disputed by the Superintendent of KSD's Commercial Division, Lee Chee Weng, who contends there are no records that KSD ever solicited work on the Proud Heritage or Rafaello. (See Weng Decl., ¶ 7.) The basis of Cileu's knowledge of these facts is unclear, as it could be derived either from KSD representatives or from the managers and/or owners of the vessels. If Cileu's source of information is the latter group, the testi-

Not Reported in F.Supp.2d                                                   Page 9
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

mony is inadmissible hearsay. Because he does not specify the source of his information, the court has considered only Cileu's testimony regarding KSD's solicitation of a contract to perform work on the Sea Encounter. There is independent evidence that KSD sought to work on the Carol Linda, Toaimoana and Fuiono, however, and the court considers these facts established as a result. (See Freitas Decl., ¶ 3; Declaration of Carlos M. Sanchez ("Sanchez Decl."), ¶ 2.)

As respects the contracts/bids for the Daniela and Sea Encounter, Cileu states that he recalls receiving a sales brochure from L.H. Chan, then Assistant General Manager of KSD, KSD on April 28, 1992 at his office in San Diego. [FN65] In connection with KSD's bid for work to be performed on the Sea Encounter, S & C, which assisted Sea Encounter's owner DeSilva, communicated from San Diego with KSD in Singapore via courier, mail, telephone and fax. It received bid documents and a proposed contract from KSD at its office in San Diego. [FN66] Similarly, John Freitas, owner of the Carol Linda, states that he received a KSD brochure through the mail in San Diego, and that KSD contacted him in 1998 to discuss its shipyard and extension services on tuna seiners. [FN67] Freitas states that, primarily as a result of that 1998 contact, he invited KSD to bid on the jumboization of the Carol Linda in late 1998 or early 1999. [FN68] Weng states that Joe Finete, the owner of the Diana, telephoned KSD in Singapore to inquire about its services. [FN69] There is evidence that Fok, Ng and Lee met with Finete in San Diego in August 1999; Finete invited KSD to submit a bid on the work shortly thereafter, on August 25, 1999. [FN70]

FN65. Cileu Decl., ¶ 3.

FN66. *Id.,* ¶ 10. Ng states that KSD bid on the Sea Encounter project prior to the August 1999 visit to California. (Ng Decl., ¶ 11.)

FN67. KSD objects to so much of Freitas' declaration as states that the attached exhibit is substantially similar to the brochure he received on the basis that the testimony lacks foundation, is argumentative and conclusory, and constitutes an impermissible opinion. Freitas states that the facts set forth in his declaration are known to him personally. As president of the company that owns the Carol Linda, Freitas' responsibilities include overseeing arrangements for maintenance and repair work on the vessel. Accordingly, his statements regarding bids and contracts for maintenance work on the Carol Linda do not lack foundation. Moreover, his testimony that the brochure is substantially similar to one he received from KSD is based on personal knowledge, is not argumentative or conclusory, and constitutes a permissible lay opinion, as it is based on Freitas' perception and is helpful in resolving an issue in dispute. See Fed.R.Evid. 701.

FN68. Freitas Decl., ¶ 3.

FN69. Weng Decl., ¶ 14.

FN70. *Id.*

Carlos M. Sanchez, former General Manager of Fleet Operations for Caribbean Fishing Company, Inc., states that Fok solicited shipyard work from him in California, and that, as a result, he contracted with KSD to overhaul and jumboize the Toaimoana and Fuiono. [FN71] Sanchez contends that he was solicited by other KSD representatives as well, via telephone and mail, and that he received sales brochures from the company, all of which contributed to his decision to engage the shipyard to perform work on the vessels. Sanchez contends that he negotiated the contracts, which generated revenue in excess of $4 million for KSD, with the company during 1998 and 1999. [FN72] Ng provides a conflicting account of the circumstances surrounding CFCI's decision to engage

Not Reported in F.Supp.2d    Page 10
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
(Cite as: 2003 WL 24242419 (C.D.Cal.))

KSD to jumboize the Toaimoana and Fuiono. He states that KSD was introduced to the project by a New Zealand consultant working for Sanchez in 1997. He states that after the consultant, John Briggs, visited KSD's shipyard in Singapore, KSD inspected the Fuiono in Singapore and submitted a bid in October 1997. Briggs allegedly introduced the Toaimoana project to KSD in January 1998. Ng states that the first time he or any other KSD representative met Sanchez was after the contracts had been let, when Sanchez traveled to Singapore during work on the vessels in 1998 or 1999. [FN73]

> FN71. Declaration of Carlos M. Sanchez ("Sanchez Decl."), ¶¶ 1-4. Caribbean Fishing Company ("CFCI") was formerly the owner/manager of the largest fleet of United States documented flag tuna purse seiners trading out of American Samoa. CFCI was a wholly-owned subsidiary of Star-Kist Foods, Inc. (Id., ¶ 1.) Defendants objects to paragraphs 3 and 4 of Sanchez's declaration on the basis that they lack foundation and omit the fact that Sanchez made prior proposals to KDS. The matters to which Sanchez testifies are within his personal knowledge, as Sanchez's job responsibilities for CFCI included negotiating and contracting with shipyards for the repair of vessels owned by the company. The fact that Sanchez does not indicate that recount other facts regarding his communications with KDS and the decision to contract with it for the jumboization of the Toaimoana and Fuiono does not render his testimony inadmissible. Rather, it affects the weight and credibility of the evidence.

> FN72. Id., ¶ 2.

> FN73. Ng Decl., ¶ 20. Vilter has proffered the declaration of Cathy Dellanbach as evidence of KSD's further contacts with California. Dellenbach states that, while working at M/V Sea Quest, Inc., she was approached on an unknown date by representatives of Singmarine Shipyard, who had come to solicit dry-dock and jumboizing work from her father, the president of the company. As her father was not in the office, the men left two sales brochures and business cards. KSD objects to the declaration on the ground that it lacks foundation and consists of hearsay. Other evidence in the record indicates that KSD's predecessor company was Singmarine Slipway. Slipway merged with Singmarine Shipyard in the late 1980's or in the 1990's. The brochure that Dellenbach proffers is from Singmarine Shipyard, and thus may predate the merger of the companies' operations in 1987. If so, the representatives who visited M/V Sea Quest did not act on behalf of KSD's predecessor company. Because it is unclear that they were in fact representatives of KSD, the court excludes the declaration on the basis that it lacks foundation and constitutes inadmissible hearsay. See Fed.R.Evid. 801(d)(2)(C), (D).

C. Keppel Corporation

1. The Conglomerate's Organizational Structure

**\*7** In addition to evidence regarding KSD's solicitation of business and entry into contracts with American vessel owners or managers, the parties also proffer conflicting evidence regarding the corporate structure of Keppel Corporation, the entities it owns directly or indirectly, and KSD's role as a Keppel subsidiary. [FN74] Keppel Corporation's "marine businesses" include KSD, Keppel Shipyards, Keppel FELS and Keppel Hitachi Zosen ("KHZ"). [FN75] KSD is a wholly-owned subsidiary of KHZ. [FN76] The companies are distinct subsidiaries that perform work on vessels of different lengths and types. KSD, for example, services vessels up to 150 meters long. Vessels longer than 150 meters are built or repaired by KHZ and Keppel Shipyard. [FN77] Keppel FELS performs maintenance and construction on oil rigs. [FN78] During 1999, KSD

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                              Page 11
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

was a subsidiary of KHZ, which was, in turn, a subsidiary of Keppel Corporation. [FN79]

> FN74. Vilter has proffered evidence regarding Keppel Corporation's structure from a website purportedly maintained by it. (See Declaration of Kenneth F. Mattfeld In Support of Vilter's Opposition ("Mattfeld Decl."), Exs. C, D, E.) Mattfeld asserts that he personally downloaded the pages attached to his declaration from Keppel Corporation's website. (*Id.* ¶¶ 4-7.) As Vilter does not proffer the testimony of a Keppel Corporation representative attesting that the information on the website was placed there by the corporation, the court declines to consider it. See *Wady v. Provident Life and Accident Ins. Co. of America,* --- F.Supp.2d ----, No. Civ. 01-10818, 2002 WL 988557, *2 (C.D.Cal. Apr.30, 2002) ("Rule 901(a) of the Federal Rules of Evidence states that documents are sufficiently authenticated by evidence that will support a finding that they are what their proponent claims them to be. The court agrees that Gravitt cannot authenticate these documents as statements of UnumProvident"). See also *United States v. Jackson,* 208 F.3d 633, 638 (7th Cir.2000) (holding that evidence taken from the Internet lacked authentication where the proponent was unable to show that the information had been posted by the organizations to which she attributed it); *St. Clair v. Johnny's Oyster & Shrimp, Inc.,* 76 F.Supp.2d 773, 775 (S.D.Tex.1999) ("Anyone can put anything on the Internet. No web-site is monitored for accuracy and nothing contained therein is under oath or even subject to independent verification absent underlying documentation. Moreover, the Court holds no illusions that hackers can adulterate the content on any web-site from any location at any time. For these reasons, any evidence procured off the Internet is adequate for almost nothing ...").

> FN75. On May 2, 2002, Keppel FELS and KHZ combined to form Keppel Offshore & Marine. The merged entity will include the businesses previously operated as Keppel FELS, KHZ, Keppel Shipyards, and KSD. (See Deposition of Simon Thiam Hock Soh ("Soh Depo.") at 101:20-22; 131:14-18.)

> FN76. *Id.* at 102:3-6.

> FN77. *Id.* at 124:14-15.; Fok Depo. at 86:11-13; 18-20.

> FN78. Soh Depo. at 125:12-15.

> FN79. Deposition of Ronald Lim ("Lim Depo.") at 90:14-25.

2. Keppel Marine Agencies

The parties also dispute the relationship the Keppel entities have with Keppel Marine Agency. Keppel Marine Agencies acts generally as Keppel Shipyard's U.S. agent, and forwards inquiries it receives regarding shipyard services to Shipyard. [FN80] If the referral concerns a smaller vessel or if Shipyard cannot handle the contract, Shipyard, not Marine Agencies, forwards the inquiry to KSD. [FN81] If KSD wishes to bid, it provides a quote to Marine Agencies to transmit to the ship owner or management company. [FN82] In the event the owner or manager accepts the bid, Keppel Marine Agencies is entitled to receive a commission. [FN83] While there is evidence in the record that a few vessels originally referred to Keppel Shipyard were in turn presented to KSD, there is no evidence that any of the referrals resulted in a contract or that Marine Agencies has ever received a commission from KSD.

> FN80. Lim Depo. at 74:8-11; 92:25-93:2.

> FN81. *Id.* at 74:1-15.

Not Reported in F.Supp.2d                                                                                                    Page 12
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

FN82. *Id.* at 76:16-19.

FN83. *Id.* at 77:1-7; 97:3-7.

Costa challenges KSD's attempt to distance itself from Keppel Marine Agencies. Costa cites the fact that KSD would have to pay Marine Agencies a commission if it were to bid successfully on a contract that it referred, evidence that John Bajor, President of Keppel Marine Agency, has visited KSD, and evidence that Keppel Marine Agency's Vice President, Michael Holcomb, was recently at KSD for meetings with Fok. [FN84] There is also evidence that Lee met Bajor in 1995 at a house owned by Singmarine Land Corporation in Placentia. There is no evidence that the two have met since that time. [FN85]

FN84. While Bajor met with Fok at KSD, the evidence indicates that they have spoken only once or twice. (See Fok Depo. at 75:20-22; 79:2-25; 88:2-3.)

FN85. Lee Depo. at 18:1-5.

3. Keppel's Land Holding Corporations

Singmarine Land Corporation is a California entity that Costa contends was established to hold properties used by Keppel Corporation's American subsidiaries. The company was originally owned by Keppel Marine Industries, and was transferred to Keppel Corporation in January 1999. [FN86] Among the properties Singmarine Land Corporation owns is a house in Placentia where Lee met Keppel Marine Agencies' Bajor in 1995, and Fok, Ng and Lee stayed when they came to California in 1999. It is unclear whether this residence is also the "office in Anaheim" or Orange County that Fok and Lee allegedly referenced during their meetings in San Diego in 1999. The extent of land and properties held by Singmarine Land is unclear, although evidence indicates that its property is used primarily to house Keppel employees. [FN87] Singmarine Land is neither a subsidiary of KSD nor within the family of marine-related Keppel entities. [FN88]

FN86. Soh Depo. at 114: 16-19.

FN87. Soh Depo. at 115:19-23.

FN88. Lee Depo. at 15:6-10.

**\*8** Costa and Vilter have submitted evidence suggesting that the corporate form of various Keppel entities is not consistently or formally maintained. They have also proffered evidence that Lim, President of Singmarine Land, took a three-day trip with Lee in 2002 to Mississippi and Houston. [FN89] The address of one of Singmarine Land's principals is KSD's address. [FN90]

FN89. *Id.* at 39:25-42:9.

FN90. Declaration of William L. Banning In Opposition to Motion to Dismiss ("Banning Decl."), Ex. H. While the evidence proffered regarding KSD's address is a website printout and hence inadmissible (see note 74, *supra* ), correspondence in the record confirms that Gul Road is the location KSD's Singapore business office.

## II. DISCUSSION

A. Standard Governing Motions To Dismiss For Lack Of Personal Jurisdiction Under Rule 12(b)(2)

1. Procedural Considerations

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the court may decide a question of personal jurisdiction on the basis of affidavits and documentary evidence submitted by the parties, or may hold an evidentiary hearing on the matter. See 5A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351, at pp. 253-59 and n. 31-35 (2d ed.1990); *Rose v. Granite City Police Dept.*, 813 F.Supp. 319, 321 (E.D.Pa.1993). Whichever procedure is used, plaintiff bears the burden of establishing that jurisdiction is proper. See *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995); *Flynt Distributing Co. v. Harvey,* 734 F.2d 1389, 1392 (9th Cir.1984). In this case, the pleadings, declarations and documentary

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                          Page 13
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

evidence submitted by the parties provide an adequate basis for evaluating jurisdiction. Accordingly, no evidentiary hearing is necessary.

Because the matter is being decided on the basis of affidavits and documentary evidence, Costa and Vilter need only make a prima facie showing of personal jurisdiction. See *Fields v. Sedgwick Associated Risks, Ltd.,* 796 F.2d 299, 301 (9th Cir.1986). All allegations in the complaint and cross-complaint must be taken as true, to the extent not controverted by KSD's affidavits, and all conflicts in the evidence must be resolved in favor of Costa and Vilter. See *AT & T Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996) (citing *WNS, Inc. v. Farrow,* 884 F.2d 200, 203 (5th Cir.1989)). A prima facie showing by Costa and Vilter will support a finding of jurisdiction " 'notwithstanding [a] contrary presentation by the moving party." ' *Wenz v. Memory Crystal,* 55 F.3d 1503, 1505 (10th Cir.1995).

**2. Substantive Standard**

Whether a federal court can exercise personal jurisdiction over a non-resident defendant turns on two independent considerations: whether an applicable state rule or statute permits service of process on the defendant, and whether the assertion of personal jurisdiction comports with constitutional due process principles. See *Pacific Atlantic Trading Co. v. M/V Main Express,* 758 F.2d 1325, 1327 (9th Cir.1985).

California's long-arm statute extends jurisdiction to the limits of constitutional due process. See *Gordy v. Daily News, L.P.,* 95 F.3d 829, 831 (9th Cir.1996); Cal.Code. Civ. Proc. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States"). Consequently, when service of process is effected under California law, the two prongs of the jurisdictional analysis collapse into one--whether the exercise of jurisdiction over defendant comports with due process. See *Fireman's Fund Ins. Co. v. National Bank of Cooperat-*

*ive,* 103 F.3d 888, 893 (9th Cir.1996); *Aanestad v. Beech Aircraft Corp.,* 521 F.2d 1298, 1300 (9th Cir.1974).

**\*9** The Fourteenth Amendment's Due Process Clause permits courts to exercise personal jurisdiction over a defendant who has sufficient "minimum contacts" with the forum state that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). There are two recognized bases for personal jurisdiction over nonresident defendants: (1) "general jurisdiction," which arises where the defendant's activities in the forum state are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over it in all matters; and (2) "specific jurisdiction," which arises when a defendant's specific contacts with the forum have given rise to the claim in question. See *Helicopteros Nacionales de Columbia S.A. v. Hall,* 466 U.S. 408, 414-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). See *Doe v. American Nat'l Red Cross,* 112 F.3d 1048, 1050-51 (9th Cir.1997); *Fields, supra,* 796 F.2d at 301-02.

**3. There Is No Basis For Exercising General Jurisdiction Over KSD**

A court has general jurisdiction over a defendant if the defendant's contacts with the forum are "substantial" or "continuous and systematic." *International Shoe, supra,* 326 U.S. at 316; see also *Data Disc, Inc. v. Systems Technology Associates, Inc.,* 557 F.2d 1280, 1287 (9th Cir.1977). When properly invoked, general jurisdiction allows a federal court to hear *any* cause of action, even one unrelated to defendant's activities within the state. See *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952). To determine if a defendant's activities within the forum are "continuous and systematic" or "substantial," the court must examine all of its activities impacting the state. See *Helicopteros, supra,* 466 U.S. at 411; *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490

Not Reported in F.Supp.2d                                                                    Page 14
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

(1980); *Perkins, supra,* 342 U.S. at 445-49 (1952).

Costa asserts that the court may exercise general jurisdiction over KSD because it has conducted substantial, systematic and continuous activities in California. Costa relies, in this regard, on evidence that KSD has solicited work and entered into contracts worth millions of dollars with vessels owners or managers located in California, evidence concerning the August 1999 visit of Fok, Ng and Lee, and evidence regarding the United States ties of other Keppel Corporation entities. [FN91]

> FN91. See Plaintiff's Memorandum of Points and Authorities in Opposition to Motion to Dismiss ("Pl.'s Opp.") at 3:13-15.

Even resolving all conflicts in the evidence in favor of Costa and Vilter, the court cannot find that KSD has engaged in substantial, systematic and continuous activities in California. First, KSD is not licensed to do business in California, it has not designated an agent for service of process in the state, it does not pay taxes or maintain bank accounts here, or it does not own property or have employees or agents domiciled in California. [FN92] Evidence regarding the residence in Placentia/Anaheim indicates that it is not owned by KSD; loose statements by Fok and Lee regarding offices in Anaheim do not refute or contradict this fact. [FN93] Between 1995 and 2000, KSD secured five contracts for ship repair and/or jumboization of ship with California residents. [FN94] It bid on four others. While admittedly each of the contracts generated millions of dollars in revenue for KSD, and together they appear to represent a not significant percentage of KSD's business, [FN95] this alone is not sufficient to support a finding of general jurisdiction.

> FN92. Kwee Decl., ¶¶ 17, 20, 24-25; Fok Decl., 27, 30, 34-35.

> FN93. See Chikami Decl., ¶ 6; Freitas Decl., ¶ 6. At the time he purportedly told Freitas that he was from Keppel's Los

Angeles or Orange County office, Lee was not a KSD employee. Accordingly, the statement is hearsay when offered against KSD.

> FN94. Sanchez Decl., ¶ 2 (Toaimoana, Fuiono); Freitas Decl., ¶ 3 (Carol Linda); Cileu Decl., ¶¶ 6, 8 (Daniela, Sea Encounter).

> FN95. There is no direct evidence in the record regarding KSD's total inventory of shipyard work during this period. Costa extrapolates from evidence regarding the company's revenues for the period, however, that contracts for repair and/or jumboization of the Daniela, Western Pacific, Toaimoana and Fuiono accounted for 11.75% of KSD's gross receipts from shipyard work between 1995 and 2000. (See Pl.'s Opp. at 5, n. 6; Soh Depo. at 67:8-68:8, 63:23-64:10.)

*10 The Supreme Court has upheld a finding of general jurisdiction only once, in a case involving contacts significantly more comprehensive than those presented here. See *Perkins, supra,* 342 U.S. at 445-49. The Ninth Circuit has also regularly declined to find general jurisdiction "even [in cases] where the [defendant's] contacts were quite extensive." *Amoco Egypt Oil Co. v. Leonis Navigation Co.,* Inc., 1 F.3d 848, 851 (9th Cir.1993).

Courts have routinely rejected the suggestion that generating substantial revenue from the sale of products or services to forum state residents is by itself sufficient to support the exercise of general jurisdiction. See, e.g., *Dalton v. R & W Marine, Inc.,* 897 F.2d 1359, 1362 (5th Cir.1990) (holding that general jurisdiction did not exist despite the fact that the defendant company chartered boats to its Louisiana subsidiaries (accounting for approximately 13% of the company's revenues), engaged in advertising which reached Louisiana, and purchased vessels within the state, because these contacts were not sufficiently "systematic and continu-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 15
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

ous to constitute a general presence in the state"); *LeBlanc v. Patton-Tully Transportation LLC,* 138 F.Supp.2d 817, 819 (S.D.Tex.2001) ("The Court concludes that out-of-state work performed for a Texas business, even if accounting for ten to fifteen percent of Defendant's revenue, cannot possibly give rise, by itself, to general jurisdiction in Texas over the Defendant"); *L.H. Carbide Corp. v. Piece Maker Co.,* 852 F.Supp. 1425, 1435 (N.D.Ind.1994) ("The facts in the present case indicate that Piece Maker has none of the pervasive contacts with the State of Indiana as the Benguet Consolidated Mining Company did with the State of Ohio in *Perkins.* The only presence Piece Maker has in Indiana is one salesman who periodically drives through the state to ascertain whether the four (4) or five (5) customers who reside in Indiana, and make up only eight percent (8%) of Piece Maker's total annual sales for the past year, require any products from Piece Maker. This sole contact does not rise to the level of 'continuous and systematic contacts' as that test has been applied by other courts to find the existence of general personal jurisdiction"). Cf. *Helicopteros, supra,* 466 U.S. at 411, 417-18 (holding that the non-resident defendant's purchase of 80% of its helicopter fleet, as well as spare parts and accessories for the aircraft, at a cost of several million dollars over a seven-year period was not sufficient to support the exercise of general jurisdiction over it); *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 573 (2d Cir.1996) (noting that the defendant's "$4 million dollars in sales in Vermont between 1987 and 1993, standing alone, may not have been sufficient" to subject it general jurisdiction in the state, but holding that "its relationship with dealers selling its products and its so-called 'authorized' builders, the visits to those dealers and builders by Robertson personnel, the advertising and support available to Vermont residents regarding Robertson's products, and the deliberate targeting of Vermont architectural firms as sales prospects" was, in combination with the sales, sufficient satisfy the "minimum contacts" requirement).

**\*11** This is particularly true where, as here, the

non-resident defendant structures its business transactions so that they are consummated outside the state and contracted work is performed outside the state. See *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 375-76 (5th Cir.1987) ("[the fact] that Beech products flow into Texas [did] not create a general presence in that state" because "Beech exercised its right to structure its affairs in a manner calculated to shield it from the general jurisdiction of the courts of other states such as Texas, carefully requiring the negotiation, completion, and performance of all contracts in Kansas. Beech has not afforded itself the benefits and protections of the laws of Texas, but instead has calculatedly avoided them").

KSD does not have a registered agent for service of process in California, it does not own property in the state, or have bank accounts or employees here. It also has no sales representatives, agents or marketing personnel who reside in the state or who are here on a frequent or even routine basis. Its contacts with the state are thus insufficient to permit the exercise of general jurisdiction. See, e.g., *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 381 (9th Cir.1990) (declining to exercise general jurisdiction where, despite the existence of other contacts in Washington, defendant "has no offices and no exclusive agents in Washington, it is not registered to do business there, and it pays no taxes there"), overruled on other grounds, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *Cubbage v. Merchent,* 744 F.2d 665, 667- 68 (9th Cir.1984) (declining to exercise general jurisdiction over defendants who were not residents of or licensed by the forum state, and who did not perform services within the state). Compare *Perkins, supra,* 342 U.S. at 447 (corporation's president and principal shareholder conducted the defendant company's wartime business from his home in Ohio, since corporate operations were halted by the Japanese occupation of the Philippines; the president corresponded on the company's behalf, had custody of the corporate files, issued salary checks, maintained two bank accounts carrying substantial balances of company

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                      Page 16
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

funds, held directors' meetings at his home, and supervised the rehabilitation of the company's properties in the Philippines.

Moreover, even if one were to credit Costa's assertion that KSD maintains an office in Anaheim, this would not change the analysis. See, e.g., *In re Rationis Enterprises, Inc. of Panama,* **261 F.3d 264, 269 (2d Cir.**2001) ("**While a local office may constitute a 'continuous and systematic' contact sufficient to allow a court to hold that a defendant subjected itself to the general jurisdiction of the forum state, ... the presence of such an office is not dispositive**"); *Glater v. Eli Lilly & Co.,* 744 F.2d 213, 215, 217 (1st Cir.1984) (the defendant corporation's general business contacts were too fragmentary to satisfy the constitutional standard for general jurisdiction where it advertised its pharmaceutical product in trade journals reaching the forum state and employed eight sales representatives to service physicians, pharmacies, and hospitals within the state); *Congoleum Corp. v. DLW Aktiengesellschaft,* 729 F.2d 1240, 1242 (9th Cir.1984) ("[N]o court has ever held that the maintenance of even a substantial sales force within the state is a sufficient contact to assert jurisdiction in an unrelated cause of action"). As noted earlier, the totality of a defendant's contacts with the state must be assessed in determining whether the exercise of general jurisdiction is appropriate. Here, the evidence reflects a single visit to the state by KSD representatives to solicit business, the receipt by some potential customers of sales brochures over an eight- to ten-year period, and some telephone and mail solicitation from KSD's home office in Singapore. This activity, which may have contributed to generating 11-12% of KSD's revenue over a five-year period, is not sufficient to permit the exercise of general jurisdiction, particularly given evidence that the contracts were consummated outside the state and all work performed pursuant to the contracts was done in Singapore.

**\*12** Costa also asserts that the court may exercise general jurisdiction over KSD because other subsi-

diaries of Keppel Corporation have ties to the United States, and KSD employs one of the subsidiaries--Keppel Marine Agencies--as an agent to obtain work from U.S. vessel managers and owners. Costa cites no authority demonstrating that a parent corporation's contacts can be imputed to a subsidiary, or that one subsidiary's contacts can be imputed to another, in determining whether to exercise general jurisdiction over the subsidiary.

"[A] parent's corporation's ties to a forum do not create personal jurisdiction over the subsidiary." *Fields v. Sedgwick Associated Risks, Ltd.,* 796 F.2d 299, 301-02 (9th Cir.1986). See also *County of Stanislaus v. Pacific Gas & Elec. Co.,* No. CV-F-93-5866, 1995 WL 819149, *2 (E.D.Cal. Dec.18, 1995) ("That A & S is a wholly-owned subsidiary of PG & E, a California corporation that actively conducts business in this state, is irrelevant to the question of whether there is personal jurisdiction over A & S. Only A & S's own contacts with this forum may be considered in assessing jurisdiction").

Similarly, courts do not impute the contacts of a subsidiary into its parent to determine whether personal jurisdiction over the parent exists. See *Doe v. Unocal Corp.,* 248 F.3d 915, 925 (9th Cir.2001) ("The existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum"); *Naxos Resources v. Southam Inc.,* No. CV 96-2314, 1996 WL 662451, *2 (C.D.Cal., Aug.16, 1996) ("Plaintiffs instead argue that because four of Southam's subsidiaries conduct business in California, Southam should be deemed to have 'continuous and systematic' contacts with California. In general, mere presence of a subsidiary in a forum state will not suffice to establish personal jurisdiction over a nonresident parent company"). Before such imputation is appropriate, there must be evidence that " 'the parent and subsidiary are not really separate entities, or [that] one acts as an agent of the other." ' *Doe, supra,* 248 F.3d at 926

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                     Page 17
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

(quoting *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 676 (D.C.Cir.1996)). This requires evidence that the parent controls the subsidiary's internal affairs or daily operations. *Id.* See also *American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996) ("A parent corporation's relationship with its subsidiary may confer personal jurisdiction over the parent if the subsidiary is acting as the parent company's alter ego, 'so as to justify disregard of the corporate entity' ").

Here, there is no evidence that would support a finding that Keppel Corporation or any of its subsidiaries controls KSD's internal daily operations. Nor is there evidence that Keppel Corporation itself has sufficient contacts with California to support the exercise of general jurisdiction over it. At best, there is evidence that certain present or former Keppel subsidiaries--Singmarine Land Corporation, MIL-I Precision and Pacific Seacraft--are incorporated or do business in the state. There is also evidence that Land Corporation owns at least one piece of property here, [FN96] and that other Keppel subsidiaries have a presence in Texas and New Jersey. [FN97] The only evidence linking KSD to Singmarine Land Corporation is Fok's reference to "an office in Anaheim," the fact that Fok, Ng and Lee stayed at the Placentia residence owned by Land Corporation while they were in California in 1999, and the fact that one of the directors of Land Corporation lists an address on the company's corporate filing that is KSD's address in Singapore. This is not sufficient to support a finding that either Keppel Corporation or Land Corporation controls KSD's daily operations, or that there is a basis for disregarding the companies' corporate form. Similarly, there is no evidence that KSD's business is or was linked in any fashion with the businesses of MIL-I Precision or Pacific Seacraft. MIL-I Precision, in fact, makes aircraft components for McDonnell Douglas and Boeing. [FN98] While the evidence reflects that executives within the Keppel family of companies move from one business to another, this is not a basis for disregarding the corpor-

ate form. Accordingly, the court concludes that the contacts of Keppel Corporation and its subsidiaries are not relevant to the jurisdictional analysis in this case.

> FN96. Land Corporation previously owned a factory in the state that was used by Pacific Seacraft. (See Soh Depo. at 115:10-13.)

> FN97. There is also evidence that Lee, KSD's Deputy General Manager, traveled to Mississippi with the General Manager of Keppel Corporation to investigate an investment opportunity. (See Lee Depo. at 39:25-40:9, 41:6- 12, 55:5-20.)

> FN98. See Lee Depo. at 1:16-3:20.

**\*13** Costa and Vilter contend that KSD has a direct relationship with Keppel Marine Agencies, and that Marine Agencies contacts with the United States are sufficient to confer personal jurisdiction over KSD. In the first place, there is little, if any, evidence that Marine Agencies has "substantial" or "continuous and systematic" contacts with California. The company is apparently based in New Jersey, and there is no evidence that it has solicited or obtained shipyard contracts from California owners and managers. Nor is there evidence that a large portion of its commission revenue is generated in the state.

Even were this not the case, the Ninth Circuit has established a high threshold that must be met before a subsidiary's contacts may be imputed to the parent corporation on an agency theory. The test "requires a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.' " *Doe, supra,* 248 F.3d at 928 (quoting *Chan v. Society Expeditions, Inc.,* 39 F.3d 1398, 1405 (9th Cir.1994)). Stated otherwise, the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                         Page 18
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

services the agent subsidiary performs must be sufficiently meaningful that its presence in the state substitutes for [the] presence of the principal." *Id.* at 930.

Costa and Vilter proffer no evidence that Marine Agencies operates as a surrogate for KSD in California. Rather, the evidence reflects that Marine Agencies is primarily the agent of Keppel Shipyard, and that its dealings with KSD are indirect only. As noted earlier, Marine Agencies refers potential ship repair/jumboization customers to Shipyard. If the projects involve smaller vessels that are more appropriate for KSD, Shipyard refers the business to it. While Marine Agencies stands to earn a commission if KSD contracts with the customer and performs the work, there is no evidence that it has in fact even received a commission from KSD. [FN99] Thus, even if the evidence supported a finding that Marine Agencies is present in California (which it does not), there is no proof that its absence from the state would cause KSD itself to establish a presence here. See *Doe, supra,* 248 F.3d at 929 ("There is no evidence that in the absence of Total's California subsidiaries involved in the petrochemical and chemical operations, Total would conduct and control those operations"). For this reason, there is no basis upon which to disregard the corporate separateness of Marine Agencies and KSD. See, e.g., *Naxos, supra,* 1996 WL 662451 at *3 ("The Court cannot conclude that the evidence adduced by Naxos regarding defendants' subsidiaries is sufficient to merit the extraordinary remedy of disregarding corporate separateness and imputing the presence of defendants' subsidiaries in California to defendants for general jurisdiction purposes"). [FN100]

> FN99. Vilter argues that Marine Agencies has referred nine potential projects to KSD over an unspecified period of years. (See Vilter Memorandum of Points and Authorities in Opposition to Keppel Singmarine's Motion to Dismiss ("Vilter Opp.") at 9:10-10:3.) Vilter cites no evidence,

however, that the vessels identified have California owners or managers, and the deposition references it provides do not correlate to any of the transcript pages that were lodged with the court.

> FN100. The same result would follow if the court applied the general test for imputing the contacts of an agent in the state to its principal. See, e.g., *Genetic Implant Systems v. Core-Vent Corp.,* 123 F.3d 1455, 1458-59 (Fed.Cir.1997) (where a manufacturer appointed an exclusive distributor to sell its patented products, and the distributor maintained sales agents in Washington, the forum state, and sold a substantial amount of product there, the manufacturer purposefully availed itself of the benefits of doing business in Washington, warranting the exercise of jurisdiction over it in that forum).

**\*14** In sum, whether analyzed in terms of its own contacts with the forum, the contacts of Keppel Corporation and its subsidiaries generally, or both, KSD has not engaged in sufficiently "substantial" or "continuous and systematic" activity in California to support the exercise of general jurisdiction over it in this case.

4. The Court May Exercise Specific Jurisdiction Over KSD

Before the court may exercise specific jurisdiction over a defendant, three things must be shown: (1) that the defendant did some act or consummated some transaction in California by which it purposefully availed itself of the privilege of conducting activities in the state; (2) that the claims against it arise out of such activities; and (3) that the exercise of jurisdiction is reasonable. *Fireman's Fund, supra,* 103 F.3d at 894; *Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995).

a. Purposeful Availment

Not Reported in F.Supp.2d                                                        Page 19
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

"Purposeful availment analysis examines whether the defendant's contacts with the forum are attributable to his own actions or are solely the actions of the plaintiff." *Sinatra v. National Enquirer,* 854 F.2d 1191, 1195 (9th Cir.1988). To demonstrate purposeful availment, plaintiffs must show that the defendant "engage[d] in some form of affirmative conduct allowing or promoting the transaction of business within the forum state." *Gray & Co. v. Firstenberg Machinery Co.,* 913 F.2d 758, 760 (9th Cir.1990) (citing *Shute, supra,* 897 F.2d at 381). See also *Burger King v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, ... or of the 'unilateral activity of another party or a third person ...'). A defendant's contacts must be such that it should "reasonably anticipate being haled into court there." See *World-Wide Volkswagen, supra,* 444 U.S. at 297.

Courts distinguish between contract and tort actions in assessing whether a defendant has purposefully availed itself of the benefits of conducting activities in the forum. See *Roth v. Garcia-Marquez,* 942 F.2d 617, 621 (9th Cir.1991). In tort cases, courts exercise jurisdiction over defendants who engage in an act that has an effect in the forum state, even if the act itself takes place outside state boundaries. *Id.; Paccar Int'l, Inc. v. Commercial Bank of Kuwait, S.A.K.,* 757 F.2d 1058, 1064 (9th Cir.1985) ("The commission of an intentional tort in a state is a purposeful act that will satisfy the first two requirements under *Data Disc* [, *supra,* 557 F.2d at 1288]. A tortious act, standing alone, can satisfy all three requirements under *Data Disc* if the act is aimed at a resident of the state or has effects in the state").

In contrast, in a case based on contract, the fact that the defendant entered into a contract with a forum resident, standing alone, is not sufficient to establish purposeful availment. See *Burger King, supra,* 471 U.S. at 478; *Gray, supra,* 913 F.2d at 760;

*Sher, supra,* 911 F.2d at 1362. Rather, the court must assess "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether it is appropriate to exercise specific jurisdiction over the defendant. *Burger King, supra,* 471 U.S. at 479-80. When tort claims arise from a contractual relationship between plaintiff and defendant, the Ninth Circuit applies the test utilized in assessing jurisdiction in contract cases. See *Sher, supra,* 911 F.2d at 1362 ("Although some of Sher's claims sound in tort, all arise out of Sher's contractual relationship with the defendants. In such a case, the mere existence of a contract with a party in the forum state does not constitute sufficient minimum contacts for jurisdiction.... Instead, we must look to 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' to determine if the defendant's contacts are 'substantial' and not merely 'random, fortuitous, or attenuated' ").

**\*15** In the instant case, the claims against KSD arise out of its performance of contractual obligations, as the company undertook to repair the Daniela only as a consequence of its entry into a contract with Z No. 2 Fishing Company. While Pete Costa was not a party to the contract, his negligence and strict liability claims flow from the obligations undertaken and duties imposed on KSD by the contract. Accordingly, it is appropriate to apply a contract analysis in assessing whether specific jurisdiction exists. See *Unic Oil Compania v. Internacional De Granos E Insumos S.A. De C.V.,* 92 F.3d 1194, 1996 WL 429172, \*4 (9th Cir. July 9, 1996) (Unpub.Disp.) ("Unic's claims, including those sounding in tort, are related to the letters of intent and distribution agreement concluded between Unic and the Honduran companies. Gonzales, the only defendant remaining in this appeal, was not a party to any of these documents. Yet his role involved extensive solicitation of business and several negotiations regarding the documents by telephone from Miami and on location in Honduras.... These con-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

tacts and developments form the basis for the tort claims alleged here").

*Burger King* emphasizes that courts must use a "highly realistic" approach in evaluating minimum contacts in a contract case that "recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' ... It is these factors--prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing--that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King, supra,* 471 U.S. at 479.

The Ninth Circuit has applied this standard in a number of decisions that provide guidance in resolving the pending dispute. In *Roth, supra,* 942 F.2d 617, the court considered an author's challenge to the exercise of personal jurisdiction over him in a contract dispute concerning movie rights to one of his works. A California film producer contacted the author in Mexico and expressed interest in making a film based on his book. *Id.* at 619. Originally, the author insisted that the film be shot in Columbia; later, he agreed it could be filmed in Brazil. *Id.* The court noted that the mere existence of a contract between a forum resident and a non-resident defendant does not suffice to subject the non-resident to jurisdiction. *Id.* at 621. Rather, it is critical to ascertain whether "the defendant's contacts [with the forum state] are attributable to 'actions by the defendant *himself,'* or conversely to the unilateral activity of another party." *Id.* (emphasis original). It is only "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state," ' the court said, who "are subject to regulation and sanctions in the other State for the consequences of their actions." *Id.* (quoting *Burger King, supra,* 471 U.S. at 473).

*16 Applying these principles to the case before it, the court held that the fact that the film producer had solicited the author to enter into the contract

weighed against subjecting the author to jurisdiction in California. Similarly it held that the author's minimal presence in the state suggested there had been no purposeful availment. *Id.* at 622. Calling the matter "a very close call," the court nonetheless concluded that "a final and broader issue appear[ed] to swing the first prong for [the film producer], namely the *future consequences* of the contract." *Id.* (emphasis original). It stated:

"The ... contract concerned a film, most of the work for which would have been performed in California. Though the shooting most likely would have taken place in Brazil, all of the editing, production work, and advertising would have occurred in California. This is not an instance where the contract was a one-shot deal that was merely negotiated and signed by one party in the forum; on the contrary, most of the future of the contract would have centered on the forum. The checks that [the producer] would have sent [the author], ... would have depended upon activities in California and the United States. In looking at the 'economic reality,' ... it seems that the contract's subject would have continuing and extensive involvement with the forum." *Id.*

See also *Ting v. Orbit Communication Co., Ltd.,* 105 F.3d 666, 1997 WL 8470, *3-4 (9th Cir. Jan.7, 1997) (Unpub.Disp.) (holding that an employment contract between a non-resident employer and a resident employee, which allegedly required the employer to open an office in Los Angeles, contemplated a continuing relationship with the forum state, as the resident employee was to be based there). Compare *Slepian v. Guerin,* 172 F.3d 58, 1999 WL 109676 (9th Cir. Jan.11, 1999) (Unpub.Disp.) (holding that an employment contract between a resident and a non-resident employer did not give rise to personal jurisdiction over the employer because the employer's accommodation of the employee's choice of residence was not coupled with other contacts directed toward the forum state, the contract was negotiated outside the state, and the employee's work was not directed at residents of the forum state but was "nationwide").

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                           Page 21
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

By contrast, in *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802 (9th Cir.1988), a California resident and his wholly owned company entered into oral and written agreements with Shell International Chemical Co., Ltd., to market and sell PB pipe grade industrial resin in South America, Africa and the Middle East. *Id.* at 805. Pursuant to the contract, the California plaintiffs were to be paid a commission on actual sales. *Id.* The parties' agreement was negotiated in England. "[C]ontract execution" occurred "by international mail," although the document was signed by the plaintiffs in California. *Id.* at 816. The contract made no reference to California (or the United States) as plaintiffs' place of residence or as the forum for the resolution of disputes. *Id.* Nor did it reference "any reliance on [plaintiffs'] facilities in California." *Id.* at 917. Plaintiffs alleged that "they [had] 'performed 90% of [their] activities [in furtherance of the contract] in the Bay Area." ' *Id.* at 816. The court rejected this as a basis for exercising jurisdiction, noting that Shell International performed no part of the contract in California, and that plaintiffs' actions constituted "unilateral activity" only. This it found insufficient, as "a plaintiff's performance in California cannot give jurisdiction ... over a nonresident defendant; it is [the] defendant's activity that must provide the basis for jurisdiction." *Id.* at 816-17 (internal quotations and parentheticals omitted).

**\*17** The contract at issue here is more similar to that involved in *McGlinchy* than it is to the agreement in *Roth.* KSD was obligated to perform a discrete body of work outlined in the contract; it had no obligation to provide ongoing maintenance or services for the vessel once the repairs were complete. All work, moreover, was performed in Singapore. KSD negotiated the contract with S & C from Singapore via fax and e-mail, following inspections of the vessel that occurred in the Philippines. The contract specifically stated that Singapore law would apply to resolve disputes arising thereunder.

The contract thus involved a "one-shot deal" that did not contemplate ongoing involvement with California. In *GATX Capital Corp. v. Fifth Third Bank,* No. C 99-3568 MJJ, 1999 WL 1244147 (N.D.Cal. Dec.10, 1999), the court concluded that it could not exercise personal jurisdiction over a non-resident company that entered into a contract for brokerage services with a California entity. The brokerage agreement concerned the leasing of fifty barges. The California-based broker identified a lessee, and the non-resident corporation entered into a twenty-five year lease with the entity. *Id.* at \*1. The court found that the brokerage contract was "more like a 'one-shot deal' than an ongoing relationship" despite the fact that it contemplated the provision of additional brokerage services once the initial lease expired as well as yearly tax services. *Id.* at \*3. The court further found that the " 'future consequences' as between [the barge owner] and the [broker] were minimal." *Id.* at \*4. Consequently, it declined to exercise jurisdiction over the non-resident barge owner. *Id.* See also *Van Steenwyk v. Interamerican Mgmt. Consulting Corp.,* 834 F.Supp. 336, 342 (E.D.Wash.1993) (finding no personal jurisdiction where, unlike *Roth,* "the contract in issue ... would not have created ongoing work in this state" as the resident plaintiff was to have performed his part of the agreement in Indonesia). Compare *Walker & Zanger (West Coast) Ltd. v. Stone Design, S.A.,* 4 F.Supp.2d 931, 939 (C.D.Cal.1997) (concluding that it was proper to exercise personal jurisdiction over an Italian company that had shipped limestone to, and accepted payment from, a California plaintiff over a period of eight years, as this was the sort of "affirmative conduct which allows or promotes the transaction of business within the forum state").

Despite the fact that the contract contemplated that KSD's work would be performed outside the forum state, and despite the fact that KSD negotiated the contract from Singapore and provided for the application of Singapore law, there are Ninth Circuit cases suggesting that KSD's solicitation of the contract in California is sufficient to support a finding of purposeful availment. See *Shute, supra,* 863 F.2d at 1441 ("This circuit has held that a non-resident

Not Reported in F.Supp.2d                                                                                                     Page 22
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

defendant's act of soliciting business in the forum state will generally be considered purposeful availment if that solicitation results in contract negotiations or the transaction of business"); *Sinatra, supra,* 854 F.2d at 1195 ("the solicitation of business in the forum state that results in business being transacted or contract negotiations will probably be considered purposeful availment"); *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 840 (9th Cir.1986) ("if the defendant directly solicits business in the forum state, the resulting transactions will probably constitute the deliberate transaction of business invoking the benefits of the forum state's laws"). See also *Burger King, supra,* 471 U.S. at 479-80 (holding that the court could exercise specific jurisdiction over defendant in part because he "deliberately 'reach[ed]' out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long term contract").

**\*18** Some courts have concluded that the results in these cases are best explained by the fact that there were "additional, substantial contacts with the respective forums" beyond the initial solicitation. See, e.g., *Reyes v. Riggs,* No. 87-4053, 1989 WL 71456, \*3 (9th Cir. June 26, 1989) (Unpub.Disp.) (discussing *Shute* and *Decker,* the court stated: "In two recent decisions we noted that the solicitation of business in the forum state will generally be considered purposeful availment if it results in contract negotiations or the transaction of business.... One might argue here that defendants' communications with the plaintiff resulted in a transaction of business. We conclude, however, that the present case is distinguishable from *Shute* and *Decker.* In *Shute,* the plaintiff advertised in local media, promoted its business through brochures sent to travel agents throughout the forum state, paid commissions to those agents for sales, and conducted promotional seminars within the state to solicit increased sales.... In *Decker,* while the contacts were not as great, the contract specified that performance was to be made in the forum state.... Thus, both *Shute* and *Decker* involved additional, substantial contacts with the respective forums").

In a recent, unpublished opinion, however, a Ninth Circuit panel held that a nonresident's solicitation of business involving a "one-shot" transaction constituted purposeful availment sufficient to subject the defendant to jurisdiction on a contract claim. In *Asad v. Pioneer Balloon,* 10 Fed. Appx. 624, 2001 WL 615269, \*2 (9th Cir.2001) (Unpub.Disp.), the non-resident defendant mailed three advertisements to plaintiff after meeting its representatives at a trade show outside the forum state. The parties entered into a contract pursuant to which defendant agreed to deliver balloon products to plaintiff in the United Arab Emirates. No ongoing relationship was anticipated and performance of the contract occurred outside of the forum state. *Id.* at \*1. Citing *Shute* and relying on the general rule that "soliciting business in the forum state will generally suffice if it results in the contract negotiations or the transaction of business," the panel nonetheless held that defendant's action in sending three advertisements to plaintiff in the forum state demonstrated that it had purposefully availed itself of the privilege of doing business there. *Id.* at \*2 (citing *Shute, supra,* 897 F.2d at 381). See also *Unic Oil, supra,* 1996 WL 429172 at \*4 (holding that jurisdiction could properly be asserted over a non-resident defendant in California with respect to tort claims arising out of a contract to distribute plaintiff's lubrication products in Honduras because defendant had engaged in "extensive solicitation of business," conducted "several negotiations regarding the [contract] by telephone from Miami and on location in Honduras," and "affirmatively sought out Unic").

**\*19** In the present case, it is undisputed that KSD executives came to California in August 1999. Costa has adduced evidence, which must be accepted as true for purposes of this proceeding, that prior to arriving, KSD's Fok telephoned S & C's Cileu, and stated that KSD was looking for shipyard work and was prepared to offer good deals and competitive pricing. Fok purportedly asked whether Cileu was planning to dry-dock any of the vessels under S & C's management and whether any of the owners

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                           Page 23
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

Cileu knew were planning to lengthen or "jum-boize" their vessels. When Fok, Ng and Lee arrived in San Diego, they solicited shipyard business from California vessel owners and managers. Among the managers they saw was Cileu. Plaintiff's evidence reflects that KSD representatives met with Cileu, and specifically solicited future business from him. Cileu states that, during the meeting, the upcoming overhaul of the Daniela was discussed, and KSD's Fok said that his company wanted to bid the job and was prepared to offer a very competitive price to secure the contract. Cileu also states that the visit was a "substantial factor" in S & C's decision to award the contract to KSD. Plaintiff's evidence thus demonstrates that KSD actively solicited the contract that gives rise to the claims here at issue by traveling to California and meeting with Cileu.

Under the rule announced in *Shute, Sinatra* and *Decker,* this is sufficient to support a finding of purposeful availment. See, e.g., *Whitson v. Stolp-man,* 174 F.Supp.2d 1131, 1133-34 (W.D.Wash.2001) (holding that jurisdiction was properly exercised over a California lawyer in Washington where plaintiff contacted the lawyer in California regarding her case, but defendant there-after "took steps to acquire the representation that were aimed toward Washington and designed to ob-tain business from Washington residents. In partic-ular, defendant provided information about his in-terest and qualifications via correspondence direc-ted to plaintiff's Seattle office ... and traveled to Washington in a successful attempt to obtain the legal representation"); *Forum Financial Group, Ltd. Liability Co. v. President and Fellows of Har-vard College,* 173 F.Supp.2d 72, 90 (D.Me.2001) ("Defendants in this case allegedly purposefully sought out Forum, in Maine, because of its expert-ise, and they traveled to Maine and initiated con-tacts with Forum in Maine in order to create the business relationship, which became the subject of the Consulting Contract. Such a course of conduct shows that Defendants focused their business ef-forts on entities and persons in the State of Maine"); *Elbeco Inc. v. Estrella de Plato Corp.,*

989 F.Supp. 669, 675 (E.D.Pa.1997) ( "Defendants initiated contact with Elbeco through a phone call into Pennsylvania. Additionally, defendants contin-ued their solicitation of Elbeco through sending promotional materials and sample shirts into Pennsylvania. After the contract was entered into, there was continued contact with Pennsylvania through mail and telephone communications. Fur-ther, representatives of Estrella and Maquiladora visited Pennsylvania in connection with this con-tract on two separate occasions.... The defendants' contacts with Pennsylvania as outlined above indic-ate a voluntary entry into Pennsylvania sufficient for this Court to exercise specific jurisdiction").

*20 In *Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267 (9th Cir.1995), the Ninth Circuit held that the district court lacked jurisdiction over a Norwegian company that had rebuilt the fishing vessel on which plaintiff was injured. The accident itself occurred while the vessel was in the Bering Sea. The Norwegian ship rebuilder did not maintain offices, employees, property, or bank accounts in the forum state of Washington. Nor had it solicited business there. *Id.* at 269. It worked on the vessels it contracted to rebuild in Norway, and redelivered them to their owners there as well. The contract to refurbish the vessel on which plaintiff was injured was negotiated and signed in Norway and Den-mark. *Id.* The ship builder's only direct connections with the forum state were its purchase, at the own-er's direction, of certain electronic components for the vessel from a company in Washington and the attendance of representatives at cocktail receptions and ship christenings on four occasions in the past. *Id.* The Ninth Circuit held that the ship builder had not purposefully availed itself of the privilege of conducting business in Washington. *Id.* at 271. Had KSD not purposefully injected itself into California to solicit the repair contract on the Daniela, the res-ult would be the same. The fact that it did so, however, warrants a different result. The Norwegi-an ship builder did not solicit business in Washing-ton or the United States generally. KSD did. As the claims at issue in this case arise out of work KSD

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

secured as a direct result of its solicitation of S & C in California, there is sufficient evidence of purposeful availment to support the exercise of specific jurisdiction over KSD.

**b. Whether The Claims Against KSD Arise Out Of The Contacts**

Because the court has found that KSD has sufficient contacts with California to warrant exercising specific jurisdiction over it, the court must consider whether Costa's and Vilter's claims against KSD arise out of its contacts, and whether the exercise of jurisdiction over KSD would be reasonable.

A lawsuit arises out of a defendant's contacts with the forum state if there is a direct nexus between the cause of action and the defendant's activities there. See *Shute, supra,* 897 F.2d at 385. The Ninth Circuit has adopted a "but for" test in assessing whether an action arises out of a defendant's contacts with the forum state. See *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1322 (9th Cir.1998) ("We must determine if the plaintiff Panavision would not have been injured 'but for' the defendant Toeppen's conduct directed toward Panavision in California"); *American Nat'l. Red Cross, supra,* 112 F.3d at 1051-52 ("... it cannot be said that Appellant would not have sustained her injury, 'but for' Donohue's alleged misconduct").

In the present case, Costa alleges that his brother was killed as a result of KSD's negligent repair of the Daniela. Vilter's indemnity cross-claim similarly arises out of KSD's repair of the vessel. Costa has adduced evidence that S & C would not have entered into the contract with KSD but for KSD's solicitation of it, most specifically, Fok's visit to San Diego. [FN101] To paraphrase the court in *Shute, supra,* KSD's "solicitation of business in [California]" was "forum-related activit[y] that put the parties within 'tortious striking distance' of one another." *Shute, supra,* 897 F.2d 386. But for such activity, KSD would not have been awarded the repair contract, and the decedent allegedly would not have been injured. Accordingly, the court finds that

the second requirement for the exercise of specific jurisdiction has been met.

> FN101. Cileu Decl., ¶ 12.

**c. Whether Exercising Jurisdiction Over Defendants Is Reasonable**

**\*21** The final prong of the jurisdictional test examines whether it is reasonable to subject the defendant to suit in the forum state. Reasonableness is assessed by weighing the following factors: (1) the extent of the defendant's purposeful injection into the forum; (2) the defendant's burden in litigating in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Ziegler, supra,* 64 F.3d at 474. See also *World-Wide Volkswagen, supra,* 444 U.S. at 292.

**1. Extent Of KSD'S Purposeful Interjection**

If a non-resident defendant has purposefully availed itself of the benefits of conducting activities in the forum state, it is "presumptively not unreasonable" to subject it to litigation in that forum. See *Burger King, supra,* 471 U.S. at 476-77 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable").

Here, the court has found that KSD purposefully availed itself of the benefits of conducting activities in California. Fok and Ng actively solicited business on KSD's behalf from California residents, and specifically solicited a contract for repair work on the Daniela from S & C. See *Sinatra, supra,* 854 F.2d at 1199 ("The factor of purposeful interjection is analogous to the purposeful direction analysis discussed above.... Because we have determined

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 25
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

that the Clinic purposefully directed its activities toward California residents, we cannot conclude that it did not deliberately avail itself of the benefits of California laws ...").

The fact that the court has made this finding, however, does not obviate the need to consider the degree of defendants' intrusion into the state. " 'Even if there is sufficient "interjection" into [California] to satisfy the [purposeful availment prong], the degree of interjection is a factor to be weighed in assessing the overall reasonableness of jurisdiction under the [reasonableness prong]." ' *Ziegler v. Indian River County,* 64 F.3d 470, 475 (9th Cir.1995) (quoting *Core-Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482, 1488 (9th Cir.1993) (brackets original), and *Insurance Company of North America v. Marina Salina Cruz,* 649 F.2d 1266, 1271 (9th Cir.1981)). See also *Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1114-15 (9th Cir.2002) ("There may be circumstances under which the level of purposeful injection into the forum supports a finding of purposeful availment yet still weighs against the reasonableness of jurisdiction ..."); *Panavision, supra,* 141 F.3d at 1323 (quoting *Core-Vent* ); *nMotion, Inc. v. Environmental Tectonics Corp.,* 196 F.Supp.2d 1051, 1060 (D.Or.2001) ("While [the purposeful interjection] factor weighs in favor of exercising jurisdiction, the contacts at issue are not 'considerable' or widespread. This factor, therefore, does not tilt heavily toward a finding of reasonableness"). KSD's contacts with the forum, while sufficient for due process purposes, are not significant or substantial. Thus, while the first factor favors exercising jurisdiction over KSD on Costa and Vilter's claims, it does so only slightly.

### 2. KSD'S Burden In Litigating In This Forum

**\*22** Turning to the second factor, the court must "examine the burden on the defendant in light of the corresponding burden on the plaintiff." *Sinatra, supra,* 854 F.2d at 1199. While it would no doubt be less burdensome for KSD to litigate this matter in Singapore, it would be more convenient for

plaintiff and Vilter to prosecute their claims here. See *Nissan Motor Co., Ltd. v. Nissan Computer Corp.,* 89 F.Supp.2d 1154, 1161 (C.D.Cal.2000). KSD contends that Costa has significant resources because he received $7 million in settlement from the Daniela's owner. This may be true. The fact remains, however, that in terms of relative resources, KSD, a company that has annual gross revenues of tens of millions of dollars, retains the edge.

KSD contends that it would be unduly burdensome for it to litigate the case in the United States because it is a foreign company. In *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Supreme Court stated that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." Courts have interpreted this statement as a direction that plaintiffs must satisfy a more stringent reasonableness test when the defendant is a foreign national or company. See, e.g., *Walker & Zanger, supra,* 4 F.Supp.2d at 940 ("Because Stone Design is a foreign national, the reasonableness standard is somewhat more stringent"); *Technology Development Associates v. Victor Company of Japan, Ltd.,* C-93-1336 MHP ARB, 1993 WL 266651, \*8 (N.D.Cal. July 14, 1993) ("Litigation involving a nonresident defendant from a foreign nation creates a higher jurisdictional barrier for a finding that personal jurisdiction is reasonable"). Nonetheless, "modern advances in communication and transportation have significantly reduced the burden of litigating in another country." *Sinatra, supra,* 854 F.2d at 1199 ("The Supreme Court recently reiterated its concern with the burdens of defending a suit in a foreign country.... However, modern advances in communications and transportation have significantly reduced the burden of litigating in another country").

Here, KSD will face significant burdens if it is required to litigate this action in California. This is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 26
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

particularly true since many of the acts that give rise to the claim occurred in Singapore, documents regarding the claim are located there, and many of its knowledgeable witnesses are located there as well. See *Amoco, supra,* 1 F.3d at 852 (" 'The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.' ... The burden on Leonis of defending the suit in Washington is considerable. Leonis' base of operations is in Manila. The company presently has no connections with Washington, nor does it have an agent or office anywhere else in the United States.... Potential witnesses and evidence are not located in Washington"); *Congoleum, supra,* 729 F.2d at 1243 ("It would not comport with fair play and substantial justice to assert jurisdiction over a West German corporation in the distant forum of California on a claim that arises out of activities in Europe, where the corporation had no contact with California other than a developing sales market"); *Rocke v. Canadian Auto. Sport Club,* 660 F.2d 395, 399 (9th Cir.1981) (holding that "[although] modern transportation had indeed reduced some of the burden of litigation in a faraway forum," the Canadian defendant organizations "nonetheless face[d] a significantly greater burden defending [an] action in California than in [Canada]," particularly where the alleged acts giving rise to the claim occurred in Canada and most of the discovery would be centered in Canada"); *Callaway Golf Corp. v. Royal Canadian Golf Ass'n.,* 125 F.Supp.2d 1194, 1206 (C.D.Cal.2000) ("Here, the defendant's burden of litigating in California is likewise great. The members of the Rules Committee, likely witnesses in this case, are all located in Canada, as are other employee witnesses to defendant's conduct at issue.... [D]efendant here employs no agents in California and has no offices or license to conduct business in California"). This factor thus favors a finding that exercising jurisdiction in this case is not reasonable.

3. The Extent Of Conflict With The Sovereignty Of

The Defendant's State

**\*23** The third factor requires that the court evaluate the extent of any conflict with the sovereignty of defendant's state. It too is more significant in the international context. See *Pacific Atlantic Trading Co., supra,* 758 F.2d at 1330 (noting that "when the nonresident defendant is from a foreign nation, rather than another state in our federal system, the sovereignty barrier is higher, undermining the reasonableness of personal jurisdiction"); *Rocke, supra,* 660 F.2d at 399 (same); *Cruz, supra,* 649 F.2d at 1272 ("We do not minimize the sovereignty of the states within our federal system when we conclude that foreign nations present a higher sovereignty barrier than that between two states within our union. This is only a recognition of what is obvious").

Defendant has adduced evidence that the Singapore government owns a 32% interest in KSD indirectly through a Singapore private holding company. [FN102] Citing *Cruz,* it argues that this militates against a finding that the exercise of jurisdiction is reasonable. See *Cruz, supra,* 649 F.2d at 1272 ("[a] second factor bearing on the seriousness of the affront to sovereignty in the present case is the fact that the shipyard belongs to an agency of a foreign sovereign.... We ... conclude that [the] sovereign status of a defendant militates against the reasonableness of jurisdiction at least in cases arising before the passage of the ... FSIA"). In *Cruz,* the defendant was owned and operated by the Mexican Navy, and adjudication of plaintiff's claim would have required compelling the testimony of members of the Navy. *Id.* at 1269, 1272. KSD, by contrast, is a private company in which the Singapore government has only a partial, indirect interest. Its connection with a foreign government is thus substantially more attenuated than that of the defendant in *Cruz.* Moreover, it has not asserted FSIA immunity as a defense, and there is no indication that any government witnesses will be required to testify. For these reasons, the court finds *Cruz* somewhat inapposite. Nonetheless, because KSD is a foreign national, and because the Singapore government has an own-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                     Page 27
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

ership interest in it, this factor weighs slightly against a finding that exercising jurisdiction would be reasonable in this case. See *Ballard, supra,* 65 F.3d at 1501 ("Although we reject Royal's invitation to decline jurisdiction on the basis of 'international comity,' we nevertheless agree with Royal and the district court that an exercise of jurisdiction would implicate Austria's sovereignty interest"); *Amoco, supra,* 1 F.3d at 852 (holding that the potential for conflict with the sovereignty of defendant's state weighed against a finding of reasonableness because of "[t]he international context of th[e] case"); *Callaway Golf Corp., supra,* 125 F.Supp.2d at 1206 ("The fact that defendant is 'unquestionably [a] resident [ ] of Canada ... tends to undermine the reasonableness of personal jurisdiction in this case,' particularly because defendant has a corporate charter by the Canadian government to administer Canadian rules of men's amateur golf in Canada," quoting *Rocke, supra,* 660 F.2d at 399).

> FN102. Declaration of Lum Chee Kong ("Kong Decl."), ¶ 10.

**4. The Forum State's Interest In Adjudicating The Dispute**

**\*24** Turning to the next factor, KSD contends that California does not have an interest in this case because Pete Costa's last residence was Panama, and the accident occurred while the Daniela was sailing in the Western Pacific Ocean. [FN103] The Daniela was a U.S. flagged vessel, however, and the plaintiff in the action is a California resident administering a California estate. See *Cruz, supra,* 649 F.2d at 1272 ("Alaska has an interest in the protection of its non-resident fishing fleet from negligent foreign repairs"). Cf. *Panavision, supra,* 141 F.3d at 1323 (" 'California maintains a strong interest in providing an effective means of redress for its residents tortiously injured," ' quoting *Gordy v. Daily News, L.P.,* 95 F.3d 829, 836 (9th Cir.1996)). Consideration of the forum state's interest thus weighs slightly in favor of exercising jurisdiction.

> FN103. Costa disputes that the decedent's last residence was Panama, noting that he lived in California (presumably because he was being treated by California physicians) following the accident. (Pl.'s Supp. Opp. at 14:2-5.)

**5. The Most Efficient Judicial Resolution Of The Controversy**

Whether California or Singapore will provide a more efficient and effective forum for the resolution of the claims is hotly contested by the parties. This factor typically focuses on the location of the evidence and witnesses. See *Panavision, supra,* 141 F.3d at 1323.

In its moving papers, KSD asserted in conclusory fashion that the majority of witnesses are located in Singapore. [FN104] In its reply, KSD contended that twenty-four of its employees, all of whom reside in Singapore, had relevant information regarding the action. [FN105] It further stated that the vessel owner appointed five Singapore investigators to examine the Daniela following the accident, and that the decedent received medical care in Singapore immediately following the accident as well. [FN106]

> FN104. Declaration of Andria L. Catalano ("Catalano Decl."), ¶ 10.

> FN105. Declaration of Simon Soh Thiam Hock ("Soh Decl."). ¶ 7.

> FN106. *Id.,* ¶¶ 8, 9.

Following oral argument, both Costa and KSD proffered additional evidence regarding the location of witnesses in supplemental briefing requested by the court. [FN107] Costa asserts that the majority of witnesses--i.e., crewmen aboard the Daniela when the accident occurred, doctors who treated Pete Costa prior to his death, members of the Costa family, representatives of the vessel owner and manager, the Chief Engineer involved in the vessel overhaul, and those who serviced and maintained

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 28
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

the Daniela over the last ten years--reside in California, Hawaii, or American Samoa. A list of crewmen submitted indicates that many are Filipino, Portuguese, and Croatian nationals; Costa's evidence, moreover, suggests that the crew is hired and discharged primarily in American Samoa, and that the vessel rarely, if ever, makes port in Singapore. Other evidence indicates that the valves that are the subject of the lawsuit are presently in the custody and control of the vessel owner, Z No. 2 Fishing Company. [FN108]

> FN107. While KSD objects to the court's consideration of Costa's evidence in this regard, the court notes that KSD's original showing on this issue was minimal, and that it did not specifically identify any witnesses until it filed its reply. It is therefore appropriate to consider the additional evidence proffered by Costa on the subject. The court likewise considers the amplification of KSD's evidence in its supplemental brief.

> FN108. Plaintiff's Supplemental Memorandum In Opposition to Defendant's Motion to Dismiss ("Pl.'s Supp. Opp."), Ex. 2, Declaration of William L. Banning ("Banning Decl."), ¶¶ 11, 14, 16, 20.

Costa contends that KSD will need to bring at most two or three witnesses from Singapore to the United States for trial. He bases this contention on the testimony of George Copitas, who has served for thirty years as a licensed Chief Engineer on U.S. flagged tuna seiners, and who has participated in valve overhauls performed by KSD on other vessels. [FN109] Based on his experience with other projects, Copitas asserts that the only KSD witnesses with relevant information regarding the valve overhaul will be the foreman or superintendent of the repair yard. [FN110] KSD, by contrast, contends that there are more than twenty witnesses with relevant knowledge located in Singapore, including KSD employees involved in negotiating the repair contract, in purchasing and project management, in producing repair parts, and in the repair work itself. It notes further that some of the work was subcontracted to other companies, and that certain of these companies' employees--located in Singapore--may have information relevant to the suit. [FN111] Citing *Cruz*, it asserts that the real issue in this case is liability rather than damages, and that in cases "involving complex factual questions about a major repair that required several weeks to complete and in which the repaired object probably cannot economically be recovered for inspection, the site of the repair will usually be the source of most of the witnesses, documents, and physical evidence on which the case will turn." *Cruz, supra,* 649 F.2d at 1273. What may "usually" be the case does not control the outcome here, where the record reveals that some witnesses who participated in the repair work are located in Singapore, but others are located elsewhere--e.g., in Hawaii or on vessels in the South Pacific [FN112]--and where it also reflects that the valves themselves are in the custody and under the control of the vessel owner, a California-based company. [FN113] While documents pertinent to KSD's performance of the contract will be found in Singapore, there will be little burden in transporting these to California. Moreover, contrary to KSD's assumption, it is not clear, at this stage of the litigation, that witnesses and documents reflecting performance of the contract will be more central to a determination of liability than the testimony of those aboard the vessel when the explosion occurred. Stated otherwise, while it will be important to ascertain the nature of the work performed on the valve during the vessel overhaul, and the identity of those who supervised and performed that work, it will also be important to determine how the valve malfunctioned aboard the vessel, if it did, so as to determine whether any of the repair work actually caused the explosion that injured the decedent. Given the fact that the Daniela's crew will likely be found on vessels throughout the South Pacific, that the majority of the decedent's physicians are located in the United States, and that Chief Engineer Yoke, who allegedly supervised the repair work, resides in Hawaii, the court concludes that wit-

Not Reported in F.Supp.2d                                                    Page 29
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
(Cite as: 2003 WL 24242419 (C.D.Cal.))

nesses and evidence are most probably dispersed in a variety of locations, and that neither California nor Singapore is a significantly more efficient forum than the other in this regard. See *Dole Food Co., supra,* 303 F.3d at 1116 ("There are some witnesses in Europe and some in California, so neither forum has a clear efficiency advantage with respect to witnesses").

> FN109. Pl.'s Supp. Opp., Ex. 1, Declaration of George Copitas ("Copitas Decl."), ¶ 3.

> FN110. *Id.*

> FN111. Defendant's Supplemental Brief ("Def.'s Supp. Brief") at 1, n. 1. It is unclear how many of these individuals have knowledge specific to the work done on ammonia refrigeration valve, as the scope of the contract was significantly broader, and involved the entire vessel.

> FN112. KSD asserts that it "did not perform any work on the failed valve," and that "[a]ll work in th[e] area of the ammonia refrigeration system was undertaken by the crew [of the Daniela] under the supervision of Mr. Costa's supervisor, Jonathan Yoke." (Defendant's Memorandum of Points and Authorities in Support of Motion to Dismiss for Lack of Jurisdiction over the Person of Defendant ("Def.'s Mem.") at 11:11-13. See also Weng Decl., ¶¶ 26, 27.)

> FN113. KSD asserts that the valves are currently in Singapore because of an ongoing arbitration between it and Z No. 2 Fishing Company. (See Supp. Brief at 2:20-25.) The record contains no information regarding the estimated length of the arbitration proceedings, and there appears to be no dispute that Z No. 2 Fishing Company retains dominion over the valves and could return them to the United States

should it choose to do so.

**\*25** In its supplemental brief, KSD asserts that the efficiency factor favors Singapore because the contract between it and the vessel owner is governed by Singapore law, and thus that country's law will provide the applicable standard of care. While KSD is correct that the contract contains a Singapore choice of law provision, [FN114] this does not automatically necessitate a finding that the efficiency factor favors dismissal. First, KSD proffers no authority for the proposition that the contract provision it cites controls choice of law in a tort action brought pursuant to an American maritime statute. Assuming the contract requires that Singapore law be applied to determine the applicable standard of care, however, there is substantial question as to whether that country's law would be significantly different from the American rules of decision the court would otherwise apply. KSD has submitted the declaration of a Singapore solicitor, R. Srivathsan, who states that the country is a common law jurisdiction "patterned on the English model," which provides a remedy for injuries "caused by the negligence of a defendant." [FN115] To the extent this is true, the applicable standard of care will be governed, not by any country's law, but by the relevant customs and practices of shipbuilding and repair industry. For this reason, the court cannot find, on the present record, that choice of law issues make Singapore a more efficient forum. See *id.* ("The choice-of-law analysis ... at this stage ... cannot be said to favor either party"). [FN116]

> FN114. See Weng Decl., Ex. B.

> FN115. Declaration of R. Srivathsan ("Srivathsan Decl."), ¶¶ 2, 5.

> FN116. In arguing that Singapore constitutes an adequate available forum, KSD in fact appears to concede that the negligence standards will be similar.

For their part, Costa and Vilter argue that efficiency demands that the action be tried in this jurisdiction,

because any other outcome will result in duplicative litigation with the risk of potentially inconsistent judgments. Whether or not exercising jurisdiction will permit resolution of all claims against all parties in a single forum is a factor courts take into consideration in assessing whether the reasonableness test is met. See, e.g., *nMotion, supra,* 196 F.Supp.2d at 1061-62 ("nMotion has brought claims in this Court against ETC-PZL and its parent corporation, ETC-USA. ETC-USA has not challenged this Court's jurisdiction. Thus, the dismissal of ETC-PZL could require nMotion to litigate two separate actions, one against ETC-USA in Oregon and a separate action against ETC-PZL in another forum. Both actions necessarily would involve proof that ETC-PZL worked on the integration of Pro Pilot into the existing GAT 2 software with the assistance of ETC-Interactive in Oregon. Separate actions would substantially inconvenience nMotion and could result in inconsistent and ineffective outcomes, especially regarding nMotion's request for an order enjoining both Defendants from future use of the Pro Pilot program. Thus, this factor as well weighs in favor of exercising jurisdiction over ETC-PZL"); *Washington State University Foundation v. Oswald,* No. Civ. 99-907, 2000 WL 251661, *3 (D.Or. Jan. 3, 2000) (exercising personal jurisdiction where the forum state "appeare[d] to be the only jurisdiction in which the parties may totally resolve this action"); *Gutierrez v. Givens,* 1 F.Supp.2d 1077, 1083 (S.D.Cal.1998) (holding that the exercise of jurisdiction was reasonable because "... judicial efficiency is best served by the consolidation of Plaintiffs' causes of action in this single suit. Plaintiffs allege that if their suit against Colonial is dismissed for lack of personal jurisdiction or improper venue, they will continue to maintain this suit in California and would file a second class action against Colonial in the Middle District of Florida"); *United Kingdom Mutual Steamship Assurance Association [Bermuda] Limited v. Continental Maritime of San Francisco, Inc.,* No. C-91-2798 RFP, 1992 WL 486937, *6 (N.D.Cal. Aug.31, 1992) ("... the most effective and convenient resolution of this issue is likely to occur through the litig-

ation of all the related claims in a single action. If VPSI is dismissed from this action, Continental will be required to initiate a second, largely duplicative action in Canada to seek indemnification from VP-SI"); *Abuan v. General Electric Co.,* 735 F.Supp. 1479, 1483 (D.Guam 1990) (concluding that the exercise of jurisdiction over the foreign manufacturer of PCB's in a class action suit brought by 189 named plaintiffs was reasonable, *inter alia,* because "[t]he most efficient judicial resolution of the suit commands that it be consolidated; severing Monsanto for litigation in a distant forum portends duplication and piecemeal adjudication, an inefficient result"). Cf. *Core-Vent, supra,* 11 F.3d at 1489 ("The fact that the lawsuit will continue in California with other parties tips the efficiency factor in Core-Vent's favor"). [FN117]

> FN117. Certain of these cases analyze the prospect of duplicative litigation and inconsistent results in considering plaintiff's interest in convenient and effective relief. See, e.g., *nMotion, supra,* 196 F.Supp.2d at 1062; *United Kingdom Mutual Steamship Assurance Ass'n., supra,* 1992 WL 486937 at *6. In the present case, it is appropriate to consider the question in analyzing whether efficient judicial resolution of the dispute indicates that the exercise of jurisdiction is reasonable because Vilter, which did not initiate this proceeding and filed a third-party complaint against KSD only after it was itself sued, will be disadvantaged if KSD does not remain a defendant in this litigation. Under these circumstances, the issue is not simply one of plaintiff's convenience, but one of ensuring the effectiveness and efficiency of the judicial proceeding in which Vilter has been named as a party.

**\*26** Costa and Vilter contend that, whether or not KSD is a party to this suit, the issue of its negligence will have to be adjudicated to determine Vilter's proportionate share of fault. See *McDermott,*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)

**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

*Inc. v. AmClyde and River Don Castings, Inc.,* 511 U.S. 202, 217, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994). They argue that if KSD's motion to dismiss is granted, they will have to try the issues *inter se* in the United States, and then try them a second time against KSD in Singapore, with the possibility of inconsistent results. KSD responds that Vilter may submit to jurisdiction voluntarily in Singapore, and avoid this problem. Reasonableness, however, must be evaluated without regard to a co-defendant/counterclaimant's willingness to submit voluntarily to jurisdiction in a distant foreign land. Without such a stipulation, it appears clear that Costa could not join all defendants in a single action in Singapore. Compare *OMI Holdings, Inc. v. Royal Ins. Co. of America,* 149 F.3d 1086, 1097 (10th Cir.1998) (stating that one "factor in [the] reasonableness inquiry [is] whether ... jurisdiction is necessary to prevent piecemeal litigation," and holding that because "a Canadian forum was apparently available in which Plaintiff could join all Defendants in one location ... litigating the dispute in Kansas would not be more efficient than in Canada"). More fundamentally, it is entirely unclear that Costa would forego his action against Vilter in the United States, since he represents that the law is significantly more favorable here than it is in Singapore. Thus, dismissing KSD will most likely give rise to parallel actions—one in California and one in Singapore—regarding essentially the same issues. As a consequence, efficient judicial resolution favors a finding that exercising jurisdiction over KSD in this action is reasonable.

6. The Importance Of The Forum To Plaintiff's Interest In Convenient And Effective Relief

The importance of this forum to plaintiff's interest in convenient and effective relief similarly favors exercising jurisdiction. Given the distances involved, and the time demands of litigating in Singapore, California is clearly a more convenient forum from Costa's point of view. Additionally, Costa is able to sue Vilter in this forum; unless Vilter were to consent voluntarily to suit in Singapore, it does

not appear that Costa could obtain jurisdiction over it there. Because the Central District of California is closer to Costa's home than Singapore, and because exercising jurisdiction over KSD in this action will permit resolution of his claims in a single action, this factor weighs in favor of exercising jurisdiction in this case.

7. The Existence Of An Alternative Forum [FN118]

> FN118. Costa asserts that this factor may be considered only if the court determines, on the basis of the remaining factors, that the exercise of jurisdiction would be unreasonable. See *Sinatra, supra,* 854 F.2d at 1201 ("... [w]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable," quoting *Corporate Inv. Business Brokers v. Melcher,* 824 F.2d 786, 791 (9th Cir.1987)). The plaintiff in *Dole Food Co.* made a similar argument. See *Dole Food Co., supra,* 303 F.3d at 1116. While acknowledging the statement in *Sinatra,* the *Dole* court nonetheless appeared to balance the factor along with the remaining considerations in determining that the exercise of jurisdiction was reasonable. See *id.* at 1116-17. Moreover, myriad Ninth Circuit cases treat the availability of an alternative forum as one of multiple factors to be assessed. See, e.g., *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1126 (9th Cir.2002); *Panavision, supra,* 141 F.3d at 1324; *Ziegler, supra,* 64 F.3d at 476; *Amoco, supra,* 1 F.3d at 853. Accordingly, the court will consider the availability of an alternative forum as one of multiple relevant factors in determining whether it would be reasonable to exercise jurisdiction over KSD in this case.

The final factor in assessing the reasonableness of exercising jurisdiction is the availability of an alternate forum. Costa and Vilter bear the burden of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 32
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

demonstrating that Singapore does not constitute an adequate forum. *Pacific Atlantic Trading Co., supra,* 758 F.2d at 1331. [FN119] KSD asserts that Singapore is an adequate alternate forum because it is an English-law jurisdiction that recognizes causes of action similar to those alleged in this case. [FN120] At oral argument, Costa disputed this, asserting that Singapore law would not allow any recovery against KSD. As part of his supplemental filing, he has proffered the declaration of a Singapore solicitor, Prem Gurbani, who asserts that, under Singapore law, the settlement Costa received from the vessel owner in prior litigation will be off-set against any award he may obtain from KSD. [FN121] Given the size of the settlement, and of his potential recovery against KSD, Costa contends that the offset will effectively preclude him from recovering against KSD if he is required to sue in Singapore. [FN122]

> FN119. Costa contends that the burden lies with KSD. (See Pl.'s Supp. Opp. at 10, n. 4.) Multiple Ninth Circuit and district court cases hold that plaintiff bears the burden of establishing that no alternate forum is available. See, e.g., *Core-Vent, supra,* 11 F.3d at 1490 ("The plaintiff bears the burden of proving the unavailability of an alternative forum"); *Paccar International, Inc. v. Commercial Bank of Kuwait, S.A.K.,* 757 F.2d 1058, 1066 (9th Cir.1985) (placing the burden of proof with respect to demonstrating the existence of an alternative forum on plaintiff); *Miracle v. N.Y.P. Holdings, Inc.,* 87 F.Supp.2d 1060, 1070 (D.Haw.2000) ( "The plaintiff bears the burden of proving the unavailability of an alternative forum"); *Technology Development Associates v. Victor Company of Japan, Ltd.,* No. C-93-1336, 1993 WL 266651, *9 (N.D.Cal. July 14, 1993) (same). But see *Ballard, supra,* 65 F.3d at 1502 (stating that defendant "erroneously assum[ed] that the burden is on [plaintiff] to prove the lack of an alternate forum").

The Ninth Circuit recently noted the "split" in its case law on this subject, but declined to resolve the question. See *Dole Food Co., supra,* 303 F.3d at 1116-17 ("Our case law appears to be split on this issue, but we need not resolve the split in this case"). For the reasons stated *infra,* even if the burden lies with Costa, the court concludes he has met it in this case.

> FN120. Srivathsan Decl., ¶¶ 2, 3.

> FN121. Declaration of Prem K. Gurbani ("Gurbani Decl."), ¶ 8.

> FN122. After this evidence was submitted, KSD sent a letter to the court, objecting to the submission of Gurbani's declaration and asking that it be stricken. Sending a letter, of course, violated the Local Rules. See CA CD L.R. 83-2.11. Nonetheless, the court has considered the objections, and concluded that, under the circumstances of this case, it should consider the declaration. The parties' initial briefing focused primarily on purposeful availment, and the court specifically invited further briefing on the adequacy of the Singapore forum. The court also notes KSD's assertion that its Singapore law expert disputes certain of Gurbani's conclusions.
> Gurbani asserts, *inter alia,* that Singapore's "one action rule" may preclude Costa from suing KSD altogether. (*Id.,* ¶ 9 ("Under Section 20(5) of the Singapore Civil Law Act (Cap 43) not more than one action shall lie for or in respect of the same subject matter of complaint. As the Z Action was brought Plaintiff Paul Costa, Personal Representative for the estate of Chief Costa ... against the shipowner in the United States and the action was concluded with a dismissal [with] prejudice, a similar action based on death caused by the wrongful act, neglect or default would constitute a second action in respect of the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 33
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

same subject matter")). This is hotly disputed by KSD. (See Letter from Andria Catalano at 1-2.) Given its view of the setoff issue, the court need not resolve this conflict, and assumes for purposes of its analysis that Costa will be able to sue KSD in Singapore despite the fact that he earlier filed an action against the vessel owner.

**\*27** Generally, an alternative forum is considered inadequate if the plaintiff would be deprived of all remedies there. See, e.g., *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 835 (5th Cir.1993); *Reid-Walen v. Hansen*, 933 F.2d 1390, 1393 n. 2 (8th Cir.1991). Cf. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) ("Of course, if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice"). [FN123] Here, Costa could bring negligence claims in Singapore based on the events alleged in the complaint. While Costa asserts he would not be able to recover certain types of damages that he could seek under United States law, [FN124] this alone does not render Singapore an inadequate forum. See *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1310 (11th Cir.2001) ("The fact that punitive damages would be unavailable in Ecuador was of no moment because the 'potential for a smaller damage award is not a basis for the denial' of a *forum non conveniens* motion; the remedy provided by the Ecuadorian courts would not be " 'so clearly inadequate or unsatisfactory that it is no remedy at all' " '); *Lockman Foundation v. Evangelical Alliance Mission*, 930 F.2d 764, 768-69 (9th Cir.1991) ("Even if the RICO and Lanham Act claims were unavailable in Japan, that would not furnish a sufficient reason to preclude dismissal. The 'possibility of an unfavorable change in the law' is not to be given conclusive or substantial weight in a *forum non conveniens* inquiry, quoting *Piper Aircraft, supra*, 454 U.S. at 249-51); *De Melo v. Lederle Laboratories*, 801

F.2d 1058, 1061 (8th Cir.1986) ("De Melo contends that the unavailability under Brazilian law of punitive damages and recovery for pain and suffering suggests that any recovery she may obtain in Brazil will be grossly inadequate to compensate her for her injuries and deter future misconduct by multinational corporations like the defendant.... [T]he Supreme Court explicitly held in *Piper Aircraft* that, ordinarily, the fact that the alternative forum's substantive law is decidedly less favorable to the plaintiff should not be given substantial weight in *forum non conveniens* determinations.... [U]nder Brazilian law, de Melo may recover lost wages, indirect losses, and twice the amount of her medical expenses. These damages, whatever they amount to in this case, are not so paltry as to render the available remedy illusory"); *Varnelo v. Eastwind Transport. Ltd.*, No. 02Civ.2084(KMW)(AJP), 2003 WL 230741, \*17 (S.D.N.Y. Feb. 3, 2003) ("Under well-settled case law, however, lower recovery in Russia would not render that forum inadequate. The fact that 'the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of the present forum ... should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry" ').

> FN123. While this definition has developed in the *forum non conveniens* context, it is applicable by analogy here.

> FN124. See Gurbani Decl., ¶ 10.

**\*28** It is only where the alternative forum does not recognize a cause of action for the injuries plaintiff alleges, or where the remedy afforded is so inadequate that it constitutes "no remedy at all" that courts find the forum to be inadequate. See *Piper Aircraft, supra*, 454 U.S. at 254 ("... if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice"); *Leetsch v. Freedman*, 260 F.3d 1100, 1103 (9th Cir.2001) ("The existence of an adequate alternat-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                     Page 34
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

ive forum depends upon whether or not an alternative forum is 'so clearly inadequate or unsatisfactory that it is no remedy at all' "); *Lueck v. Sunstrand Corp.,* 236 F.3d 1137, 1143-45 (9th Cir.2001) ("The foreign forum must provide the plaintiff with some remedy for his wrong in order for the alternative forum to be adequate.... [I]t is only in 'rare circumstances ... where the remedy provided by the alternative forum ... is so clearly inadequate or unsatisfactory, that it is no remedy at all,' that this requirement is not met.... Although New Zealand law does not permit Plaintiffs to maintain this exact suit, New Zealand, through its no-fault accident compensation scheme, has provided and continues to provide a remedy for Plaintiffs' losses. Plaintiffs have not shown that this type of administrative remedy is so inadequate that it is tantamount to no remedy at all"); *Mattel, Inc. v. MCA Records, Inc.,* 28 F.Supp.2d 1120, 1129 (C.D.Cal.1998) (concluding there was no available alternative forum where Sweden and Denmark did not recognize a cause of action comparable to plaintiff's trademark claim); *Seltzer Sister Bottling Co., Inc. v. Source Perrier, S.A.,* No. C-90-1468, 1991 WL 279273, *9 (N.D.Cal. May 1, 1991) (exercising jurisdiction over French corporation in part because "a mechanism for class relief for the type of injuries asserted ... may not be available in France," and consequently "plaintiffs [did] not necessarily have a choice of forum"). Compare *Core-Vent, supra,* 11 F.3d at 1490 (dismissing antitrust and libel claims for lack of personal jurisdiction where "the maintenance of a suit in Sweden may be costly and inconvenient for [plaintiff], but [plaintiff] has not shown that its libel claims cannot be effectively remedied there").

The question is whether the prospect that the amount of Costa's settlement with the vessel owner will be offset against any damages KSD might otherwise be required to pay affords him "no remedy at all" in Singapore. Courts typically take defenses that can be raised to defeat recovery into account in assessing whether an alternate forum is adequate. See, e.g., *Bank of Credit and Commerce Interna-*

*tional (Overseas) Ltd. v. State Bank of Pakistan,* 273 F.3d 241, 246 (2d Cir.2001) ("An alternative forum is generally adequate if: '(1) the defendants are subject to service of process there; and (2) the forum permits ' "litigation of the subject matter of the dispute." ' ... It follows that an adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum"); *Miracle, supra,* 87 F.Supp.2d at 1071 ("The plaintiff bears the burden of proving the unavailability of an alternative forum.... Here, Plaintiff has met that burden. As discussed above, Plaintiff has demonstrated that under New York law Plaintiff would be precluded by a one-year statute of limitations from bringing the action. Defendants do not argue with Plaintiff's assertion that she would be barred by the statute of limitations. Due to the fact that Plaintiff would be barred from bringing this action in New York, this factor weighs in Plaintiff's favor"); *Crimson Semiconductor, Inc. v. Electronum,* 629 F.Supp. 903, 909 (S.D.N.Y.1986) ("The statute of limitations bar in Romania does not go to the merits of plaintiff's claim, or to the quantum of damages, but to the very existence of the claim in the foreign forum. Thus, this is one of the 'rare circumstances' in which the foreign forum is 'clearly unsatisfactory' ").

**\*29** KSD argues that any offset defense it may be able to assert in Singapore is a direct result of the litigation strategy Costa chose to employ, not the inadequacy of Singapore's legal rules or procedures. This type of argument can often be made with respect to a plaintiff who delays filing an action until the statute of limitations has run in an alternative forum. Nonetheless, most courts focus solely on the availability of a remedy, not on the parties' respective fault, and conclude that the alternative forum is not adequate. Here, the parties do not appear to dispute that Costa may avoid an offset by filing separate actions under American maritime law as he has done. The fact that, by contrast, he cannot avoid an offset in Singapore, and that this will effectively preclude his ability to recover damages from KSD, renders Singapore an inadequate forum. Cf. *Ne-*

Not Reported in F.Supp.2d                                                    Page 35
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

*mariam v. Federal Democratic Republic of Ethiopia,* 315 F.3d 390, 394-95 (D.C.Cir.2003) (holding that a commission formed to arbitrate all claims for loss or damage arising out of a border war between Eritrea and Ethiopia was not an adequate alternative forum given "the Commission's inability to make an award directly to Nemariam, and the possibility that Eritrea could set off [plaintiff's] claims or even an award in her favor against claims made by or an award in favor of Ethiopia," and noting that "[w]hile a more limited recovery than is available in the plaintiff's forum of choice does not automatically make the alternative forum inadequate, we fail to see how an alternative forum in which the plaintiff can recover nothing for a valid claim may also be deemed adequate. In other words, it would be peculiar indeed to dismiss Nemariam's claim in the United States District Court--a forum in which, assuming the court has jurisdiction, she is certain to be awarded full relief if she wins on the merits of her claim--in favor of a forum in which she has no certainty of getting any relief for a meritorious claim").

Additionally, as noted previously, it does not appear that Costa could compel Vilter to appear and defend in Singapore. In and of itself, this may render Singapore an inadequate forum. See *Dole Food Co., supra,* 303 F.3d at 1118 ("Only Watts has agreed to submit to personal jurisdiction in The Netherlands. Thus, even assuming that there is no valid statute of limitations defense, it is unclear whether there is an alternative forum in The Netherlands, for it is unclear that Boenneken could be compelled to appear in a court there," citing *Lueck, supra,* 236 F.3d at 1143 (holding that an alternative forum was available because all defendants indicated they would accept service of process in New Zealand), and *Alpine View Co. Ltd. v. Atlas Copco,* 205 F.3d 208, 221 (5th Cir.2000) ("A foreign forum is available when the *entire case and all parties* can come within the jurisdiction of that forum" (emphasis added by the *Dole* court)).

Accordingly, the court concludes that Singapore does not constitute an adequate alternative forum under the circumstances of this case, and that this factor favors a finding that it is reasonable to exercise jurisdiction over KSD in California.

8. Balancing The Factors

**\*30** Looking at the reasonableness factors in combination, the extent of KSD's purposeful availment favors a finding that it is reasonable to exercise jurisdiction in this case, but only slightly, as Costa's showing regarding KSD's contacts with the jurisdiction, while sufficient to satisfy due process, is not substantial. The burden that will be imposed on KSD if it is forced to litigate in this forum weighs against a finding of reasonableness, as does the extent of conflict with the sovereignty of its state. By contrast, it is clearly in plaintiff's interest to litigate the case here, and California has some interest in having the dispute adjudicated here, although not as strong an interest as is typically present in suits brought by residents of the state. Before considering the most efficient judicial resolution of the controversy and the adequacy of the alternative forum, therefore, it appears that two factors strongly favor KSD, one strongly favors Costa, and two tip slightly in his direction. [FN125] The factors favoring plaintiff are those that typically weigh in favor of a plaintiff litigating in his home forum.

> FN125. During oral argument and in its supplemental brief, Vilter chastised the court for engaging in what it characterized as box-score analysis. (See Vilter's Supplemental Opposition to Motion to Dismiss ("Vilter's Supp. Opp.") at 3:7-14.) To the contrary, the court has attempted to analyze and weigh the various considerations as they relate to the facts of this case, and to assign to them the importance they deserve. Unfortunately, it is often difficult to discuss the factors and explain the manner in which they are being weighed without noting in some fashion the number that favor one party versus the other. See, e.g., *Dole Food Co., supra,* 303 F.3d at 1117

Not Reported in F.Supp.2d                                                                        Page 36
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
(Cite as: 2003 WL 24242419 (C.D.Cal.))

("In this case, only two of the seven factors-- burden on defendants and sovereignty conflicts--favor Watts and Boenneken"); *Ziegler, supra,* 64 F.3d at 474 ("In sum, factors 3 and 7 (Florida's sovereignty interests and available alternative forum) favor defendants. Ziegler has a slight edge on factors 2 and 6 (respective burdens and convenience and effectiveness of relief), and factors 4 and 5 (California's interest and efficiency) decisively favor him. Defendants' interjection into California was significant; therefore, factor 1 weighs in favor of Ziegler").

When efficient judicial resolution and adequacy of the alternative forum are added to the calculus, however, the result comes into clearer focus. Both of these factors strongly favor Costa, and tip the balance sharply in his favor. Because Costa's showing of purposeful availment was not overly strong, the quantum of evidence required to demonstrate that it is reasonable to exercise jurisdiction increases. See, e.g., *Ticketmaster-New York, Inc. v. Alioto,* 26 F.3d 201, 209 (1st Cir.1994) ("The conclusion that we draw from this line of reasoning is that appellant has made only the most marginal of showings that Alioto purposefully availed himself of an opportunity to act in Massachusetts. And the weakness of this showing assumes decretory significance when we step back and evaluate the fairness of asserting jurisdiction in the totality of the circumstances"); *Core-Vent, supra,* 11 F.3d at 1488 ("In *Burger King,* 471 U.S. at 476, ... the Court stated that the minimum contacts must be evaluated 'in light of' the reasonableness factors, suggesting that the minimum contacts and reasonableness factors occupy a sliding scale"); *Cruz, supra,* 649 F.2d at 1271 ("The smaller the element of purposeful interjection, the less is jurisdiction to be anticipated and the less reasonable is its exercise"); *Washington State University Foundation, supra,* 2000 WL 251661 at *3 ("... the Ninth Circuit indicated that this three-part test is to be applied flexibly. For example, a strong showing of reasonableness

lessens the required showing of minimum contacts"). Even raising the bar in this fashion, however, the lack of an adequate alternative forum, and the fact that both Costa and Vilter would likely be forced to litigate in two fora rather than one to secure complete relief demonstrate that the requisite showing has been made.

**\*31** This is particularly true when one considers that a defendant in KSD's position must present a "compelling case" as to why the exercise of jurisdiction would be unreasonable. See *Dole Food Co., supra,* 303 F.3d at 1117 ("A number of our cases emphasize the heavy burden on both domestic and foreign defendants in proving a 'compelling case' of unreasonableness to defeat jurisdiction"); *Panavision, supra,* 141 F.3d at 1324 ("[Defendant] failed to present a compelling case that district court's exercise of jurisdiction in California would be unreasonable"); *Ballard, supra,* 65 F.3d at 1502 ("In fine, Royal has not carried its heavy burden of presenting a 'compelling case' against jurisdiction"); *Caruth v. International Psychoanalytical Ass'n.,* 59 F.3d 126, 129 (9th Cir.1995) ("[G]iven the closeness of the factors, we conclude that [defendant] has not presented a 'compelling case' that exercising jurisdiction over it would be unreasonable"); *Roth, supra,* 942 F.2d at 621- 22 ("Once purposeful availment has been established, the forum's exercise of jurisdiction is presumptively reasonable. To rebut that presumption, a defendant must present a compelling case that the exercise of jurisdiction would, in fact, be unreasonable"). Here, given the fact that a majority of the factors favor the retention of jurisdiction, the fact that there is no adequate alternative forum, and the fact that dismissal will leave the parties to litigate their dispute piecemeal, the court concludes that KSD has not presented a compelling case as to why the exercise of jurisdiction would be unreasonable. This is particularly true since the factors that favor KSD are those that "are likely to favor foreign defendants every time personal jurisdiction in the United States is considered." *Dole Food Co., supra,* 303 F.3d at 1117. KSD's motion is, accordingly, denied. [FN126]

Not Reported in F.Supp.2d                                                                Page 37
Not Reported in F.Supp.2d, 2003 WL 24242419 (C.D.Cal.)
**(Cite as: 2003 WL 24242419 (C.D.Cal.))**

> FN126. Because the court has found that
> KSD has sufficient minimum contacts with
> California to support the exercise of spe-
> cific jurisdiction in this case, and because
> it has further concluded that the exercise of
> such jurisdiction is reasonable, it need not
> address the argument made by Costa and
> Vilter that KSD is subject to jurisdiction
> under Rule 4(k)(2) of the Federal Rules of
> Civil Procedure.

### III. CONCLUSION

For the foregoing reasons, the court denies defend-
ant's motion to dismiss for lack of personal jurisdic-
tion (Docket No. 19). As noted in footnote 20, the
court also denies plaintiff's motion to strike the de-
claration of Lee Chee Weng (Docket No. 71).

Not Reported in F.Supp.2d, 2003 WL 24242419
(C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1123755 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

◨Export-Import Bank of U.S. v. Asia Pulp & Paper Co.,
Ltd.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
EXPORT-IMPORT BANK OF THE UNITED STATES,
Plaintiff,
v.
ASIA PULP & PAPER CO., LTD., PT Indah Kiat Pulp &
Paper Tbk, PT Pabrik Kertas Tjiwi Kimia Tbk, and PT
Pindo Deli Pulp & Paper Mills, Defendants.
**No. 03Civ.8554(LTS)(JCF).**

May 11, 2005.

*MEMORANDUM AND ORDER*

FRANCIS, Magistrate J.
　　**\*1** The Export-Import Bank of the United States
("Ex-Im") brings this action under the Federal Debt
Collection Procedures Act (the "FDCPA"), 28 U.S.C. §
3001*etseq.,* to recover a judgment on debts allegedly due
to it from Asia Pulp & Paper Co., Ltd. ("APP") and its

| Subsidiary   | Transaction No. |
|--------------|-----------------|
| Indah Kiat   | AP071268        |
|              | AP069195        |
|              | AP070292        |
|              | AP067169        |
| Tjiwi Kimia  | AP069899        |
|              | AP070294        |
| Pindo Deli   | AP071220        |

　　The plaintiff commenced this action by filing a
Summons and Complaint on October 29, 2003.
(Declaration of Kenneth Puhala dated January 18, 2005
("Puhala Decl."), Exh. B, Docket No. 1). Ex-Im has not
asserted, however, that it attempted to serve this pleading

subsidiaries PT Indah Kiat Pulp & Paper Tbk ("Indah
Kiat"), PT Pabri Kertas Tjiwi Kimia Tbk ("Tjiwi Kimia"),
and PT Pindo Deli Pulp & Paper Mills ("Pindo Deli")
(collectively, the "Subsidiaries"). Ex-Im asserts that it has
attempted to serve the Subsidiaries by international
registered mail, return receipt requested, and that it has
successfully served them by DHL, an international courier
service. Ex-Im now moves to declare service valid
*nuncprotunc,* and for leave to serve its Second Amended
Complaint by DHL. For the reasons set forth below, the
plaintiff's motion is granted.

*Background*

　　Ex-Im is a corporation organized and existing under
federal law as an agency of the United States of America.
*See*12 U.S.C. § 635. In this action, it asserts claims
against APP and the Subsidiaries for breach of loan and
guarantee agreements. (Declaration of Sarah E. Light
dated Dec. 30, 2004 ("Light Decl."), attached to Plaintiff's
Notice of Motion, ¶ 3). These agreements are embodied in
various transaction documents which contain service of
process provisions:

　　Service Provisions
　　Light Decl., Exh. A, ¶ 12.03 at
US-000637-38
　　Light Decl., Exh. B, ¶ 8.4 at
US-000113-14
　　Light Decl., Exh. C, ¶ 4(b) at
US-000503
　　Light Decl., Exh. D, ¶ 11.03 at
US-000024
　　Light Decl., Exh. J, ¶ 12.03 at
US-000375-76
　　Light Decl., Exh. K, ¶ 4(b) at
US-000264
　　Light Decl., Exh. O, ¶ 13 at
US-000159
on any of the Subsidiaries. (Specially Appearing
Indonesian Defendants' Memorandum in Opposition to
Plaintiff's Motion ("Def.Memo.") at 1-2). Rather, on
February 11, 2004, it informed the Court that it planned to
file a First Amended Complaint and requested an
extension of certain Court deadlines "in light of ...
complex rules for service of process."(Puhala Decl., Exh.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 1123755 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

A). The Court granted Ex-Im's request on Febrary 17, 2004. (Puhala Decl., Exh. B).

Ex-Im claims that it initially "attempted service of the First Amended Complaint on each of the Subsidiaries ... in accordance with the [parties'] agreements ... by international registered mail, return receipt requested, dispatched by the Clerk of [the] Court." (Light Decl., ¶ 4). Ex-Im acknowledges, though, that it did not receive return receipts. (Light Decl., ¶ 4). Subsequently, Ex-Im itself tried to serve the Subsidiaries by international mail, return receipt requested, using the address of the parent company and co-defendant, APP. (Plaintiff's Memorandum of Law In Support of Motion to Declare Service Valid *NuncProTunc,* and For Leave To Serve the Second Amended Complaint By DHL ("Pl.Memo.") at 10). But these packages were either "refused or [ ] otherwise undeliverable." (Light Decl., ¶ 4).

*2 Ex-Im then obtained addresses for the Subsidiaries from the World Wide Web, though these differed from the addresses contained in the parties' agreements. (Light Decl., ¶ 4; Pl. Memo. at 10). Copies of the Summons and First Amended Complaint were successfully delivered to the Subsidiaries at these addresses by the international courier service DHL. (Light Decl., ¶ 4).

*Discussion*

Ex-Im seeks an order under either Rule 4(f)(2)(C)(ii) or Rule 4(f)(3) of the Federal Rules of Civil Procedure declaring service on the Indonesian Subsidiaries valid *nuncprotunc* and granting leave to serve the Second Amended Complaint.

A. *Rule 4(f)(2)(C)(ii)*

Rule 4(f)(2)(C)(ii) provides that service may be effected outside the United States "by ... any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served."This Rule is limited to instances where "there is no internationally agreed means of service or the applicable international agreement allows other means of service."Fed.R.Civ.P. 4(f)(2). In addition, service cannot be effected under this Rule in a manner "prohibited by the law of the foreign country." Fed.R.Civ.P. 4(f)(2)(C). Ex-Im contends that its efforts at service both by international mail and by DHL courier were effective under this rule.

As a threshold matter, Indonesia is not party to any applicable treaty or agreement. See*Dee-K Enterprises Inc. v. Heveafil Sdn. Bhd.,* 174 F.R.D. 376, 378 (E.D.Va.1997); *Graval v. P.T. Bakrie & Brothers,* 986 F.Supp. 1326, 1329 n. 2 (C.D.Cal.1996); United States Department of State, Treaties in Force, *available at*http://www.state.gov/s/l (site last visited May 11, 2005). However, the attempted service by mail was ineffective here both because, in some instances, the service was initiated by the plaintiff rather than by the Clerk of the Court, and because the Subsidiaries never executed return receipts. (Light Decl., ¶ 4 & Pl. Memo. at 10).See*Marine Trading Ltd. v. Naviera Comercial Naylamp S.A.,* 879 F.Supp. 389, 392 (S.D.N.Y.1995) (service by mail not effective where no receipt returned).

The plaintiff has furnished proof of service by DHL. (Light Decl., Exhs. M, N, P, Q, R, S, T, U, V). Again, however, the Clerk of the Court was not responsible for dispatching the summons and complaint, as required by Rule 4(f)(2)(C)(ii). Furthermore, because Indonesia appears to prohibit service by international courier, service would not have been effective under this subsection in any event.[FN1]

> FN1. The parties have not addressed whether an international courier like DHL even qualifies as a "form of mail" within the terms of Rule 4(f)(2)(C)(ii).Cf.*In re Cinar Corp. Securities Litigation,* 186 F.Supp.2d 279, 304 (E.D.N.Y.2002) (questioning, without deciding, whether an international courier constituted a "postal channel" under the Hague Convention provisions for service). That question need not be decided here, however, as there are other grounds for finding service inadequate under that subsection of the Rule.

A court determines foreign law as a matter of law. See*Vishipco Line v. Chase Manhattan Bank,* 660 F.2d 854, 859-60 (2d Cir.1981); *Norex Petroleum Ltd. v. Access Industries, Inc.,* 304 F.Supp.2d 570, 577 (S.D.N.Y.2004). In that determination, the court "may consider any relevant material or source."Fed R. Civ. P. 44.1.

The Subsidiaries have presented the Declaration of Marx Andryan, an Indonesian attorney (Declaration of Marx Andryan dated Jan. 14, 2005 ("Andryan Decl.")), and §§ 6.1 and 6.2 of the "Guidelines to Carrying Out the Task and Administration of the Court-Book II, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 1123755 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Supreme Court of the Republic of Indonesia" (the "Guidelines"). (Andryan Decl., Exh. A). The Guidelines state that "[s]ummons to parties to attend a court proceeding must be delivered by a bailiff."(Guidelines, § 6.1). Furthermore, according to Mr. Andryan, under Indonesian law, "service of legal proceedings commenced outside of Indonesia must and can only be effected through an Indonesian court-appointed bailiff."(Andryan Decl., ¶ 3). Accordingly, the Subsidiaries argue that "[s]ervice by private parties, including service by mail or courier service is prohibited and ineffective as it offends Indonesian law and sovereignty."(Andryan Decl., ¶ 3).

*3 The plaintiff, in turn, submits a flyer published by the United States Department of State entitled "Indonesia Judicial Assistance," (the "DOS Circular") (attached as Exh. W to Supplemental Declaration of Sarah E. Light dated Jan. 25, 2005). The DOS Circular states that "[s]ervice of process can be effected in Indonesia [by][i]nternational registered mail, return receipt requested."(DOS Circular, ¶ entitled "Service of Process"). But the flyer also states that "it is not an opinion on any aspect of ... foreign ... law," and that "[t]he U.S. Department of State does not intend by [its] contents ... to take a position on any aspect of any pending litigation."(DOS Circular, ¶ entitled "Proviso"). Therefore, the DOS Circular cannot be considered an authoritative source on Indonesian law for the purposes of this motion.

The caselaw is divided. The plaintiff argues that _Resource Ventures, Inc. v. Resources Management International, Inc._, 42 F.Supp.2d 423, 430 (D.Del.1999), and _Dee-K_, 174 F.R.D. at 381-82, hold that service of process by mail and by international courier are not prohibited methods of service in Indonesia. The _Resource Ventures_ opinion, however, was grounded on an Indonesian lawyer's affidavit which stated that a bailiff in Indonesia may serve process by registered mail. _Resource Ventures_, 42 F.Supp.2d at 430. In light of this, the court found that service of process by international registered mail was "not prohibited." _Id._ Here, Ex-Im has proffered no such evidence.

Similarly, in _Dee-K_ the court relied on an Indonesian lawyer's declaration that "service by any form of mail, including DHL, with or without a return receipt, is not effective service under Indonesian law."174 F.R.D. at 381-82 (internal quotations omitted). But, the court reasoned, "[a]n ineffective or invalid form of service is not necessarily a prohibited form of service."_Id._ at

381.And, since "explicit permission for a form of return receipt mail service is not required by [Rule 4(f) ](2)(C)(ii) ]," the court held that service in Indonesia by DHL was valid. _Id._

Here, by contrast, Mr. Andryan explicitly states in his affidavit that "service by mail or courier service is _prohibited_" in Indonesia. (Andryan Decl., ¶ 3) (emphasis added). That construction is supported by the Guidelines, at least in the translation that has been submitted to the Court. If a summons "must" be delivered by a bailiff, then alternative forms of service are indeed prohibited, even if no penalty is imposed on the party who initiates them. It would be a different situation if Indonesian law merely provided that service "may" be effected by the bailiff; in that circumstance, alternative means of service, while not expressly authorized, would nevertheless not be prohibited. Based on similar evidence, the court in _Graval_, 986 F.Supp. at 1329, concluded that service by mail could not be made in Indonesia pursuant to Rule 4(f)(2)(C)(ii). There, Indonesian lawyers advised that Indonesian law "prohibits service by mail, including service by mail with a return receipt requested."_Id._

*4 In sum, while the authority is divided, the record in this case tips in favor of a determination that service made by mail in Indonesia would not be effective under Rule 4(f)(2)(C)(ii).

**B.** _Rule 4(f)(3)_

That conclusion, however, does not preclude a finding that service by mail or DHL may be effective under Rule 4(f)(3). That subsection provides that service may be effected "by other means not prohibited by international agreement as may be directed by the court."As the Ninth Circuit Court of Appeals has observed,

service under Rule 4(f)(3) must be (1) directed by the court; and (2) not prohibited by international agreement. No other limitations are evident from the text. In fact, as long as court-directed and not prohibited by an international agreement, service of process ordered under Rule 4(f)(3) may be accomplished in contravention of the laws of the foreign country.

_Rio Properties, Inc. v. Rio International Interlink_, 284 F.3d 1007, 1014 (9th Cir.2002) (citation omitted). Nevertheless, a district court may:require parties ... to show that they have reasonably attempted to effectuate service on the defendant(s) and that the circumstances are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 4
Not Reported in F.Supp.2d, 2005 WL 1123755 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

such that the district court's intervention is necessary to obviate the need to undertake methods of service that are unduly burdensome or that are untried but likely futile. This threshold requirement, although not expressly provided by [Rule] 4(f)(3) is necessary in order to prevent parties from whimsically seeking alternative means of service and thereby increasing the workload of the courts.

*Ryan v. Brunswick Corp.,* No. 02-CV-0133, 2002 WL 1628933, at *2 (W.D.N.Y. May 31, 2002) (citation omitted). In the interests of comity, a district court exercising its discretion under Rule 4(f)(3) should indeed make "an earnest effort ... to devise a method of communication that is consistent with due process and minimizes offense to foreign law."Fed.R.Civ.P. 4 advisory committee's note, 1993 Amendment. This does not mean, however, that a district court should read Rule 4(f)(3) to require a party to "attempt[ ] every permissible means of service of process before petitioning the court for alternative relief."*Ryan,* 2002 WL 1628933, at *2 (citation omitted).

Here, Ex-Im's application is hardly whimsical. It has repeatedly attempted to effect service in the manner provided for in each of the transaction documents, only to be frustrated by the Subsidiaries. For example, two signatory Subsidiaries-Indah Kiat and Tjiwi Kimia-were required to maintain an agent for service of process. Specifically, Indah Kiat irrevocably appointed CT Corporation system as its service agent pursuant to Agreements AP071268 (Light Decl., Exh. A, ¶ 12.03(a) at US-000637), AP069195 (Light Decl., Exh. B, ¶ 8.4 at US-000113), and AP070292 (Light Decl., Exh. C, ¶ 4(b) at US-000503). And, it was required to maintain a service agent in New York at all times pursuant to Agreements AP071268 (Light Decl., Exh. A, ¶ 12.03(d) US-000638), AP070292 (Light Decl., Exh. C, ¶ 4(b) at US-000503), and AP067169 (Light Decl., Exh. D, ¶ 11.03(d) at US-000024). Likewise, Tjiwi Kimia irrevocably appointed CT Corp. as it service agent-and was required to maintain a service agent at all times-pursuant to Agreements AP069899 (Light Decl., Exh. J, ¶ 12.03(a) at US-000375) and AP070294 (Light Decl., Exh K, ¶ 4(b) at US-000264). But, in the words of their counsel, these two "specially appearing Indonesian defendants breached a contractual obligation to maintain an agent."(Transcript of oral argument dated March 23, 2005 at 24).

**\*5** Similarly, two Subsidiaries agreed to service of process by international registered mail, return receipt requested: Indah Kiat consented in Agreement AP069195

FN2 (Light Decl., Exh. B, ¶ 8.4 at US-000113-14), and Pindo Deli consented in Agreement AP071220 (Light Decl., Exh. O, ¶ 13 at US-000159). Yet when the plaintiff tried to serve process at the addresses identified in the parties' agreements, either the defendants failed to return receipts or the packages were undeliverable to those addresses. (Light Decl., ¶ 4 & Pl. Memo. at 10).

> FN2. Again, in this agreement, Indah Kiat also agreed to service of process by courier. (Light Decl., Exh. B, ¶ 8.4 at US-000113-14).

In short, the agreements between the parties provided for simple and inexpensive means of service. The Subsidiaries thwarted service under these agreements. It would therefore be unduly burdensome to require Ex-Im to initiate letters rogatory in order to have the pleadings served by a bailiff in Indonesia. The alternative-service by an international courier-has already proven effective. Even if it is technically in violation of Indonesian service requirements, any offense to that country's sovereignty is minimal. Such service is not disruptive, and any party that engages in international transactions must anticipate the use of generally accepted forms of service, especially where it has, through its own actions, frustrated the methods of service provided for in the underlying transaction documents.

*Conclusion*

For the reasons set forth above, the plaintiff's motion to declare service valid *nuncprotunc* and for leave to serve the Second Amended Complaint by DHL international courier is granted.
   SO ORDERED.

S.D.N.Y.,2005.
Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.
Not Reported in F.Supp.2d, 2005 WL 1123755 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 2071644 (D.D.C.)
**(Cite as: Slip Copy)**

C

Fasolyak v. The Cradle Society, Inc.
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Dmitry FASOLYAK, Plaintiff,
v.
THE CRADLE SOCIETY, INC., Defendant.
**Civil Action No. 06-01126(TFH).**

July 19, 2007.

John David Quinn, Claxton, Sale & Quinn, P.C.,
Washington, DC, for Plaintiff.
Robert P. Lynch, Macleay, Lynch, Gregg & Lynch,
PC, Washington, DC, for Defendant.

### MEMORANDUM OPINION

THOMAS F. HOGAN, Chief Judge.
**\*1** Pending before the Court are two motions filed
by the defendant, The Cradle Society, Inc., the first
of which requests that this case be dismissed for
lack of personal jurisdiction pursuant to Federal
Rule of Civil Procedure 12(b)(2) and the second of
which seeks a protective order prohibiting the
plaintiff, Dmitry Fasolyak, from conducting any
discovery, presumably until the Court makes this
determination about whether it has personal juris-
diction over the defendant. Also pending before the
Court is the plaintiff's Motion to Compel Discovery
and Alternative Motion to Compel Rule 26(f) Con-
ference and Motion for Emergency Hearing, which
requests that the Court enter an order permitting
discovery to proceed immediately and compelling
the defendant to attend a scheduling conference.
For the reasons set forth below, the Court finds that
it lacks personal jurisdiction but that jurisdiction
may be appropriate in the United States District
Court for the Northen District of Illinois. Accord-
ingly, this case will be transferred to the United
States District Court for the Northern District of
Illinois pursuant to 28 U.S.C. § 1631.

## BACKGROUND

This case is traveling a road to resolution that in-
volves detours through multiple jurisdictions. The
plaintiff is an individual who resides in Maryland
and the defendant is a not-for-profit corporation in-
corporated in Illinois, which also is where its prin-
cipal office is located. Compl. ¶¶ 1-2. The plaintiff
alleges that he and the defendant entered into a con-
tract according to which the defendant agreed to
pay the plaintiff a fee for consulting services to es-
tablish and coordinate an international adoption
program in the Russian Federation for the purpose
of placing Russian children with adoptive parents in
the United States.[FN1] Compl. ¶¶ 8-11; Rule 16(b)
Statement 1 (Plaintiff's Statement of Fact). The
plaintiff claims that he set up an office in Moscow
for the defendant, identified individuals the defend-
ant could employ to process adoptions in Russia,
and assisted to secure accreditation from the Russi-
an government to authorize the defendant to con-
duct adoptions in that country, among other ser-
vices performed. Rule 16(b) Statement 2. Accord-
ing to the plaintiff, however, after the Moscow of-
fice became operational the defendant engaged in a
number of activities that were intended to
"circumvent" the plaintiff "to avoid paying his fee"
and otherwise interfere with his contract perform-
ance, which allegedly culminated in the defendant
wrongfully terminating the contract and defaming
the plaintiff. *Id.;* Compl. ¶¶ 92-100, 155. Accord-
ingly, the plaintiff filed the instant lawsuit against
the defendant seeking (1) damages for breach of
contract, intentional misrepresentation (fraud and
deceit), negligent misrepresentation, unjust enrich-
ment, quantum meruit, and tortious interference
with prospective economic advantage, (2) an in-
junction to prevent the defendant from further de-
faming or disparaging him, and (3) "a full account-
ing of the operations at the Moscow office and of
defendant related to Russian adoptions."Compl. ¶¶
101-166; Rule 16(b) Statement 3.

FN1. The Agreement between the parties,

which is dated January 1, 2004, provides that the defendant would "cause" adoptive families to pay a fee in the amount of $16,500.00. Agreement ¶ 2(a) (Jan. 1, 2004). The Court presumes this fee benefited the defendant, notwithstanding the fact that the fee was to be made payable to a different name, *i.e.,* Alexander Sukharev. *Id.*

**\*2** This is not the first jurisdiction where the plaintiff filed suit, however. The plaintiff originally filed a lawsuit against the defendant in the United States District Court for the District of Maryland, asserting what appear to be the very same claims advanced in the present case. *Fasolyak v. The Cradle Society, Inc.,* No. 06-CV-00622-AW, slip op. at 4 (D. Md. June 14, 2006). On June 15, 2006, Judge Alexander Williams, Jr. issued a Revised Memorandum Opinion in the Maryland case granting the defendant's Motion to Dismiss for lack of personal jurisdiction and indicating the court's intent to transfer the case to the Northern District of Illinois. *Id.* at 1. Judge Williams determined that the contract's place of performance was Russia, the fact that the defendant sent letters, e-mails, and made telephone calls to the plaintiff in Maryland did not establish substantial contacts sufficient to exercise personal jurisdiction over the defendant, the plaintiff failed to prove "to a sufficient degree" that the defendant was ever in Maryland, the acts that caused the alleged injuries occurred in Russia, "the technical fact that Maryland served as the place of contracting is not a sufficient contact ... to have personal jurisdiction over the [d]efendant," and the other factors outlined in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985), favored jurisdiction in Russia and weighed against the exercise of personal jurisdiction by the court in Maryland. Judge Williams ultimately concluded that "although a choice of law provision is not a part of the contacts analysis from *International Shoe* or *Burger King,* having a choice of law provision weighs in favor of giving jurisdiction over a case to the forum specified by the contract. Here, the parties have

stipulated that the contract should be governed by the law of the state of Illinois, so Illinois would be a more appropriate forum to litigate this dispute."*Fasolyak,* No. 06-CV-00622-AW, at 12.At the plaintiff's request, however, the court eventually dismissed the case rather than transfer it. Meanwhile, the defendant reportedly filed a lawsuit against the plaintiff in an Illinois state circuit court alleging that the plaintiff failed to perform the contract as promised. Pl.'s Mem. of Law In Opp'n to Def .'s Mot. to Dismiss 7-8 [hereinafter "Pl.'s Opp'n Br. ----"].

The case subsequently found its way to this Court on June 21, 2006, when the plaintiff essentially re-filed his Complaint in this jurisdiction. The defendant responded to the instant lawsuit in the same fashion that it responded to the previous one filed in Maryland-the defendant moved for dismissal on the ground that, like the federal district court in Maryland, this Court lacks personal jurisdiction over the defendant because the defendant "is a foreign corporation organized under the laws of Illinois, its principal place of business is in the State of Illinois, and the Defendant does not have sufficient minimum contacts with the District of Columbia to establish personal jurisdiction."Def.'s Mot. to Dismiss 1. While the defendant's motion to dismiss was pending before this Court, the plaintiff secured two subpoenas from the United States District Court for the Northern District of Illinois compelling witnesses to appear for depositions and produce specified documents. These subpoenas were the subject of the defendant's pending Motion for Protective Order, which seeks an order from the Court prohibiting all discovery. Def.'s Mot. for Protective Order 3. The plaintiff countered by filing a Motion to Compel Discovery and Alternative Motion to Compel Rule 26(f) Conference and Motion for Emergency Hearing, which, as is self evident, seeks an order compelling the defendant to engage in discovery. Pl.'s Mem. of P. & A. in Supp. of Mot. to Compel 1.

**DISCUSSION**

Slip Copy                                                                                                           Page 3
Slip Copy, 2007 WL 2071644 (D.D.C.)
(Cite as: Slip Copy)

## I. The Defendant's Motion To Dismiss

*3 Because the question of personal jurisdiction is a threshold inquiry the resolution of which will, *ipso facto,* determine the outcome of the other pending discovery motions, the Court will address that issue first, as indeed it must given that "[j]urisdiction to resolve cases on the merits requires both authority over the category of claim in suit (subject-matter jurisdiction) and authority over the parties (personal jurisdiction), so that the court's decision will bind them." [FN2] *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 577 (1999). The plaintiff bears the burden of establishing a factual basis for exercising personal jurisdiction over the non-resident defendant. *Mwani v. Bin Laden,* 417 F.3d 1, 7 (D.C.Cir.2005); *Crane v. New York Zoological Soc'y,* 894 F.2d 454, 456 (D.C.Cir.1990)."In determining whether such a basis exists, factual discrepancies appearing in the record must be resolved in favor of the plaintiff."*Crane,* 894 F.2d at 456. Because no evidentiary hearing was held, the plaintiff may carry his burden by making a *prima facie* showing that personal jurisdiction exists. *Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d 415, 424 (D.C .Cir.1991); *Reuber v. United States,* 750 F.2d 1039, 1052 (D.C.Cir .1984). This *prima facie* showing must be premised on specific facts, however, and cannot be based on mere conclusory allegations.*GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1349 (D.C.Cir.2000).

> FN2. Subject matter jurisdiction is not at issue in this case.

The plaintiff avers that the Court may exercise general jurisdiction over the non-resident defendant pursuant to D.C.Code § 13-422 and specific jurisdiction pursuant to D.C.Code § 13-423, which is the District of Columbia's long-arm statute. [FN3] Compl. ¶ 3. In addition, in his opposition brief filed in response to the defendant's Motion to Dismiss, the plaintiff argues that the Court also may exercise personal jurisdiction over the defendant because the defendant "is doing business here," which presumably is a reference to D.C.Code

§ 13-334(a), a statute that appears to involve only service of process but courts have construed to confer general jurisdiction. [FN4] Pl.'s Opp'n Br. 10; *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 673 n. 7 (D.C.Cir.1996) (noting that the District of Columbia Court of Appeals ("D.C. Court of appeals") has construed § 13-334(a) to " 'confer[ ] jurisdiction upon trial courts here over foreign corporations doing substantial business in the District of Columbia, even though the claim arose from a transaction which occurred elsewhere, and hence, outside the scope of the long-arm statute' " (quoting *Guevara v. Reed,* 598 A.2d 1157, 1159 (D.C.1991))). The Court will address in turn each of the plaintiff's proffered bases for exercising personal jurisdiction.

> FN3. The Court's exercise of personal jurisdiction over the defendant in this diversity case "turns on local (state) law, here, District of Columbia law."*Crane,* 814 F.2d at 762. The Constitution, however, acts as a restraint on the scope of personal jurisdiction authorized by District of Columbia law. *Id.*"Due process sets the outer boundary; the local law may be coextensive with due process, or it may be more restrictive than the constitutional limit."*Id.*

> FN4. The Court makes this presumption based on the fact that the plaintiff cited *Gorman v. Ameritrade Holding Corp.,* 293 F.3d 506 (D.C.Cir.2002), which is a case analyzing general jurisdiction pursuant to D.C.Code § 13-334(a). Pl.'s Opp'n Br. 10.

### A. *D.C.Code § 13-422*

Any argument that this Court may exercise general personal jurisdiction over the defendant pursuant to D.C.Code § 13-422 is easily resolved. The statute provides that "[a] District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the Dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 4
Slip Copy, 2007 WL 2071644 (D.D.C.)
**(Cite as: Slip Copy)**

trict of Columbia as to any claim for relief."D.C.Code § 13-422. *Accord El-Fadl,* 75 F.3d at 671-72. A review of the plaintiff's Complaint and Memorandum of Law In Opposition to Defendant's Motion to Dismiss reveals no facts showing that the defendant is organized under the laws of the District of Columbia or maintains its principal place of business here. To the contrary, the plaintiff's Complaint and Memorandum of Law both concede that the defendant is organized under the laws of the state of Illinois and has its principal office there. Compl. ¶ 2; Pl.'s Opp'n Br. 1. Furthermore, the plaintiff makes no mention of D.C.Code § 13-422 in its brief opposing the defendant's Motion to Dismiss, stating instead that "[t]he Court's jurisdiction is predicated ... on the District of Columbia long-arm statute," which is D.C.Code § 13-423. As mentioned above, the plaintiff's only argument in favor of exercising general personal jurisdiction is premised on the assertion that the defendant "does business" in the District of Columbia, which refers to D.C.Code § 13-334(a) and not D.C.Code § 13-422. So it appears the plaintiff has abandoned any claim that the Court may exercise general personal jurisdiction over the defendant pursuant D .C.Code § 13-422.[FN5]

> FN5. Even if the plaintiff were to challenge the notion that he abandoned asserting general personal jurisdiction pursuant to D.C.Code § 13-422, the D.C. Circuit's decision in *El-Fadl* suggests that jurisdiction under that statute is inappropriate when the defendant is organized under the laws of another jurisdiction and maintains its principal place of business in that other jurisdiction. 75 F.3d at 672 n. 6 (affirming "the district court's holding that it lacked jurisdiction under § 13-422 because the record shows that Petra Bank is organized under the laws of Jordan and maintains its principal place of business there").

**B.** *D.C.Code § 13-423*

**\*4** The plaintiff next invokes two provisions of

D.C.Code § 13-423 that he asserts authorize exercising specific personal jurisdiction over the defendant in this case, namely § 13-423(a)(1), which permits personal jurisdiction over a defendant "transacting any business in the District of Columbia," and § 13-423(a)(3), which permits personal jurisdiction over a defendant "causing tortious injury in the District of Columbia by an act or omission in the District of Columbia."[FN6]D.C.Code § 13-423; Pl.'s Opp'n Br. 1, 4; Compl. ¶ 3. As the plaintiff recognizes, *see* Pl.'s Opp'n Br. 4, when personal jurisdiction is asserted under either of these two sections of the statute, the claims for relief must arise from the very acts that establish jurisdiction. D.C.Code § 13-423(b) ("When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.").

> FN6. The plaintiff inexplicably failed to identify exactly which provision(s) of D.C.Code § 13-423 relating to tort injuries he is relying on to assert personal jurisdiction. Because he claimed in his opposition brief that the "defendant's action in the District of Columbia caused harm to the plaintiff," the Court presumes that the plaintiff is asserting jurisdiction in accordance with D.C.Code § 13-423(a)(3) and will address the matter accordingly. Pl.'s Opp'n Br. 9-10 (stating that his "tort claims for negligent and intentional misrepresentation are based on the actions of Cradle Society in the District of Columbia").

To find that personal jurisdiction exists over a nonresident defendant in accordance with either of the asserted provisions of D.C.Code § 13-423"a court must engage in a two-part inquiry: A court must first examine whether jurisdiction is applicable under the ... long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process."*GTE New Media Servs..* 199 F.3d at 1347. The United States

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") has recognized that "Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements" whereas "Section (a)(4) has been construed more narrowly...."[FN7] *Id.* Moreover, "[e]ven when the literal terms of the long-arm statute have been satisfied, a plaintiff must still show that the exercise of personal jurisdiction is within the permissible bounds of the Due Process Clause." *Id.* It is established beyond peradventure that "due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)).

> FN7. Because D.C.Code § 13-423(a)(1) is coextensive with the Due Process Clause the Court's analysis merges into a "single inquiry" that asks whether the defendant established minimum contacts with the forum. *GTE New Media Servs.,* 199 F.3d at 1347.

To support his claim that the defendant "transacted business" in the District of Columbia sufficient to warrant exercising specific personal jurisdiction pursuant to D.C.Code § 13-423(a)(1) the plaintiff submitted a sworn affidavit in which he states that he met with the defendant's officers and employees in the District of Columbia on numerous occasions to discuss the contract and the parties' business relationship (Pl.'s Opp'n Br. Ex. 1 at ¶¶ 5-7, 14-17 [hereinafter "Fasolyak Aff. ¶ ----"] ),[FN8] he and one of the defendant's officers met with the defendant's attorney at the attorney's office in the District of Columbia (Fasolyak Aff. ¶ 8), he and his agents visited the Embassy of the Russian Federation and the Russian Consulate in the District of Columbia to "perform activities" and meet with embassy offi-

cials to secure accreditation, visas, or other documentation necessary for the defendant to comply with official adoption procedures or otherwise travel to the Russian Federation (Fasolyak Aff. ¶¶ 9-10, 18-22), he met Russian Federation officials in the District of Columbia to discuss the defendant's business (Fasolyak Aff. ¶¶ 11-12), and he helped arrange a United States senator's visit to the Russian Federation (Fasolyak Aff. ¶ 13). These factual allegations are consistent with those made in the plaintiff's Complaint. Compl. ¶¶ 14-26, 33, 35-36, 47, 50-51, 57, 93.

> FN8. Although the affidavit attached as Exhibit 1 to the plaintiff's opposition brief contains a case caption for the lawsuit filed in Maryland, it is the Court's understanding that this particular affidavit was filed for the first time in this case.

**\*5** The defendant elected not to counter the plaintiff's assertions of fact with its own affidavit but relied instead on the arguments raised in its legal briefs supporting the Motion to Dismiss, which generally declare that the parties' contract anticipated performance only in the Russian Federation (Def.'s Mot. to Dismiss 4; Def.'s Reply Br. 2, -3), the defendant never engaged in any activities in the District of Columbia sufficient to subject it to personal jurisdiction (Def.'s Mot. to Dismiss 4), none of the alleged injuries arose from contacts the defendant had with the District of Columbia (*id.*), the United States District Court for the District of Maryland already determined that the contract was performed in Russia and the federal court in Illinois should have jurisdiction (*id.;* Def.'s Reply Br. 2), "the defendant's duties and alleged wrongdoing were related to actions in Russia" (Def.'s Mot. to Dismiss 2, 4), and, generally, that the defendant "was not advertising or selling anything in Washington D.C." (Def.'s Reply Br. 4). The defendant further argues that the plaintiff's allegation that the parties' contract required him to process adoption applications at the Embassy of the Russian Federation "is blatantly false." Def.'s Reply Br. 2.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 6
Slip Copy, 2007 WL 2071644 (D.D.C.)
**(Cite as: Slip Copy)**

Whatever might be said about the defendant's contacts with the District of Columbia, it strikes the Court that traditional notions of fair play and substantial justice counsel against exercising specific personal jurisdiction pursuant to D.C.Code § 13-423(a)(1) under the particular circumstances presented here. "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation,' " *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204 (1977)), and considers whether the defendant purposely availed itself of the privilege of conducting activities in the forum such that it could anticipate being haled into court there, *Burger King Corp.,* 471 U.S. 462, 474-75 (1985). "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp.,* 471 U.S. at 475 (internal quotations and citations omitted).

The Court notes from the outset that, with the exception of nebulous meetings with the plaintiff that are alleged to have taken place in the District of Columbia, *see* Discussion *infra,* the only "contacts" the defendant itself had with this forum are imputed from the plaintiff's unilateral activities at the Embassy of the Russian Federation and the Russian Consulate for the purpose of securing required accreditation, providing required governmental documentation regarding Russian adoptions, and obtaining visas for travel, or the contacts relate to meetings the plaintiff alone had with Russian Federation officials. *See* Fasolyak Aff. ¶¶ 9-13, 18-22. District of Columbia law, however, precludes plaintiffs from "rely[ing] on [their] own activities, rather than those of a defendant, to establish the requisite minimal contacts for personal jurisdiction."*Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.,* 355 A.2d 808, 812 (D.C.1976) (en banc) ("The mere fact that a nonresident has retained the professional services of a District of Columbia firm, thereby setting into motion the res-

ident party's own activities within this jurisdiction, does not constitute an invocation by the nonresident of the benefits and protections of the District's laws.").*See also Helicopteros Nationales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417 (stating that the "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction").*Accord Burger King Corp.,* 471 U.S. at 475 ("Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State.").

**\*6** The plaintiff nevertheless contends that the decisions in *Helmer v. Doletskaya,* 393 F.3d 201 (D.C.Cir.2004), *Ulico Cas. Co. v. Fleet Nat'l Bank,* 257 F.Supp.2d 142 (D.D.C.2003), and *Burger King Corp., supra,* compel the conclusion that exercising personal jurisdiction is appropriate when the contract is substantially performed in the District of Columbia by either the plaintiff or the defendant. Pl.'s Opp'n Br. 5-6. These cases do not support that proposition. Each of the cited cases hinged to a great deal on the fact that they involved claims advanced by forum residents regarding contracts that had a substantial connection to the forum. The decision in *Helmer* involved a contract between a *resident* plaintiff and non-resident defendant for repayment of a credit card, which the court determined had a substantial connection to the District of Columbia "[b]ecause the contract was formed in the District of Columbia, the corpus of the contract involved credit cards issued to a District of Columbia resident and registered with a District of Columbia address, and the parties contemplated future repeated contacts with the District of Columbia as a condition of performance...."393 F.3d at 206. Similarly, in *Ulico Cas. Co .,* our colleague on this Court expressly cited the District's substantial interest in providing a convenient forum to address *its citizens'* wrongs as a basis for exercising specific personal jurisdiction over a nonresident corporation that entered into a banking contract with a resident

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

corporation. 257 F.Supp.2d at 975. The same can be said of the Supreme Court's decision in *Burger King Corp.,* which involved claims for breach of a franchise agreement between *resident* and non-resident corporate parties where the non-resident defendant had no significant presence in the forum but was found to have deliberately negotiated with the resident plaintiff for the franchise, "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts" with the plaintiff in the disputed forum, and voluntarily accepted "the long-term and exacting regulation of his business" by the resident plaintiff. 471 U.S. at 479-80. In contrast, the contract in this case, which anticipates performance in the Russian Federation,FN9 has no substantial connection to the District of Columbia and was executed by non-resident parties. Thus, the policies served by the decisions in the cited cases lose their force when, as is the case here, both parties to the dispute are nonresidents, the contract contemplates no performance in the District of Columbia, and the defendant engaged in no act directed at District citizens or acted pursuant to a contract that anticipated future consequences here. *See Helmer,* 393 F.3d at 205 (indicating that "a court must evaluate the 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' to determine whether the defendant 'purposefully established minimum contacts within the forum" (quoting *Burger King Corp.,* 471 U.S. at 479)).

> FN9. This Court is inclined to agree with our sister court in Maryland that the contract anticipates performance of its obligations primarily in the Russian Federation. *See Fasolyak,* No. 06-CV-00622-AW, slip op. at 7-8.The contract makes no mention of any work to be performed specifically at the Embassy of the Russian Federation or generally in the District of Columbia, albeit the plaintiff's duties are broadly defined to encompass the provision of "advice and coordination to The Cradle

with respect to *all* activities in the Russian Federation which are necessary to achieve the placement of children from the Russian Federation with adoptive parents residing in the United States."Compl. Ex. 1 (emphasis added). The contract expressly states, however, that the plaintiff shall support the program "within the Russian Federation," assist in identifying staff "in the Russian Federation" to perform program functions, advise the defendant about "practices and procedures required by the Government of the Russian Federation" and "with respect to all actions necessary to maintain the accreditation of The Cradle by the Russian Federation," ensure that "all actions are taken in Russia which are necessary to complete adoptions under Russian law and regulations," and ensure the program "operates in compliance with all applicable Russian laws and regulations."*Id.* Accordingly, the Court finds unpersuasive the plaintiff's assertion that "substantial performance" took place in this forum, particularly since the affidavit the plaintiff submitted in the prior litigation indicates that he performed "a significant portion" of the contract's requirement to set up, promote, manage and coordinate the defendant's Russian Program, as well as to monitor and supervise work on the defendant's adoption cases, in Maryland. Def.'s Reply Br. Ex. A ¶ 11.

**\*7** At this juncture it is worthwhile to point out that, although the defendant's business involves placing children from the Russian Federation with adoptive families in the United States, the plaintiff made no allegation that any adoptions performed by the defendant involve residents of the District of Columbia. Nor has the plaintiff alleged that the defendant solicits adoptive families or otherwise markets its services in the District of Columbia, whether by telephone calls into the District, advertising in publications that circulate in the District, or via an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

internet site used by District residents. *See, e.g., id.* at 476 (noting that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted"). Indeed, according to the plaintiff, the only contacts the defendant itself had with the District of Columbia involved meetings the defendant's officers and employees attended with the plaintiff, who is a resident of Maryland and runs a consulting business in Maryland. Fasolyak Aff. ¶ 2. *See also Keeton,* 465 U.S. at 780 (acknowledging that a plaintiff's residence "may well play an important role in determining the propriety of entertaining a suit against the defendant in the forum" but "lack of residence will not defeat jurisdiction established on the basis of defendant's contacts"). The plaintiff offered no indication that the decision to hold meetings in the District of Columbia related in any way to business the defendant conducts here, versus the location being a mere fortuitous convenience (the plaintiff resides in Potomac, Maryland, which is a suburb of the District of Columbia).FN10 The plaintiff's allegations with respect to the District of Columbia meetings are conclusory and offer only generalized time frames with no explanation about what the meetings entailed other than nondescript and self-serving statements that the discussions involved "the business" of the defendant, "performance of the Agreement," or were "to advance the purpose of the Contract."Fasolyak Aff. ¶ 5, 7, 14-15; Compl. ¶ 23; Pl.'s Opp'n Br. 9. A common sense approach dictates that the defendant could not have anticipated being haled into court in the District of Columbia when it engaged in no commerce or other activities directed at District of Columbia residents FN11 and merely attended meetings here with another nonresident. Particularly when those meetings related to business conducted in the Russian Federation pursuant to a contract that our sister court already determined was formed in Maryland, involved performance in the Russian Federation the consequences of which would be felt in Russia, FN12

and that by stipulation was governed by Illinois law.*Fasolyak,* No. 06-CV-00622-AW, slip op. at 7-12.

> FN10. The plaintiff acknowledged that meetings also were held in Maryland. Fasolyak Aff. ¶ 7.

> FN11. The D.C. Court of Appeals has stated that "[a] critical inquiry is whether [the defendant] 'has purposefully directed its activities at residents of the forum.' " *Holder v. Haarmann & Reimer Corp.,* 779 A.2d 264, 269-70 (D.C.2001) (quoting *Shoppers Food Warehouse v. Moreno,* 746 A.2d 320, 331 (D.C.2000)).

> FN12. The D.C. Court of Appeals has emphasized that "the 'transacting any business' provision embraces those contractual activities of a nonresident defendant which cause a consequence here ."*Mouzavires v. Baxter,* 434 A.2d 988, 992 (D.C.1981) (per curium). No

This Court also concurs with our sister court in Maryland with regard to the significance of the choice-of-law provision. In *Burger King Corp.,* the Supreme Court admonished the lower court for failing to give "sufficient weight" to the choice-of-law provisions in the parties' franchise agreement. The Supreme Court stated that a choice-of-law provision was not sufficient on its own to confer jurisdiction but nonetheless "reinforced" the defendant's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."471 U.S. at 481-82. It seems to this Court that the same logic also would apply inversely in this case to reinforce the Court's conclusion that the non-resident defendant did not purposely avail itself of the privilege of conducting activities in the District of Columbia such that it could anticipate being haled into court here.

**\*8** The Court also remains unconvinced that it may exercise specific personal jurisdiction over the de-

fendant pursuant to D.C.Code § 13-423(a)(3), which, as mentioned previously, permits personal jurisdiction over a defendant who causes tortious injury in the District of Columbia by an act or omission that also occurred in the District of Columbia. D.C.Code § 13-423(a)(4). As a threshold matter, the plaintiff is unable to make out a *prima facie* case that jurisdiction exists under this section of the statute because he failed to identify any tortious act or injury that occurred in the District of Columbia. At best, the plaintiff argues in his opposition brief that the defendant represented to him that if he secured re-accreditation the defendant would pay him fees for every Russian adoption the defendant processed. Pl.'s Opp'n Br. 10. But the plaintiff never asserted any facts showing that the misrepresentation was made in the District of Columbia, for example during one of the meetings he claims he had with the defendant's officers and employees. The plaintiff's citations to his Complaint are to no avail-none of the paragraphs he cited state any facts demonstrating how the misrepresentation came about, whether via a telephone call, meeting, electronic mail, or some other form of communication. Compl. ¶¶ 48-55. More to the point, the plaintiff failed to aver a single fact in his Complaint indicating where the alleged misrepresentation occurred. As a consequence, the Court has no factual basis to support the exercise of jurisdiction over defendant based on tortious acts occurring in the District of Columbia. The same observations apply to the plaintiff's assertions about tortious injury-at no time has the plaintiff asserted any fact to support his contention that he was injured in the District of Columbia by any act committed by the defendant. At their essence, the plaintiff's claims of tortious acts and injuries are revealed to be bare conclusory allegations. As a result, the plaintiff has failed to allege specific facts sufficient to meet his burden of establishing a *prima facie* case for the exercise of personal jurisdiction under this statute. *GTE New Media Servs.*, 199 F.3d at 1349 (holding that "conclusory statements and intimations" were not enough to establish personal jurisdiction).

**C. *D.C.Code § 13-334***

The plaintiff's final argument asserts that the Court may exercise general personal jurisdiction over the defendant pursuant to D.C.Code § 13-334, which has been construed by the courts to authorize general personal jurisdiction over non-resident defendants if the defendant is "doing business" in the District of Columbia, regardless of whether the actual claims arise from the defendant's contacts with the District. *See, e.g., Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C.Cir.2002). The D.C. Court of Appeals has held that the scope of jurisdiction under D.C.Code § 13-334 is coextensive with the Due Process Clause. *Id.* at 510. "For general jurisdiction, the Due Process Clause requires that the defendant have 'continuous and systematic general business contacts' with the forum." *El-Fadl*, 75 F.3d at 675. Given that this is a more rigorous standard than the "minimum contacts" necessary to establish specific personal jurisdiction, which the Court has found lacking in this case, it logically follows that the same contacts that were insufficient to support the exercise of specific jurisdiction cannot suffice to support the exercise of general jurisdiction.

*9 To recapitulate, the facts presented to the Court indicate that the defendant is involved in the business of facilitating the adoption of Russian children by parents in the United States. No facts were alleged, however, to show that the defendant provides adoption services to District of Columbia residents or markets any of its services here. The plaintiff alleged that the defendant met with him multiple times in the District of Columbia, but the plaintiff offered no specific facts to tie those meetings to business the defendant conducts here versus business conducted in Russia or elsewhere. Nor did the plaintiff show that the meeting with the defendant's counsel was in any way meaningful for the purpose of the Court's analysis. The plaintiff also omitted any facts demonstrating that those meetings were systematic and not occasional. So, with regard to the contacts the defendant itself had in the District

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of Columbia, the Court finds that they fall far short of the standard for exercising specific personal jurisdiction.

As was the case in the prior analysis, the remaining factual allegations advanced by the plaintiff involve his own acts and conduct in the District of Columbia, such as meeting with Russian Federation officials and conducting activities at the Embassy of the Russian Federation and the Russian Consulate. The Court is disinclined to agree that such acts demonstrate continuous and systematic business contacts with the District of Columbia in light of controlling precedent recognizing that general jurisdiction is inappropriate when a defendant's presence in this particular forum is necessitated by virtue of the fact that this is the only place where federal agencies, embassies, and other such instrumentalities are located. *See Fandel v. Arabian Am. Oil Co.,* 345 F.2d 87, 88-89 (D.C.Cir.1965).

In *Fandel,* the D.C. Circuit considered whether it would be appropriate to exercise general personal jurisdiction over a Delaware oil-production corporation based on the fact that it maintained an office in the District of Columbia for diplomatic and intelligence relationships with government and private agencies interested in Middle East affairs. *Id.* at 88.Distinguishing the activities performed by the corporation's District office from those of a company "whose agents in Washington are seeking contracts, either with our own Government or with other governments represented in Washington," the D.C. Circuit ultimately concluded that the corporation's presence was "of a kind we think this court has heretofore regarded as falling outside the range of Congressional contemplation of the scope of 'doing business' as that phrase is used in 13 D.C.Code § 334."*Id.* at 89.The D.C. Circuit cited a number of cases that it observed "constitute a recognition that Washington presents many business organizations with special needs for a continuous and ponderable physical presence there, which needs are not those customarily associated with strictly commercial operations; and that the purpose

of Congress was not to make that presence in every case a base for the assertion of personal jurisdiction."*Id.*

**\*10** This same reasoning applies to the defendant's alleged presence in the District of Columbia, which is premised on the plaintiff's activities at the Embassy of the Russian Federation and Russian Consulate for the purpose of complying with Russian legal requirements [FN13] that could be accomplished only at those facilities [FN14] and appear not to be for the purpose of soliciting business on behalf of the defendant. Fasolyak Aff. ¶¶ 9-12, 18-22. Thus, this Court is disposed to agree with our colleague that "it would not comport with due process for this Court to exercise general jurisdiction over [the defendant] because of its contacts with foreign embassies, as the District of Columbia is the only district in the country where these embassies are located."[FN15]*AGS Int'l Servs. S.A. v. Newmont USA Ltd.,* 346 F.Supp.2d 64, 76 (D.D.C.2004) (J. Walton). In a similar vein, the plaintiff's contacts with a United States senator are subject to the "government contacts" exception to the exercise of personal jurisdiction, which provides that contacts with federal agencies and instrumentalities located in the District of Columbia "will not give rise to personal jurisdiction."*United States v. Ferrara,* 54 F.3d 825, 831 (D.C.Cir.1995).

> FN13. The plaintiff stated that he "had to make visits to and perform activities at the Embassy of the Russian Federation in Washington, D.C. and to meet with officials of the Russian government" to assist the defendant to obtain the accreditation required to conduct adoptions in Russia. Fasolyak Aff. ¶ 9. The plaintiff also stated that a Russian visa was required for adoptive parents and the defendant's employees to travel to the Russian Federation so he "made frequent trips to the Russian Consulate to meet-in Washington, D.C.-with Russian consular officers and process the required documents."*Id.* at ¶ 18-20.In addi-

tion, the plaintiff further stated that each Russian child must be registered at the Russian Consulate as a matter of Russian law, so he and his agents "traveled to and from Washington, D.C. to obtain and submit the required documents, to meet with Russian consular officers, and to perform the required registrations."*Id* . ¶ 21.

FN14. This reasoning also likely applies to the plaintiff's meetings with Russian government officials, which the Court assumes from context probably were treated as something akin to lobbying efforts. Because the plaintiff's allegations regarding those meetings were conclusory and failed to provide specific facts identifying their purpose, they are untenable to demonstrate continuous or systematic business contacts consistent with Due Process.

FN15. The plaintiff stated in his affidavit that the Russian Consulate with territorial jurisdiction over Illinois is located in the District of Columbia, so the same reasoning applies to the defendant's activities at that institution as well. Fasolyak Aff. ¶ 18.

## II. The Plaintiff's Motion For Jurisdictional Discovery

The plaintiff requested leave to take jurisdictional discovery in the event the Court "considers the allegations and evidence submitted insufficient."Pl.'s Opp'n Br. 11. It is the rule in this circuit that "if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified."*GTE New Media Servs.,* 199 F.3d at 1351. A plaintiff must, however, "have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant."*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1090 (D.C.Cir.1998). Thus, it is not error to deny jurisdictional discovery when the record indicates there is nothing to be gained from the ef-

fort. *See Goodman Holdings v. Rafidain Bank,* 26 F.3d 1143, 1147 (D.C.Cir.1994) ("[W]we do not see what facts additional discovery could produce that would affect our jurisdictional analysis above and therefore conclude the district court did not abuse its discretion in dismissing the action when it did.").*Accord Natural Res. Def. Council v. Pena,* 147 F.3d 1012, (D.C.Cir.1998) (agreeing that jurisdictional discovery should be permitted "if allegations indicate its likely utility").

Unlike the cases in this circuit where plaintiffs made specific and nonspeculative allegations demonstrating that jurisdictional discovery might in fact lead to evidence supporting the exercise of personal jurisdiction, *see, e.g., Edmond,* 949 F.2d at 425-26, the plaintiff in this case offered nothing to support his request. He simply tacked on a one-sentence motion for discovery at the conclusion of his opposition brief without any explication about what he thought discovery might disclose with regard to likely contacts the defendant had with the District of Columbia or what information he thought might be gained from jurisdictional discovery that could possibly assist the Court in its analysis. The Court is loathe to subject a defendant to the costs and burdens of discovery, no matter how narrowly tailored, based on a plaintiff's naked assertion of entitlement. This is particularly so when, as is the case here, the jurisdictional facts already asserted have been conclusory and premised in large part on the plaintiff's unilateral acts rather than the defendant's purposeful contacts. Because the plaintiff made no showing whatsoever that jurisdictional discovery is warranted, the Court will deny the motion.

## III. The Pending Discovery Motions

**\*11** The Court's determination that it lacks personal jurisdiction over the defendant obviates the need for any ruling on the merits of the pending discovery motions.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IV. Whether Transfer Pursuant To 28 U.S.C. § 1631 Is In The Interests Of Justice**

28 U.S.C. § 1631 authorizes intercourt transfer when an originating court finds that it lacks jurisdiction and the interests of justice warrant such a result. 28 U.S.C. § 1631. "There are three elements to a section 1631 transfer: (1) there must be a lack of jurisdiction in the district court; (2) the transfer must be in the interest of justice; and (3) the transfer can be made only to a court in which the action could have been brought at the time it was filed or noticed."*Ukiah Adventist Hosp. v. FTC,* 981 F.2d 543, 549 (D.C.Cir.1992) (internal citations omitted). This Court has determined that it lacks personal jurisdiction over the defendant and, without expressing any opinion about the merits of the plaintiff's claims, the Court finds that the interests of justice warrant transfer so the plaintiff may proceed with his claims in an appropriate forum where he may be heard. The diversity of the parties and the defendant's status as a corporation organized under the laws of the State of Illinois, with its principal place of business there, suggest that the United States District Court for the Northern District of Illinois properly may exercise personal jurisdiction over the defendant, and could have done so at the time the plaintiff originally filed his claims. In addition, the contract between the parties stipulates that Illinois law shall govern the agreement. Compl. Ex. 1. The Court therefore finds that the interests of justice warrant transferring this case to the United States District Court for the Northern District of Illinois in accordance with 28 U.S.C. § 1631.

**CONCLUSION**

For the foregoing reasons, the Court concludes that it lacks personal jurisdiction over the defendant but that transfer to the United States District Court for the Northern District of Illinois is in the interests of justice. Accordingly, this case will be transferred to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1631.

All other arguments not expressly considered are deemed to be without merit. An appropriate order consistent with this Memorandum Opinion will follow.

D.D.C.,2007.
Fasolyak v. The Cradle Society, Inc.
Slip Copy, 2007 WL 2071644 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2008 WL 341664 (E.D.Mo.)
**(Cite as: Slip Copy, 2008 WL 341664)**

Osborn & Barr Communications, Inc. v. EMC
Corp., Inc.
E.D.Mo.,2008.
Only the Westlaw citation is currently available.
United States District Court,E.D. Missouri,Eastern
Division.
OSBORN & BARR COMMUNICATIONS, INC.,
Plaintiff,
v.
EMC CORPORATION, INC., et al., Defendants.
**No. 4:08-CV-87 CAS.**

Feb. 5, 2008.

John F. Cowling, Armstrong Teasdale, LLP, St.
Louis, MO, for Plaintiff.

### MEMORANDUM AND ORDER

CHARLES A. SHAW, District Judge.
**\*1** This matter is before the Court on plaintiff Os-
born & Barr Communications, Inc.'s Motion to Ex-
tend Deadline to File Amended Complaint and for
Leave to Serve Jurisdictional Discovery. For the
following reasons, the motion will be denied in all
respects and this matter dismissed for lack of sub-
ject matter jurisdiction.

### Background.

In the Memorandum and Order dated January 23,
2008 (Doc. 3), the Court noted the existence of is-
sues concerning jurisdiction in this diversity case.
The Court stated that although defendant Forefront
Technologies is alleged to be a limited liability
company, the complaint did not allege the members
of Forefront Technologies or the citizenship of
those members. For limited liability companies, the
Court must examine the citizenship of each member
of the limited liability company for purposes of di-
versity jurisdiction. *GMAC Commercial Credit,
LLC v. Dillard Dep't Stores, Inc.,* 357 F.3d 827,
829 (8th Cir.2004) ("*GMAC* ").

Because of this omission, the complaint does not
adequately establish the existence of diversity juris-
diction. *See*Rule 8(a), Federal Rules of Civil Pro-
cedure ("A pleading which sets forth a claim for re-
lief shall contain (1) a short and plain statement of
the grounds upon which the court's jurisdiction de-
pends"); *see also Sanders v. Clemco Indus.,* 823
F.2d 214, 216 (8th Cir.1987) (discussing pleading
requirements to establish diversity jurisdiction).
The Court could not determine whether diversity
jurisdiction existed and ordered plaintiff to file an
amended complaint with appropriate jurisdictional
allegations by January 30, 2008. The Memorandum
and Order stated that "in the event plaintiff does not
timely comply with this Order, this case will be dis-
missed without prejudice for lack of subject matter
jurisdiction."

Plaintiff responds that it has attempted to determine
the identity and citizenship of defendant Forefront
Technologies' members, but is currently unable to
do so. Plaintiff asks for additional time to file an
amended complaint and for an order granting ex-
pedited jurisdictional discovery. Plaintiff cites the
*GMAC* case for the proposition that jurisdictional
discovery is appropriate under these circumstances.

Discussion.

The decision whether to grant jurisdictional discov-
ery in a case is left to the trial court's sound discre-
tion. *Lakin v. Prudential Securities, Inc.,* 348 F.3d
704, 713 (8th Cir.2003).Rule 8(a) of the Federal
Rules of Civil Procedure requires a plaintiff to in-
clude appropriate jurisdictional allegations in a
complaint. Diversity jurisdiction requires that the
parties be "citizens of different states." 28 U.S.C. §
1332(a)(1). Plaintiff failed to establish a threshold
prima facie allegation of diversity jurisdiction in
this case because it did not allege the citizenship of
each member of the defendant limited liability com-
pany. *See GMAC,* 357 F.3d at 829.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2008 WL 341664 (E.D.Mo.)
**(Cite as: Slip Copy, 2008 WL 341664)**

Numerous cases hold that district courts have the discretion to deny jurisdictional discovery when a plaintiff has failed to make a prima facie case of jurisdiction. *See, e.g., Negron-Torres v. Verizon Communications, Inc.,* 478 F.3d 19, 27 (1st Cir.2007); *Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 946 (7th Cir.2000) ("At a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted."); *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181 (2d Cir.1998) (district court did not abuse its discretion in denying jurisdictional discovery where plaintiff did not establish a prima facie case of diversity jurisdiction); *Caribbean Broad. Sys. Ltd. v. Cable & Wireless P.L.C.,* 148 F.3d 1080, 1089-90 (D.C.Cir.1998) (affirming district court's denial of discovery when plaintiffs did not present sufficient evidence of jurisdiction); *Arch v. American Tobacco Co., Inc.,* 984 F.Supp. 830, 841 (E.D.Pa.1997) (refusing to permit jurisdictional discovery in diversity action where plaintiff failed to meet its burden of making out a threshold prima facie case of personal jurisdiction); *Milligan Elec. Co. v. Hudson Construction Co.,* 886 F.Supp. 845, 850 (N.D.Fla.1995) (refusing to allow jurisdictional discovery where plaintiff failed to allege a basis for jurisdiction over one of two defendants in a diversity case).

**\*2** In this case, plaintiff implicitly admits that it has no known basis for alleging jurisdiction over Forefront Technologies, but asks for discovery in order to uncover some evidence supporting diversity jurisdiction. The discovery process established by the Federal Rules is not intended to establish jurisdiction. "It is the obligation of the plaintiff to undertake at least enough minimal investigation prior to filing a complaint as to permit it to allege a basis for jurisdiction in the complaint. It would be an abuse of the discovery process to allow discovery when the plaintiff fails to meet the minimal jurisdictional requirements." *Milligan Elec. Co .,* 886 F.Supp. at 850.

Plaintiff relies on the Eighth Circuit's remand for jurisdictional discovery in *GMAC* to support its own request, but *GMAC* is distinguishable from this situation and does not compel a different result. In *GMAC,* the defendant did not raise an objection to the issue of subject matter jurisdiction until an appeal following the entry of final judgment by the district court. *GMAC,* 357 F.3d at 828. On appeal, the Eighth Circuit held as a matter of first impression that the citizenship of an LLC for purposes of diversity jurisdiction is that of its members. *Id.* at 829.The appellate court was unable to determine the citizenship of GMAC's members on the record before it, and as a result remanded for the district court to making factual findings concerning GMAC's citizenship. *Id.* The Eighth Circuit was not asked to address and did not determine whether a plaintiff who failed to plead minimal jurisdictional facts could obtain jurisdictional discovery in order to learn those facts. Further, some courts have held that despite the presumption against federal jurisdiction, where an action has resulted in a final judgment in the district court despite an unnoticed potential jurisdictional defect, interests of justice, fairness and judicial economy require some additional opportunity to attempt to cure the pleading defects. *See Penteco Corp. Ltd. P'ship-1985A v. Union Gas Sys.,* 929 F.2d 1519, 1523 (10th Cir.1991). Such considerations are inapplicable here.

"A plaintiff who seeks to invoke diversity jurisdiction of the federal courts must plead citizenship distinctly and affirmatively." 15 James Wm. Moore, et al., *Moore's Federal Practice,* § 102.31 (3d ed.2007). Plaintiff's complaint fails to plead complete diversity of citizenship, and for the reasons above stated, the Court in the exercise of its discretion declines to permit plaintiff to conduct jurisdictional discovery.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's Motion to Extend Deadline to File Amended Complaint and for Leave to Serve Jurisdictional Discovery is **DENIED.** [Doc. 4]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 341664 (E.D.Mo.)
**(Cite as: Slip Copy, 2008 WL 341664)**

**IT IS FURTHER ORDERED** that this case is dismissed without prejudice for lack of subject matter jurisdiction.

An appropriate order of dismissal will accompany this memorandum and order.

E.D.Mo.,2008.
Osborn & Barr Communications, Inc. v. EMC Corp., Inc.
Slip Copy, 2008 WL 341664 (E.D.Mo.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.